No. 1:09-cv-271

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

_____

CLIFTON LAMAR WILLIAMS,

*Petitioner,*

v.

RICK THALER,
      Director, Texas Department of Criminal Justice,
      Institutional Division,

*Respondent.*

_____

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the
114th District Court of Smith County, Texas

_____

## FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
_____

**JAMES W. VOLBERDING**    **ZACK HAWTHORN**
SBN: 00786313           SBN: 24014603

Plaza Tower               Hawthorn & Hawthorn, P.C.
110 North College Avenue    485 Milam
Suite 1850              Beaumont, Texas 77701
Tyler, Texas 75702

(903) 597-6622 (Office)     (409) 838-3969 (Office)
(903) 597-5522 (fax)       (409) 832-5611 (fax)
*e-mail: volberding@attglobal.net*  *e-mail: zackhawthorn@yahoo.com*

Court-Appointed Attorneys for the Petitioner

No. 1:09-cv-271

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

_____

CLIFTON LAMAR WILLIAMS,

*Petitioner,*

v.

RICK THALER,
        Director, Texas Department of Criminal Justice,
        Institutional Division,

*Respondent.*

_____

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the
114th District Court of Smith County, Texas

_____

## FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
_____

TO THE HONORABLE U.S. DISTRICT COURT:

NOW COMES, CLIFTON LAMAR WILLIAMS, the Petitioner, and respectfully submits his First Amended Petition for Writ of Habeas Corpus, asking the Court to issue a writ ordering his release from the Institutional Division of the Texas Department of Criminal Justice. The purpose of this amended petition is to delete claim number 10, asserting mental illness as an *Atkins* exemption, in accordance with the Court's order denying leave to present claim number 10.

This application follows his conviction and death sentence in the 114th District Court of Smith County, Texas, cause number 114-1505-06, styled *State of Texas v. Clifton Lamar Williams.*

## <u>CERTIFICATE OF INTERESTED PARTIES</u>

The undersigned counsel of record for Petitioner, CLIFTON LAMAR WILLIAMS, certifies

that the following listed persons have an interest in the outcome of this case.  These representations

are made in order that this court may evaluate possible disqualifications or recusal.

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| *Petitioner* | | |
| Mr. Clifton Williams<br>Inmate No. 00999515 | Texas Department of Corrections, Institutional Division<br>Polunsky Unit, Death Row<br>3872 FM 350 South<br>Livingston, Texas 77351 | Petitioner |
| Mr. James W. Volberding | 110 North College Avenue<br>Suite 1850, Plaza Tower<br>Tyler, Texas 75702<br>(903) 597-6622 | Appointed attorney for current federal habeas |
| Mr. Zack Hawthorn | 485 Milam<br>Beaumont, Texas 77701<br>(409) 838-3969 | Appointed attorney for current federal habeas |
| Mr. Jeff L. Haas | 908 First Place<br>Tyler, Texas 75702<br>(903) 593-8338 | Appointed attorney for Williams for state writ of habeas corpus and appeal therefrom |
| Mr. Stephen Evans | 513 North Church<br>Palestine, Texas 75802<br>(903) 723-3334 | Appointed attorney for Williams on direct appeal to the Texas Court of Criminal Appeals |
| Ms. Tonda Curry | 423 South Spring<br>Tyler, Texas 75702<br>(903) 526-5115 | Of counsel attorney for Williams on direct appeal to the Texas Court of Criminal Appeals |

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| Mr. Melvin Thompson | 2100 North Emerson Avenue<br>Tyler, Texas 75702<br>(903) 595-7856 | Represented Williams at trial |
| Ms. La Juanda T. Lacy | 2419 Cecil Avenue<br>Tyler, Texas 75701<br>(903) 592-8335 | Represented Williams at trial |
| *Respondent* | | |
| The Hon. Mr. Greg Abbott | 300 West 15th Street<br>Austin, Texas 78701 | Texas Attorney General |
| Ms. Carole S. Callaghan<br>Asst. Texas Attorney General | P.O. Box 12548<br>Capitol Station<br>Austin, TX 78711-2548<br>(512) 463-7463 | Asst. Attorney General and lead attorney representing Respondent on federal writ of habeas corpus |
| Mr. Edward Larry Marshall<br>Asst. Texas Attorney General | P.O. Box 12548<br>Austin, Texas 78711-2548<br>(512) 936-1400 | Asst. Attorney General representing Respondent on federal writ of habeas corpus |
| Smith County District Attorney's Office | 100 North Broadway<br>Tyler, Texas 75702<br>(903) 590-1720 | Prosecuted trial of Williams |
| Mr. Matt Bingham | 100 North Broadway<br>Tyler, Texas 75702<br>(903) 590-1720 | Current Smith County District Attorney, trial counsel for State of Texas |
| Mr. Michael West | 100 North Broadway<br>Tyler, Texas 75702<br>(903) 590-1720 | Assistant Smith County District Attorney, appellate section |
| Ms. April Sikes | 100 North Broadway<br>Tyler, Texas 75702<br>(903) 590-1720 | Assistant Smith County District Attorney, trial counsel for State of Texas |
| *Judges* | | |

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| Hon. Cynthia Stevens Kent, Retired | 114th District Court Tyler, Texas | District judge for the 114th District Court in Tyler, Texas who presided over the trial and habeas hearing. |
| Hon. Christi Kennedy | 114th District Court Tyler, Texas | Current district judge for the 114th District Court in Tyler, Texas |
| | | |

<u>**TABLE OF CONTENTS**</u>

CERTIFICATE OF INTERESTED PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

DESIGNATION OF ABBREVIATIONS and
      EXPLANATION OF THE TRIAL RECORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

WILLIAMS HAS MET ALL PROCEDURAL REQUIREMENTS . . . . . . . . . . . . . . . . . . . . 9

      ALL CLAIMS HAVE BEEN EXHAUSTED BUT CLAIM 10 . . . . . . . . . . . . . . . . . . . 9

      NO CLAIMS HAVE BEEN PROCEDURALLY
            DEFAULTED BUT CLAIM 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

RELIEF UNDER THE ANTITERRORISM AND
      EFFECTIVE DEATH PENALTY ACT; 28 U.S.C. §2254 . . . . . . . . . . . . . . . . . . . . . . . 12

GROUNDS FOR HABEAS RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      Claim Number 1: Williams' counsel provided ineffective assistance of counsel when he
            issued a notice of intent to raise the insanity defense. . . . . . . . . . . . . . . . . . . . . . . 15

      Claim Number 2: Williams' received ineffective assistance of counsel when his trial counsel
            "opened the door" to allow the State's experts unrestricted access to Williams and
            providing them with a basis for testifying that he constituted a future danger to
            society and was not mentally retarded. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      Claim Number 3: Williams' trial counsel rendered ineffective assistance of counsel when he
            failed to  object to the State's experts' testimony that Williams constituted a future
            danger to society. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

            A.      The Forensic Psychology Profession Has Developed Standards of Conduct
                    and Scientific Methodology for Conducting Risk Assessments of a Capital
                    Defendant's Propensity for Future Serious Violence. . . . . . . . . . . . . . . . 27

B.      State Hired Forensic Psychologists Frequently Fail to Consider Recognized Influences on Future Dangerousness.  . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        1.      First Error of State Forensic Psychologists: Failing to Consider the Context of Prison When Assessing Future Risk of Violence. . . . 30

        2.      Second Error of State Forensic Psychologists: Failing to Consider the Base Rate Data of Actual Violence in Prison. . . . . . . . . . . . . . . 31

C.      Current Forensic Psychology Standards Has Created a Methodology for Assessing Future Danger.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        1.      Methodology Step One: Assessing the Defendant's Past Behavior in Similar Context. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        2.      Methodology Step Two: Applying the Relevant Base Rates.  . . . 34

        3.      Methodology Step Three: Adjusting The Final Risk Estimate For Risk Management or Violence Prevention/Reduction Procedures That Could Be Applied.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Claim Number 4: Williams' trial counsel rendered ineffective assistance of counsel when he mistakenly believed one of his experts was not qualified to render an opinion that Williams was mentally retarded.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Claim Number 5:  Williams' trial counsel rendered ineffective assistance of counsel when he failed  to produce evidence of Williams' failed attempt to obtain his GED from the Literacy Council when that evidence was available to the defense and highly probative to the issue of mental retardation and constituted mitigating evidence.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Claim Number 6:  Williams' trial counsel rendered ineffective assistance of counsel when he failed  to object to the admissibility of State's witness, Steve Rogers. . . . . . . 44

Claim Number 7:  Williams' trial counsel rendered ineffective assistance of counsel when he failed  to properly investigate Williams' work duties in connection with his previous employment.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Claim Number 8:  Williams' trial counsel rendered ineffective assistance of counsel when he allowed Williams to be questioned by the trial court as to his possession of a razor while in jail. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Claim Number 9: Williams is Mentally Retarded.  As Held by The U.S. Supreme Court in
    *Atkins v. Virginia*, Execution of an Individual Who is Mentally Retarded Violates the
    Eighth Amendment Guarantee Against Cruel and Unusual Punishment of the U.S.
    Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    A.        Decisions Below  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

The state courts' determination that Williams is not mentally retarded is
    unreasonable in light of the evidence presented in the state court and the
    result is contrary to and an unreasonable application of *Atkins*.  . . . . . . . 56

    B.        Standards of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    C.        Basic Information about Mental Retardation . . . . . . . . . . . . . . . . . . . . . 57

    D.        The Elements of a Claim under *Atkins*  . . . . . . . . . . . . . . . . . . . . . . . . 58

    E.        Texas Adopted the AAMR Definition Of Mental Retardation. . . . . . . . . 60

    F.        The Court of Criminal Appeals' Improvisation of Seven Factors to Guide the
              Mental Retardation Determination Has No Basis in the Science of Mental
              Retardation, and the Factors Are in Most Respects Contrary to the Science of
              Mental Retardation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

              1.        "Did those who knew the person best during the developmental stage
                        – his family, friends, teachers, employers, authorities – think he was
                        mentally retarded at that time, and, if so, act in accordance with that
                        determination?" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

              2.        "Has the person formulated plans and carried them through or is his
                        conduct impulsive?"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

              3.        "Does his conduct show leadership or does it show that he is led
                        around by others?" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

              4.        "Is his conduct in response to external stimuli rational and
                        appropriate, regardless of whether it is socially acceptable?" . . . 73

              5.        "Does he respond coherently, rationally, and on point to oral or
                        written questions or do his responses wander from subject to
                        subject?" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

6.    "Can the person hide facts or lie effectively in his own or others' interests?" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

7.    "Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?" . . . 80

G.    Williams Meets The AAMR And APA Definitions Of Mental Retardation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

1.    There is proof that Williams' IQ is below 70. . . . . . . . . . . . . . . 83

2.    There is proof that he possesses adaptive deficits in two categories. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

3.    There is proof that his disability began before age 18. . . . . . . . . 85

H.    The jury instructions were incomprehensible and inadequate to provide a framework for deciding whether Williams was mentally retarded. . . . . . 85

I.    Fifth Circuit Standards for *Atkins* Claims . . . . . . . . . . . . . . . . . . . . . . . . . 87

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

RELIEF REQUESTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

**DESIGNATION OF ABBREVIATIONS and**
**EXPLANATION OF THE TRIAL RECORD**

The 2006 trial record consists of sixty-eight volumes of transcript and exhibits. References to the trial record statement of facts are abbreviated as "RR." The number that precedes "RR" is the volume number. The number that follows "RR" is the page number. The state court clerk's record is referred to as "CR." The reporter's record from the hearing on Williams' state writ of habeas corpus is abbreviated as "SW" with the date of the hearing and the page number following "SW."

**STATEMENT OF JURISDICTION**

This petition is submitted pursuant to 28 U.S.C. § 2254 et. seq., and amendments five (due process clause), six (right to counsel clause), and fourteen (due process and equal protection clauses), of the United States Constitution, and section nine, clause two of the United States Constitution (habeas corpus).

**PROCEDURAL HISTORY**

*A.      Procedural History in State Court.*

On June 26, 2006, Clifton Lamar Williams was indicted for the offense of Capital Murder. The indictment alleged that on or about July 9, 2005, Williams intentionally caused the death of Cecelia Schneider, 94, by either stabbing her with a sharp object, strangling her or inflicting blunt force injuries while he was in the course of committing several different felonies, namely burglary of a habitation, robbery, arson, obstruction or retaliation.

On October 2, 2006, a jury found Williams guilty of the offense of Capital Murder. 49 RR 147-48. On October 13, 2006, Williams was sentenced to death.

Following automatic direct appeal, on November 26, 2008, the Texas Court of Criminal Appeals ("CCA") affirmed the trial court judgment. *See Williams v. State*, 270 S.W.3d 112 (Tex. Crim. App. 2008). Williams did not appeal that decision to the United States Supreme Court. For AEDPA purposes, however, the deadline for doing so was ninety (90) days following affirmation, February, 26, 2009.

On June 9, 2008, while his direct appeal was pending before the Texas Court of Criminal Appeals, Williams filed an Application for Writ of Habeas Corpus pursuant to Tex. Code Crim. Proc. Art. 11.071. The state trial court conducted an evidentiary hearing November 24 and December 4, 2008, and issued a report and findings recommending denial of habeas relief.

On March 18, 2009, in a two-page unpublished decision, the Texas Court of Criminal Appeals approved the trial court's findings and denied habeas relief with little comment. *Ex parte Williams*, WR-71,296-01, 2009 WL 695550 (Tex. Crim. App. 2009).

Consequently, Williams has exhausted his state remedies. The one-year AEDPA deadline is March 18, 2010, one year following the CCA's denial of habeas relief.

### B.      *Procedural History in Federal Court.*

In April of 2009, this Court appointed undersigned counsel to represent Williams on his federal application for writ of habeas corpus. Clerk's Doc. No. 2. On May 21, 2009, this Court issued a stay of Williams' execution date pending further order by the Court. Clerk's Doc. No. 8. This Court also ordered Williams to file his federal petition for writ of habeas corpus on or before January 1, 2010. Clerk's Doc. No. 8. Williams filed this petition December 31, 2009.

## STATEMENT OF FACTS

On October 2, 2006, after several weeks of evidence during the guilt/innocence phase of Williams' trial, the jury returned a guilty verdict for the offense of capital murder which was committed during the course of committing or attempting to commit several felonies including burglary, robbery and arson. *Williams v. State*, 270 S.W.3d 112 (Tex. Crim. App. 2008).

On October 3, 2006, the punishment phase of the trial commenced. During that proceeding, Dr. Herbert Davis, a psychiatrist with the Andrews Center Community Mental Health Center testified he had diagnosed Williams with paranoid schizophrenia in 2004, just one year prior to the alleged offense date. 52 RR 12. Dr. Davis subsequently enrolled Williams into the "ACT Team" which he described as a "mental health SWAT team" that consists of a group of two nurses and three therapists that supervise their patients on an outpatient basis in the community. 52 RR 14. While Williams was supervised by the ACT Team, his doctors, caseworkers and father noted a significant improvement in his mental health condition. 52 RR 18, 125, 130; 53 RR 140. But due to certain State regulations, the ACT Team had to "back off" and Williams then only sporadically made his appointments with the doctor. 52 RR 19. Dr. Davis' last appointment with Williams occurred just several months before the date of the offense. 52 RR 20. During that visit, he described Williams as "better than when I first saw him," but not as good as he had been previously when he was more compliant with his medications during the ACT Team supervision. 52 RR 23. Overall, Williams' doctor and two of his caseworkers, Judy Smith and Beverly Jackson, described him as "passive," "a nice young man," "respectful," and non-threatening. 52 RR 21, 158, 203, 206-207.

Jason Swindell, Williams' older brother, recounted episodes during their childhood in which their mother, Ethel Swindell, rubbed red pepper, salt and olive oil on the children as part of her

practice of some type of voodoo religion. 52 RR 235-236, 252. Ms. Swindell did not allow Williams or his siblings to drink water out of the faucet, causing them to resort to drinking it from the fire hydrant. 52 RR 237. When Jason Swindell was thirteen or fourteen years old, he assumed the responsibility of cooking and feeding Williams and his younger sister because their mother was unable to do so. 52 RR 238. Several years later, when Williams was approximately twelve years old, their mother died from bone cancer. 52 RR 246; 53 RR 222. Williams was then forced to move in with his father when, according to Swindell, "he flew over the cliff." 52 RR 246, 253. Swindell recounted episodes after her death where he would talk to his younger brother but Williams acted as if nothing had ever been said to him. 52 RR 524.

Willie Williams, Clifton's father, testified that his mother started to exhibit strange behavior when she was pregnant with her son. 53 RR 107. She began to cut holes in the walls in the house and fill them with whole onions, talk to herself, and throw salt on mattresses and people. 53 RR 107-108. Willie Williams also stated that Clifton Williams' mother would "catch" rainwater off the ceiling and place it into the refrigerator for the children to drink and over time he noticed the children to become malnourished. 53 RR 113-114, 117.

Helena Hawkins, Williams' aunt, saw Williams' mother crawl around on the floor on her hands and knees like an animal and had poured bleach over their furniture and carpet. 53 RR 206-207. Ms. Hawkins testified that Williams took his mother's death "real hard" and started laughing and talking to himself and hearing voices after her passing. 53 RR 216-217, 240. Reports from Child Protective Services indicated his mother bathed Williams in ammonia or bleach when he was six years old and badly burned his body. 55 RR 63.

During Williams' trial, a jailer observed, "He's not coherent with what you're asking him. He would curse at you. He just wouldn't do what you would ask him to do." 50 RR 12. She had no idea what provoked him to call her names without reason. 50 RR 13. He threatened to kill himself. RR50:17, 19, 33. His cell was completely disorganized. 50 RR 21.

Tynus McNeal, testifying for the State that Williams was a future danger to society, concluded that Williams was not living with family much of the time, 51 RR 192, 194, 202-03, frequently homeless, 51 RR 192, 194, 195-96, 202-03, and possessed few friends, 51 RR 192-93, 194, 202-03. He saw no evidence of personality disorder or sociopathic personality, 51 RR 193, or evidence of gang involvement, 51 RR 193. Williams, however, had some sort of mental illness which began in early adolescence or mid adolescence, RR51:195, and probably had a lower than average IQ. 51 RR 195 (Report is at DX 4).

Dr. Edward Gripon, M.D., a psychiatrist testifying for the State, read reports that Williams was periodically homeless. 51 RR 263. Williams repeated the first grade, but did average work in first, second and third grade. 51 RR 296, 299. Williams was not in special education, but regular classes, 51 RR 296, and was designated and tracked as a section 504 student who had special needs. 51:300. Williams made As and Bs in classes, 51 RR 296, but then there was a sharp decline in high school when his mother died, 51 RR 296-97. Dr. Gripon was asked and confirmed that people with paranoid schizophrenia have a greater propensity for violent behavior, and are therefore more likely to be a future danger, 51 RR 282, although not everyone with paranoid schizophrenia is violent, 51 RR 294.

Dr. Herbert Davis, M.D., the Tyler Andrews Center psychiatrist who interviewed and supervised Williams in 2004 and 2005 before the murder, diagnosed Williams as an obvious

paranoid schizophrenic. 52 RR 12. He prescribed Abilify, a modern anti-psychotic medication, 52 RR 15, and with the medication and training by his staff, Williams showed some signs of improvement within 6 - 9 months, 52 RR 16, although Williams did not take his medication regularly. 52 RR 17. At a certain point, however, state regulations terminated the medical support. 52 RR 18. Williams reported hearing voices since childhood, age 11, during his 2004 interview, known as auditory hallucinations. 52 RR 32-33, 43-44. Williams also had made suicidal statements in past and was admitted to ETMC Behavioral Health Center in Tyler (a psychiatric unit) sometime before 2004. 52 RR 36. Dr. Davis thought it unlikely that paranoid schizophrenia played a role in the murder, 52 RR 47-49, but had not consulted for that purpose. However, Williams' paranoid schizophrenia was more likely genuine and not drug induced substance disorder. 52 RR 94-95.

Dr. Robert McClure, a licensed psychologist and professor of psychology at the University of Texas at Tyler, reported that Williams tested at a composite 63 I.Q. before he was eighteen years old and read at a fourth grade level. 55 RR 196, 201. Dr. McClure also diagnosed Williams as mentally retarded and schizophrenic. 55 RR 200. Throughout his adult life, he had difficulty maintaining employment at fast food establishments and was intermittently homeless. 55 RR 197.

Dr. Thomas Allen, a forensic psychologist retained by the defense, administered the Wechsler Adult Intelligence Scale (WAIS) test to Williams and found full scale I.Q. to be 65 which falls within the mild range of mental retardation. 56 RR 49, 51. Dr. Allen also found significant adaptive functioning deficits in academics, communication, daily living skills and socialization with an onset prior to him reaching the age of 18. 56 RR 96-97, 108.

Dr. James Patton, another expert retained by the defense, testified that Williams had adaptive deficits in functional academics, community use and home living. 56 RR 242, 273.

Dr. Timothy Proctor, an expert retained by the State, examined Williams and found his I.Q. on one intelligence test to be 71. 59 RR 44. Technically, that score did not qualify Williams as mentally retarded because the AAMR definition of mental retardation is an I.Q. of 70 or below, but that test does include measurement errors of plus or minus five points, meaning his true I.Q. could fall somewhere under 70. 59 RR 44. Dr. Proctor administered yet another I.Q. test and found his score to be a 70. 59 RR 51. This particular test also included a margin of error, putting his possible "true" I.Q. between a 61 and 79. 59 RR 53.

In punishment, the state trial court instructed jurors to answer four special issues:

### Special Issue No. 1

Is there a probability that the defendant, Clifton Williams, would commit criminal acts of violence that would constitute a continuing threat to society?

Answer to Special Issue Number 1:

We, the jury unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue No. 1 is "Yes."

*/s/ Jamie Leach*
_____
Foreman

### Special Issue No. 2

Did the defendant, Clifton Williams, actually cause the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken?

Answer to Special Issue Number 2:

We, the jury unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue No. 2 is "Yes."

*/s/ Jamie Leach*
_____

Foreman

## **Special Issue No. 3**

Is the defendant, Clifton Williams, a person with mental retardation?

Answer to Special Issue Number 3:

We, the jury unanimously find and determine that the answer to this Special Issue No. 3 is "No."

*/s/ Jamie Leach*

_____

Foreman

## **Special Issue No. 4**

Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, the mental impairment of the defendant that might not amount to mental retardation, if any, and the personal moral culpability of the defendant, is there sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

Answer to Special Issue Number 2:

We, the jury unanimously find and determine that the answer to this Special Issue No. 4 is "No."

*/s/ Jamie Leach*

_____

Foreman

*See* Jury Instructions in Williams trial 19-22 (filed Oct. 13, 2006).

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held the execution of mentally retarded individuals violates the Eighth Amendment of the United States Constitution. In Texas, the person advancing an *Atkins* claim has the burden to prove by a preponderance of the evidence that

he is mentally retarded. *Gallo v. State*, 239 S.W.3d 757, 769-70 (Tex. Crim. App.2007), *cert. denied*, ___ U.S.____, 128 S.Ct. 2872 (2008).

Here, the state trial court instructed the jury by way of special issue number three whether Williams was a person with mental retardation. *Williams v. State*, 270 S.W.3d 112, 133 (Tex. Crim. App. 2008). The jury was further instructed that if at least ten jurors determined that if Williams proved by a preponderance of the evidence that he was mentally retarded, then the jury should provide a "yes" answer to the special issue. *Id*. at 113 fn.30. The jury was further instructed to answer the special issue "no" if all twelve jurors determined that Williams was not mentally retarded. *Id*. In this case, the jury unanimously determined that Williams was not mentally retarded by providing a "no" answer to special issue three. *Id*. Pursuant to the jury's answers on the other special issues, the trial court sentenced Williams to death. *Id*. at 113.

## **WILLIAMS HAS MET ALL PROCEDURAL REQUIREMENTS.** **ALL CLAIMS HAVE BEEN EXHAUSTED BUT CLAIM 10**[1]

There are procedural hurdles which must be crossed before a petitioner may ask a federal court to review a claim entitling him to federal habeas relief. *See generally Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999).

A petitioner seeking a writ of habeas corpus in federal court must show that he has exhausted all avenues of relief in state court. A federal district court may decline to address the merits of a claim that was inexcusably "defaulted" by the petitioner in state court proceedings. Aside from claim 10, discussed below, Williams' claims have been exhausted.

---

[1]Portions of this and the following section on exhaustion and procedural default were abstracted from a 1995 paper written entitled *Pleading Prejudice in Capital Habeas Corpus Proceedings*, by John H. Blume and Mark E. Olive.

A federal "default" question generally involves an evaluation of whether and how a claim for relief was presented to and considered by a state court. A default question arises in several ways. First, a default question can arise if a claim in a habeas corpus petition was not presented, or not fully presented, to the state court. Presenting a claim to the state courts is called "exhausting" the claim. *See Keeney v. Tamayo-Reyes*, 112 S. Ct. 1715, 1720 (1992) (the exhaustion requirement is grounded in "comity concerns." "The purpose of exhaustion is . . . [to] afford the State a full and fair opportunity to address and resolve the [federal] claim on the merits.")

"In order for a claim to have been 'fairly presented' to a state court to fulfill the exhaustion requirement, the applicant 'need not spell out each syllable of the claim before the state court.' Instead, a federal claim must only be the 'substantial equivalent' of one presented to the state courts." *Fisher*, 169 F.3d at 303 (citations omitted).

Second, a default question may arise if the claim was presented to the state court, but not in the manner that the state court normally and regularly requires that it be presented, such as when the claim is presented untimely, and the state court invoked its state rule to bar consideration of the inmate's claim. This is called a "procedural default." *See Wainwright v. Sykes*, 433 U.S. 72 (1977). This is discussed next.

## NO CLAIMS HAVE BEEN PROCEDURALLY DEFAULTED BUT CLAIM 10

As mentioned, a requirement of a state death row petitioner seeking a federal writ of habeas corpus is to show that he has not procedurally defaulted any of the grounds for relief presented. In order for a claim to have been procedurally defaulted, the state court's ruling must *not* be based upon the federal constitution. In other words, the state ruling must be on grounds independent of the

federal constitution. In addition, the state court's ruling *must be* based upon an adequate state ground. *See Ford v. Georgia*, 498 U.S. 411, 423 (1991) (discussing what is meant by "adequate" state ground). Here, none of Williams' claims were procedurally defaulted except claim 10, discussed below.

For example, *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994), *cert. denied*, 115 S. Ct. 778 (1995), held that an ineffective assistance at guilt phase claim was adequately presented to state courts. Even though the issue was not "precisely articulated" in state post-conviction proceedings, the "necessary arguable factual commonality" existed between claims presented in state court and in the federal petition.

*Boyd v. Scott*, 45 F.3d 876, 880-81 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1964 (1995), held that a petitioner's claim was not defaulted even though state court discussed procedural bar because the state court decision was "interwoven with federal law and did not expressly state that its decision was based on state procedural grounds."

In *Gochicoa v. Johnson*, 118 F.3d 440, 445 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1063 (1998), the court held that a petitioner's failure to object at trial to the admission of a snitch's out-of-court statements did not prevent the federal habeas court from considering the petitioner's confrontation clause claim where the state courts did not, on direct or collateral review, rely on adequate and independent state procedural bar rules to reject the petitioner's claims. The mere existence of a procedural default, without reliance on it by the state court as an adequate and independent reason for denying the claim, is not enough to foreclose federal review.

"A federal court reviewing a state prisoner's habeas claim must respect a state court's determination that the claim is procedurally barred under state law." *Williams v. Cain,* 125 F.3d 269,

275 (5th Cir. 1997), *cert. denied*, 119 S. Ct. 114 (1998) (*citing Wainwright v. Sykes,* 433 U.S. 72, 90-91, 97 S. Ct. 2497, 2508-09 (1977). "The rule is quite simple: 'a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.'" *Williams*, 125 F.3d at 275 (*quoting Harris v. Reed,* 489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989) (internal quotation marks and citation omitted)).

"In *Coleman v. Thompson,* 501 U.S. 722, 739, 111 S. Ct. 2546, 2559, 115 L.Ed.2d 640 (1991), the Court explained that the 'clear and express' statement requirement applies to cases where the state court's judgment fairly appears to rest primarily upon federal law, or to be interwoven with federal law, and not to cases where there is no reason to question whether the decision was based upon independent and adequate state law grounds." *Williams*, 125 F.3d at 275 n.3.

Of course, if there has been no adjudication on the merits in state court, and the claim is exhausted, then the statute by its terms requires no deference to the state decision. In that situation, the general rule that federal courts review questions of law *de novo* would apply. See *Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997) (Where the state appellate court erroneously applied a state procedural default rule to bar review, there was no adjudication on the merits and § 2254(d) did not apply.)

## RELIEF UNDER THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT; 28 U.S.C. §2254

Williams exhausted all avenues of state relief on the following issues by raising them in his direct appeal or state application for writ of habeas corpus, aside from claim 10. This Court's review of a habeas petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"),

28 U.S.C. §§ 2241, *et seq.* Under the AEDPA, a federal court may grant a habeas petition on a claim that was adjudicated on the merits in a state court proceedings only if the state court's decision was "contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A federal court may also grant habeas petition on the adjudication of a claim that resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(2); *Pondexter v. Quarterman*, 537 F.3d 511, 519 (5th Cir. 2008).

The phrases "contrary to" and "unreasonable application of" federal law created two different categories in which a prisoner can obtain federal habeas relief on claims adjudicated on the merits in state court. *Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002), citing *Williams v. Taylor*, 529 U.S. 362, 391 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision is "contrary to clearly established Federal law" if the state court applies a rule that contradicts the governing law set forth in the Supreme Court's decisions or the state court confronts facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Id.* A state court's decision is "an unreasonable application of clearly established Federal law" if the state court correctly identifies the governing law but applies it unreasonably to the facts of the Petitioner's case. *Id.* The inquiry into unreasonableness is an objective one and the application of clearly established Federal law must be incorrect and unreasonable to warrant federal habeas relief. *Id.*

To establish federal habeas relief on the ground that the state court's decision was based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," a Petitioner must rebut by clear and convincing evidence the factual determinations by

the state court even though the state court's finding are presumptively correct and given deference by the federal court. *Dickson v. Quarterman*, 462 F.3d 470, 476-477 (5th Cir.2006).

All of Williams' state habeas claims complain of his state trial and appeal counsel rendering ineffective assistance of counsel as guaranteed by the Sixth Amendment. Thus, "clearly established federal law" for all of Williams' claims in the instant federal writ will concern the state court's decision contrary to or an unreasonable application of his right to effective assistance of counsel pursuant to the Sixth Amendment. *See Williams v. Taylor*, 529 U.S. 362, 391 (2000) (holding that the standard governing claims of ineffective assistance of counsel established in *Strickland v. Washington* qualifies as clearly established Federal law, as determined by the Supreme Court of the United States for the purpose of federal habeas review under 28 U.S.C. §2254(d)).

For Williams to establish a violation of his Sixth Amendment right to effective assistance of counsel, he must show (1) that his counsel's performance fell below an objective standard of reasonableness and (2) there was a reasonable probability that but for his counsel's deficient performance, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 692-694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Courts are "not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir.1999). *Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir.1992) (noting that "whether counsel's omission served a strategic purpose is a pivotal point in *Strickland* and its progeny" and that this "crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this court"). ("[T]he 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating

evidence resembles more a post-hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing. *Wiggins v. Smith*, 539 U.S. 510, 526-527, 123 S.Ct. 2527 (2003).

## GROUNDS FOR HABEAS RELIEF

### CLAIM NUMBER 1: WILLIAMS' COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HE ISSUED A NOTICE OF INTENT TO RAISE THE INSANITY DEFENSE.

In his state writ of habeas corpus, Williams claimed he received ineffective assistance of counsel when his trial counsel filed a Notice of Intent to Raise the Issue of Insanity. Williams' State App. Habeas Corpus, June 9, 2008. Williams' defense counsel filed this motion when he had no colorable claim that Williams was insane at the time the offense was committed. Prompted by this filing, the trial court ordered Williams examined by with court-appointed experts who acquired a basis for later rendering opinions detrimental and contrary to Williams' claim that he was mentally retarded and did not constitute a continuing threat to society. Therefore, his trial counsel's tactical blunder permitted the state to eviscerate the considerable evidence of mental retardation collected and presented by the trial counsel.

In its state habeas Findings of Fact and Conclusions of Law, the state court cited Williams' trial counsel's testimony that he filed a notice to raise the insanity defense for two reasons: (1) because it was necessary to do so prior to the start of pretrial hearings before he had concluded all of his investigation so as not to lose the opportunity for timely filing should further investigation reveal, after the time for filing notice to do so had expired, that the insanity defense needed to be asserted, and (2) he had a good faith basis to believe that the defendant may have been insane during the commission of the offense, including that the defendant had been previously diagnosed as

paranoid schizophrenic and, after interviewing family members, he learned that the defendant's mother had a history of mental illness and bizarre behaviors. This strategical decision, the court concluded, was made with the full knowledge of experienced counsel that such would open up the possibility -- actually certainty -- that the State would be allowed to examine Williams personally and without counsel. The trial court concluded that Williams was represented at trial by counsel who were extensively experienced, were properly certified, and who provided effective assistance of counsel in both phases of Williams' trial. The trial court further concluded that there was simply no credible evidence before the court that Williams' trial counsel provided ineffective assistance of counsel in any manner, much less in the manner alleged by Williams' writ application. On March 18, 2009, the Texas Court of Criminal Appeals adopted the trial court's findings and conclusions without analysis. *Ex Parte Clifton Lamar Williams*, No. WR-71,296-01, (Tex. Crim. App. 2009).

Williams is entitled to relief on this claim because the state court's adjudication of this claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding and the state court's decision was contrary to or involved an unreasonable application of clearly established Federal law. See 28 U.S.C. §2254(d)(1)-(2). The trial court's findings of fact and conclusion that Williams' counsel performed competently in filing their Notice of Intent to Raise Insanity Defense is completely belied by the record.

At the initial pretrial hearing held on February 3, 2006, the trial court specifically stated "You have not filed – this was the initial pretrial hearing. If there was an insanity defense, you-all are competent counsel, you would have filed a notice of intent to plead insanity. That has not been done." 2 RR 62-63. During this hearing, Williams' trial counsel never stated that they had formed

16

any good-faith basis that Williams was insane at the time of the offense nor did they suggest to the trial court that further investigation had or could reveal such evidence.

On June 2, 2006, four months after that pretrial hearing, belatedly recognizing his blunder and attempting to undo it, the trial counsel argued that his Notice of Intent to Offer Insanity as a Defense was untimely filed, and therefore should not be considered. 5 RR 11-12. The trial court, refused to permit the withdrawal, but stated unequivocally that this Notice was not timely filed. 5 RR 15. There was no explanation given for the reason the Notice was not filed by the court's deadline for the filing of pretrial motions prior to the earlier February 3, 2006, pretrial hearing, but just a stammering rationalization by defense counsel that "filing the notice does not mean that we intend to raise the issue[,] it's merely a notice given to the State of our intent to do so." 5 RR 14. Again, no mention was given regarding any good-faith basis that Williams might have been insane at the time the offense was committed or any fear defense counsel had that any "untimely" filing of the notice would waive that issue at trial. 5 RR 13-16.

It is unreasonable to find Williams' defense counsel performed competently in filing a late Notice to Seek Insanity Defense on the theory that he had a good-faith basis for a viable insanity defense and that further investigation may have in fact revealed such evidence. The "reason" given for the late filing at the June 2, 2006, pretrial hearing is entirely inconsistent with the reasons that the defense counsel gave during the hearing on the state writ of habeas corpus and later adopted and found by the trial court. If during trial Williams' defense counsel really had a good-faith belief that an insanity defense could be available, then he would surely have said that to the trial court at the time he originally urged the motion. Furthermore, that motion was urged four months after the trial court's initial pretrial hearing, when the trial was set to commence in three months. If his defense

counsel waited that long to adequately investigate whether Williams was insane at the time of the offense, then he was *per se* rendering constitutionally deficient performance.

In any event, there could have never been a good faith reason to believe Williams was insane at the time of the offense. Insanity is an affirmative defense to prosecution when, at the time of the conduct charged, the actor, as a result of a severe mental disease or defect, did not know that his conduct was wrong. Tex. Pen. Code §8.01(a). Although he is certainly mentally ill and retarded, all of the evidence showed that Williams knew that his conduct was wrong. After the offense was committed, he fled the scene, disposed of the knife and the other evidence, removed his clothing, lied to others about the stolen car, lied to the police during a confession and eventually told them "I'm going to lose my life over this." 55 RR 150. Dr. Herbert Davis, a licensed psychiatrist called by the defense, had previously diagnosed Williams in 2004, a year before the murder, with paranoid schizophrenia, but stated that the condition did not play a part in the offense. 52 RR 47-49. Certainly, Williams' attorney had access to most, if not all, of this information prior to stating urging the untimely notice just three months before the trial on guilt/innocence was to begin and one month before jury selection.

Unlike what his defense counsel stated and believed, failure to provide timely notice of the insanity defense does not preclude all possibility of asserting that defense in the future. If the trial court finds good cause exists for the failure to timely file notice of the insanity defense, evidence of the insanity defense can still be admissible. Tex. Code Crim. Proc. 46.03 §2(b) (O'Connor's Criminal Codes Plus 2005-06). Certainly, if evidence later developed during defense counsel's investigation that Williams was in fact insane at the time offense and that information was revealed during the course of a diligent case investigation, given that this was a capital murder case in which

the State was seeking the death penalty, the trial court would have allowed Williams to assert the insanity defense. In fact, the trial court stated that "capital cases are different... and even if [the State] can show me case law that [the defense can not untimely file notice of intent to raise insanity defense], I think the statute itself talks about good cause shown that it can be filed at a later time. And so I'm inclined to determine that by them filing it, is [sic] going to be considered timely, or leave for them to file it at this pretrial." 5 RR 18. The trial court has discretion to decide whether good cause exists for failure to timely file notice of raising the insanity defense. *Wagner v. State*, 687 S.W.2d 303, 305 (Tex. Crim. App. 1984).

> **CLAIM NUMBER 2: WILLIAMS' RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL COUNSEL "OPENED THE DOOR" TO ALLOW THE STATE'S EXPERTS UNRESTRICTED ACCESS TO WILLIAMS AND PROVIDING THEM WITH A BASIS FOR TESTIFYING THAT HE CONSTITUTED A FUTURE DANGER TO SOCIETY AND WAS NOT MENTALLY RETARDED.**

In the second and third claims of his state writ of habeas corpus, Williams claimed he received ineffective assistance of counsel when his trial counsel, during his cross-examination of the State's expert witnesses, "opened the door" to allow those same experts to interview personally Williams who then formed and strengthened their opinions that Williams constituted a future danger to society. *See* Williams' State App. Habeas Corpus, June 9, 2008. Williams also claimed that his trial counsel failed to limit the State's experts opinion to their proper scope in that one of the State's experts, who was called upon to testify as to future dangerousness, also testified without objection that Williams was not mentally retarded.

In its Findings of Fact and Conclusions of Law, the trial court found that there was no legal authority giving Williams' trial counsel the power to limit the State's expert's degree of inquiry during their examination of Williams. Further, the court wrote that the State was entitled to a

personal examination of Williams and to present evidence from that examination on all issues presented by the *State* (emphasis added) during trial. The trial court concluded that Williams was represented at trial by counsel who were extensively experienced, were properly certified, and who provided effective assistance of counsel in both phases of Williams' trial. The trial court further concluded that there was simply no credible evidence before the court that Williams' trial counsel provided ineffective assistance of counsel in any manner, much less in the manner alleged by the defendant's writ application. As mentioned, on March 18, 2009, the Texas Court of Criminal Appeals adopted the trial court's findings and conclusions without analysis. *Ex Parte Clifton Lamar Williams*, No. WR-71,296-01 (Tex. Crim. App.2009).

Dr. Tynus McNeel, a Tyler psychologist who always testifies for the State, predictably testified that Williams would continue to commit criminal acts of violence that would constitute a continuing threat to society. 51 RR 200. Even McNeel admitted that his opinion was weak. After reviewing the entire offense file and Williams' medical files, he initially concluded that there was insufficient evidence to prove that Williams was a future danger and wrote a report to that effect. DX 5. The day before his testimony, however, he flipped his opinion based an a couple minor incidents in the local jail in which Williams refused orders, threatened to kill himself with a dismantled razor, and hid a trusty's shirt. 51 RR197-200.

Dr. McNeel rendered his revamped future dangerousness opinion without interviewing Williams, a practice condemned by the American Psychiatric Association, of which McNeel was stunningly ignorant. 51RR 226. *See Barefoot v. Estelle*, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090, APA Brief Amicus Curiae.[2] When Williams' defense counsel brought his lack of a personal

---

[2] http://archive.psych.org./edu.other_res/lib_archives/archives/amicus/82-6080.pdf

interview up during his cross-examination of Dr. McNeel, he then, according to the trial court, "opened the door" to allow Dr. Gripon, another "future danger" expert retained by the State, to interview Williams personally and reinforce his earlier opinion that Williams constituted a future danger to society. 51 RR 225, 233; 59 RR 211-212. The trial counsel immediately recognized his blunder and its implication, arguing furiously that he had not opened the door and trying to block the consequences which he incompetently created. 51 RR 228-230. There was obviously no trial strategy justification for his actions.

The State court's decision was therefore based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding and was a decision that contrary to or involved an unreasonable application of clearly established Federal law. The Fifth Amendment to the United States Constitution provides that no person shall be compelled in any criminal case to be a witness against himself. A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866 (1981). A defendant only waives his Fifth Amendment privilege not to be compelled to a state-sponsored interview to determine future dangerousness once he issues a limited waiver of that privilege by submitting expert testimony that he is not a future danger. *Lagrone v. State*, 942 S.W.2d 602, 611 (Tex. Crim. App. 1997). Further, a psychiatrist may only compel testimony from a defendant that is tailored to an issue raised by the defendant. In *Estelle*, *supra*, the state trial judge *sua sponte* ordered a psychiatric evaluation of the defendant for the limited, neutral purpose of determining his competency to stand trial. 451 U.S. 465. The State then offered information obtained from the court-ordered competency examination as affirmative

evidence to persuade the jury the defendant constituted a future danger to society and return a sentence of death.  *Id.*  The State used the defendant's own statements unwittingly made without awareness that he was assisting the State's efforts to obtain his execution.  *Id.*  The United States Supreme Court concluded that the Fifth and Sixth Amendment privileges were violated.  *Id.*

Here, Williams never proffered any expert testimony that he did not constitute a future danger to society.  His attorneys' purported trial strategy was focused on a "yes" answer to the mitigation question by showing that Williams was mentally ill.  Thus, the state trial court's holding that the prosecution "was entitled to a personal examination of the defendant in this case and to present evidence from that examination on *all* issues presented by the State during the trial" is wholly contrary to clearly established federal law and the holding in *Estelle*.  Further, Williams' defense counsel's mistaken belief that "there is no legal authority giving him the power to limit the State's expert's degree of inquiry during their examinations" also runs counter to the clearly established holding in *Estelle*.  Granted, Williams raised the issue that he was mentally retarded, and the State then had the right to have their expert examine and personally interview Williams to test that claim.  However, the State never had the right, and Williams never waived his Fifth Amendment right, to compel testimony from Williams as to the issue of whether he constituted a future danger to society.  Williams' attorney never recognized that distinction with deadly consequences for his client.

### CLAIM NUMBER 3: WILLIAMS' TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HE FAILED TO  OBJECT TO THE STATE'S EXPERTS' TESTIMONY THAT WILLIAMS CONSTITUTED A FUTURE DANGER TO SOCIETY.

In the fourth claim of his state writ of habeas corpus, Williams alleged he received ineffective assistance of counsel when his trial counsel failed to object to the State's psychiatric and psychological experts' testimony that Williams constituted a future danger to society.  It is still hotly

contested whether such evidence of a defendant's "future dangerousness" is admissible under common law and the rules of evidence, and his trial counsel's failure to object to such testimony precluded any meaningful review by the trial court or any appellate court of those claims and issues.

In its Findings of Fact and Conclusions of Law, the trial court found that his trial counsel was "well aware" that the State has "the right" to offer expert mental health testimony regarding future dangerousness. A request for a hearing pursuant to Rules 702 or 705 was not conducted, the court wrote, because Williams trial counsel was also "well aware" that the State's experts had been found to qualify as experts by the trial court in past capital murder trials and of their past credentials. Once again, the trial court concluded that Williams was represented at trial by counsel who were extensively experienced, were properly certified, and who provided effective assistance of counsel in both phases of Williams' trial. Similarly, the trial court further concluded that there was simply no credible evidence before the court that Williams' trial counsel provided ineffective assistance of counsel in any manner, much less in the manner alleged by the defendant's writ application. And as mentioned, on March 18, 2009, the Texas Court of Criminal Appeals adopted the trial court's findings and conclusions without analysis. *Ex Parte Clifton Lamar Williams*, No. WR-71,296-01 (Tex. Crim. App. 2009).

During the punishment phase of the trial, Dr. Tynus McNeel, a forensic psychiatrist, testified without objection that Williams would pose a significant future risk of violence and that there is a probability that he would continue to commit criminal acts of violence that would constitute a continuing threat to society. 51 RR 200. Dr. Ed Gripon, an additional forensic psychiatrist called by the State, also testified, over no objection from defense counsel, that in his opinion, Williams

would continue to commit criminal acts of violence that would constitute a continuing threat to society. 51 RR 253-254.

The State court's adjudication of this claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Contrary to the state court's conclusion that Williams' defense counsel was "well aware" such expert testimony was admissible, the record actually indicates that Williams' trial counsel believed the State should *not* have "the right" to offer psychiatric or psychological evidence that Williams constituted a future danger to society. Thompson filed an extensive Motion in Limine with the court to exclude psychological or psychiatric evidence on the issue of future dangerousness. 12 RR 10. At the pretrial hearing on August 4, 2006, it was his position that such evidence was not sufficiently reliable in making a prediction whether someone could be a danger in the future, especially when those experts had never personally interviewed the defendant. 12 RR 10-11. The trial court overruled Thompson's Motion in Limine but specifically stated the court "already said" that it would conduct a hearing pursuant to Tex. R. Evid. 705 when the evidence was proffered and the defense would still have the burden of making a timely objection at which time the trial court would make a ruling on whether or not the requirements of the statute for admissibility were met at the hearing outside the presence of the jury. 12 RR 11-12. Of course, such a hearing was never conducted because Thompson sat in his chair as the State rolled out its expert testimony. Even after the trial at the hearing on the state writ of habeas corpus, Williams believed that "ethical" psychiatrists should not make an assessment that an individual poses a risk of being a future danger. SW hearing, 51, belying any conclusion by the trial court that he felt foreclosed by Texas and federal law.

24

In contrast, the State requested a 705 hearing outside the presence of the jury challenging the testimony of a defense expert witness, Dr. Kate Allen. 55 RR 11. Her proffered testimony concerned the effects of Williams' early childhood experiences, parenting, familial environment, mental illness and mental retardation had on his functioning as an adolescent and young adult. 55 RR 12. The State also requested a 705 hearing on Dr. Tom Allen, a psychologist who opined Williams was mentally retarded. 55 RR 250-251. The State clearly understood how to ask and exercise Rule 705 hearings, while Williams' counsel did not.

It is true that Williams' counsel should have been "well aware" that such psychiatric testimony about future dangerousness is currently admissible under then-existing Supreme Court precedent. *See Barefoot v. Estelle*, 463 U.S. 880 (1983). However, his counsel should also have been "well aware" that there was nothing to lose and much to gain by challenging that testimony in the chance that the Supreme Court will revisit and reject future dangerousness prognosticating as junk science incompatible with the Court's later decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), the seminal expert witness case the Supreme Court decided ten years after *Barefoot*, or even that the trial court would itself find the evidence inadmissible. In *Flores v. Johnson*, 210 F.3d 456 (5th Cir. 2000), Justice Garza in his concurrence openly questioned whether that form of expert testimony would still pass muster under the standards for the admissibility of expert testimony set forth in *Daubert*. It is Justice Garza's opinion that that the use of psychiatric evidence to predict a murderer's future dangerousness fails all five *Daubert* factors. *Flores*, *supra*, at 464. One court has stated that it would probably exclude any expert evidence offered on future dangerousness because its probative value would have been outweighed by the danger of creating unfair prejudice and specifically stated that the issue in an

25

appropriate case, fully-developed factually and well-briefed, should be reconsidered by the Supreme Court. *United States v. Sampson*, 335 F. Supp. 2d 166, 220 (D. Mass. 2004). One day the Supreme Court is going to revisit *Barefoot* and likely find future dangerousness predictions violative of *Daubert*, and every competent trial attorney preserves this claim in a capital case. In any event, the failure to retain experts to challenge the scientific validity of the prosecution's experts that testify concerning questionably valid scientific evidence constitutes deficient performance. *Gersten v. Senkowski*, 426 F.3d 588, 611 (2nd Cir. 2005) (holding defense counsel rendered ineffective assistance of counsel when he failed to properly investigate and challenge the scientific validity of "Child Sexual Abuse Accommodation Syndrome").

During the hearing on the state writ of habeas corpus, Williams' defense counsel further explained that if the Supreme Court or the Fifth Circuit Court of Appeals later ruled such testimony of future dangerousness were somehow unreliable or otherwise inadmissible, then that rule would be made retroactive. Hearing on State Writ of Habeas Corpus, November 24, 2008, pp. 59-62. This is highly unlikely and shows a profound misunderstanding of the strict retroactivity principles of *Teague v. Lane*, 489 U.S. 288 (1989), in which new constitutional rules are held to be retroactive only when they constitute a "watershed rule of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Whorton v. Bockting*, 127 S. Ct. 1173, 1181 (2007) (quotation omitted). Since *Teague*, not a single new constitutional rule has met this high standard, including the landmark confrontational decision in *Crawford v. Washington*, 541 U.S. 35 (2004). *See Bockting*, 127 S. Ct. at 1181. It is doubtful that a new rule barring testimony of future dangerousness would be deemed retroactive under *Teague*, making it vital for trial and appellate attorneys to present, protect and preserve the issue at trial and direct appeal.

As the following analysis shows, there was a considerable body of empirical and peer reviewed evidence on which Williams' attorney could properly have objected to the State's future dangerousness testimony.

   **A.**   ***THE FORENSIC PSYCHOLOGY PROFESSION HAS DEVELOPED STANDARDS OF CONDUCT AND SCIENTIFIC METHODOLOGY FOR CONDUCTING RISK ASSESSMENTS OF A CAPITAL DEFENDANT'S PROPENSITY FOR FUTURE SERIOUS VIOLENCE.***

To begin, one must first consider what standards of conduct and scientific methodology have been developed for conducting risk assessments of a particular capital defendant's propensity to commit future acts of serious violence.

It is not considered *per se* unethical by the mental health profession for a psychologist to testify for the prosecution that a capital defendant constitutes a future danger to society. What is considered unethical is for a psychologist to offer opinions that a particular capital defendant is a future danger if the psychologist: (1) lacks the experience or training, or (2) has not reviewed relevant objective base rate data for and against future dangerousness, or (3) has not undertaken relevant objective psychological testing of the defendant. Cunningham, Mark D. and Alan M. Goldstein, *Sentencing Determinations in Death Penalty Cases*, Ch. 21, published in Goldstein, Alan M. and Irving B. Weiner, 11 Forensic Psychology, Handbook of Psychology, 407-32, 416-17 (John Wiley & Sons, Inc.) (hereinafter "Cunningham & Goldstein"); *Specialty Guidelines for Forensic Psychologists*, Committee on Ethical Guidelines for Forensic Psychologists, 1991.

Therefore, if the State experts possessed competent experience and training in the field of forensic psychology, then they may have been entitled to accept Williams' case from the State and conduct a risk assessment on him. If they lacked competent experience or training on the other hand, then they are not entitled to accept the case and they violated the APA's cannon of ethics.

27

Similarly, the State experts must have obtained and reviewed relevant objective data against which to compare Williams. They must also undertake appropriate objective testing of Williams. Finally, they must accurately apply the unique factors of Williams and his background against *objective research data* in order to reach a final risk assessment to justify their opinions. If the State experts failed in these steps, then they violated their profession's cannon of ethics.

The cannon of ethics imposed other requirements on the State's experts. For instance, current cannons of ethics also require State-retained forensic psychologists to "verify that defense counsel is aware of the pending evaluation, the agreed-on parameters of any interview regarding the capital offense or unadjudicated conduct, and how the evaluation will be memorialized." Cunningham & Goldstein*, supra,* at 418. In addition, a State forensic psychologist should not use his skill to lull the defendant or his lawyer into feeling that the psychologist is on his side. "State-retained experts should take care in building rapport and using empathy in capital sentencing evaluations, as the combination of these techniques and the expert's professional identification as a psychologist may contribute to a misplaced anticipation of benevolence and a setting-aside of the initial interview warnings." Cunningham & Goldstein*, supra,* at 418 (citing Showalter, 1990).

The ethical standards recognize that there may be legitimate impediments which cause the State forensic psychologist to be restricted from receiving all of the relevant data or testing which would be useful to making a future dangerous assessment. In such situations, it is not an ethical violation for the psychologist to offer opinions at trial. What is an ethical violation, however, is to offer opinions *beyond the objective data actually obtained* . "Although some opinions may be presented with an 'incomplete data set,' ethical standards limit testimony to what is supported by the

data, and further require that the trier of fact be informed regarding the limitations of opinions." Cunningham & Goldstein, *supra,* at 418.

There is significant portion of the psychiatric community which equates the entire effort to forecast a capital defendant's future dangerousness with voodoo. The psychiatric profession as a whole has repeatedly rejected such methods.[3] An American Psychiatric Association task force found such methods of practicing future dangerousness forensic psychiatry to be both unreliable and unprofessional.[4]

There is widespread belief among the psychiatric profession that future dangerousness cannot be reliably predicted, and to testify otherwise is simply unethical. Forensic psychiatrists as a profession oppose "recommending the death penalty specifically or expressing an opinion on a state's legal criteria virtually amounting to such a recommendation."[5] The language of the Task Force on Clinical Aspects of the Violent Individual underscores why the State's experts claims are unsupported by their peers:

> Neither psychiatrists nor anyone else have reliably demonstrated an ability to predict future violence or "dangerousness." Neither has any special psychiatric "expertise" in this area been established.

> American Psychiatric Association, "Clinical Aspects of the Violent Individual" (1974).

---

[3] *See, e.g.,* Applebaum, Paul S., M.D., "Hypotheticals, Psychiatric Testimony, and the Death Sentence," *Bulletin of the American Academy of Psychiatry and the Law* 12.2 (1984): 169-77; Dix, George E., "The Death Penalty: 'Dangerousness,' Psychiatric Testimony and Professional Ethics." *American Journal of Criminal Law* May, 1977.

[4] American Psychiatric Association, "Clinical Aspects of the Violent Individual" (1974).

[5] Weinstock, Robert, "Perceptions of Ethical Problems by Forensic Psychiatrists," *Bulletin of the American Academy of Psychiatry and the Law,* Vol. 17, No. 2, p. 194 (1989).

**B.** ***STATE HIRED FORENSIC PSYCHOLOGISTS FREQUENTLY FAIL TO CONSIDER RECOGNIZED INFLUENCES ON FUTURE DANGEROUSNESS.***

The profession of forensic psychology has considered testimony by psychologists in capital cases and has identified several fundamental mistakes often made by those testifying for the State that a particular capital defendant will be a future violent danger in prison, two which may be discussed here.

**1.** ***FIRST ERROR OF STATE FORENSIC PSYCHOLOGISTS: FAILING TO CONSIDER THE CONTEXT OF PRISON WHEN ASSESSING FUTURE RISK OF VIOLENCE.***

The failure of mental health experts to "continue to neglect the dominance of context in their capital violence risk assessments, . . ." is one of the three most common failures of State forensic psychologists who attempt to predict future dangerousness. Cunningham & Goldstein, *supra,* at 425. State experts instead rely too heavily on "factors from community-based literature that are either pervasively present in an incarcerated population or have not been demonstrated to be predictive in a prison context." Cunningham & Goldstein*, supra,* at 425. In other words, it is one matter to say that someone is going to be violent in free society; it is quite another to say that someone is going to be violate in a maximum security prison.

The context of prison, however, is the single most important consideration, particularly since the inmate in Texas is going to serve a minimum 40-year sentence before his file is even picked up by the Parole Board, much less before parole may actually be granted. Dr. Cunningham, a leading authority, has found that mental health experts, particularly those testifying as State experts, persist in the mistake of failing to consider the effects of prison on future violence, notwithstanding that psychology literature has emphasized the importance of prison context for years. *See* Hall, 1987,

Monahan, 1981, Shah, 1978. "[R]isk is always a function of context." Cunningham & Goldstein, *supra,* at 425.

Compounding this error is that "factors that are associated with violence in the community do not demonstrate the same relationship with prison violence." Cunningham & Goldstein, *supra,* at 425 Cunningham. This recognition that the causes of free community violence are vastly different from the causes of prison violence likewise are not new and have been known in forensic science for years. *See* Alexander & Austin, 1992, Cunningham & Reidy, 1998a, 1998b, 1999, in press; National Institute of Corrections, 1992, Reidy et al., 2001.

> **2.     SECOND ERROR OF STATE FORENSIC PSYCHOLOGISTS: FAILING TO CONSIDER THE BASE RATE DATA OF ACTUAL VIOLENCE IN PRISON.**

The second significant error made by State mental health experts is that "many psychologists remain ignorant of or fail to rely on base rate data regarding the frequency of serious violence in prison in making violence risk assessment regarding particular defendants." Cunningham & Goldstein, *supra,* at 425. This is not a new concept. In 1978, Dr. Shaw "described this problem over 20 years ago, noting that even forensic clinicians tend to ignore base rates in the face of specific information or when confronted with a specific individuals." Cunningham & Goldstein, *supra,* at 425. The relevance of base rate data is discussed below and in the attached articles. Moreover, attached to this application are internal reports from TDC explaining the low actual rate of violence in prison.

> **C.     CURRENT FORENSIC PSYCHOLOGY STANDARDS HAS CREATED A METHODOLOGY FOR ASSESSING FUTURE DANGER.**

When a psychologist is hired by the State to conduct an assessment of a particular capital defendant like Williams with an eye to testifying that the inmate is a future danger to society, the

state appointed psychologist is required to comply with the profession's code of ethics by applying the accepted methodology for assessing the capital defendant's future risk of violence.

Consideration of the scientific methodology to be applied by a forensic psychologist in assessing a defendant's likelihood for future violent behavior is <u>extremely important</u> to meeting the Supreme Court's requirement that courts serve as the gatekeeper for scientific testimony. The influential opinions to be offered by a psychologist in a death penalty trial are only as valid as the methodology which led to them. After extensive internal discussion and external research, the psychology profession has crafted methodology considered as reliable as the profession can currently produce. There are three important components to this methodology.

Current research has shown "that long-range assessment of the probability of future serious violence is most reliable when:"

1.  "The risk estimate relies on the past pattern of conduct displayed by the individual in a *similar* context." Morris & Miller, 1985. (emphasis in original). Cunningham & Goldstein*, supra,* at 426.

2.  "The risk assessment is anchored to the base rate of violence for the group to which the individual most closely corresponds, and is then conservatively individualized." Hall, 1987, Monahan, 1981, Morris & Miller, 1985. Cunningham & Goldstein *, supra,* at 426.

3.  "The final risk estimate is adjusted for risk management or violence preveation/reduction procedures that could be applied." Heilbrun, 1997, Serin & Amos, 1995. Cunningham & Goldstein*, supra,* at 426.

### 1.  METHODOLOGY STEP ONE: ASSESSING THE DEFENDANT'S PAST BEHAVIOR IN SIMILAR CONTEXT.

When evaluating a capital defendant's propensity for future violence, "[a] past pattern of behavior can be reliably predictive of future behavior, assuming that sufficient behavior has been

exhibited to form a pattern and the context of prediction is sufficiently similar."  Cunningham & Goldstein, *supra,* at 426, citing Morris and Miller, 1985.

"In a violence risk assessment at capital sentencing, then, detailed information regarding the defendant's history of serious violence during his pretrial confinement as well as past incarcerations can be quite important."  Cunningham & Goldstein *supra,* at 426.  This means that the starting point for future violence risk assessment is to find out when the defendant was previously in jail or prison and review prison records to determine how the defendant behaved.  In his assessment of prison behavior, the forensic psychologist should certainly consider the defendant's stretch of incarceration while awaiting his current capital trial.  "The presence or absence of a record of serious violence during any past prison sentences is particularly relevant, as this context most closely approximates that of the pending capital life term."  Cunningham & Goldstein *supra,* at 426.  "The circumstances and context of past institutional violence also may be illuminating."  Cunningham & Goldstein , *supra,* at 426.  The forensic psychologist cannot simply turn pages of the prison records and accept them at face value, but must think about each event in prison in context and proportion:

- Specific descriptions of prior confinements;
- Security level and celling arrangement;
- Disciplinary write-ups;
- Any prison gang affiliation;
- Out-of-cell activities;
- Involvement in work, academic, treatment, or religious programming;
- Visitation contacts; and
- Inmate and staff interactions.

Cunningham & Goldstein, *supra,* at 426.

Events like these "often provide additional perspectives regarding both the defendant's adjustment to confinement and the correctional staff's appraisal of whether the defendant was

disproportionately at risk for serious violence."  Cunningham & Goldstein, *supra,* at 426; *see also* Cunningham and Reidy, 1998b, 1999, 2001, Reidy, et al., 2001.

2.        *METHODOLOGY STEP TWO: APPLYING THE RELEVANT BASE RATES.*

The second step in the methodology for assessing future violence is to consider what are called the "relevant base rates."  "In the absence of a prior history of prison incarceration or serious violence in jail pretrial, the most reliable anchor for a violence risk assessment at capital sentencing involves the application of relevant base rates."  Cunningham & Goldstein, *supra,* at 426.  "Group statistical data have repeatedly been demonstrated to enhance the reliability of violence risk assessments[6], including the violence of capital offenders.  Cunningham & Reidy, 1998b, 1999, 2001, Reidy 2001.

The leading forensic psychologists have "concluded that knowledge of the violence rate in the respective group is the single most important piece of information necessary to make an accurate risk assessment of a particular individual."  Cunningham & Goldstein, *supra,* at 426.

Although it may seem counterintuitive, studies based upon prison records have shown that "the overwhelming majority of capital offenders do not have records of serious prison violence."  Cunningham & Goldstein, *supra,* at 426.  "This finding is broadly consistent – despite differences in the decade of follow-up, applicable capital statute, and/or geographical location."  Cunningham & Goldstein, *supra,* at 426.

"For example, approximately two-thirds of former death row inmates were never confined in administrative segregation in samples from both Texas and Indiana."  Cunningham & Goldstein, *supra,* at 426-27 (citations omitted).  Other studies tracked death row inmates who were transferred

_____

[6]*See* Hall, 1987, Monahan, 1981, 1996, Morris and Miller, 1985, Serin & Amos, 1995.

to general population after the 1993 *Furman* decision ended executions temporarily. "Similarly, just over two-thirds of the nationwide sample of *Furman* commutees were never written up for assaultive conduct." Cunningham & Goldstein, *supra,* at 427.

Twenty-two percent of Texas death row inmates who were released to general population "had no disciplinary write-ups of any sort during follow-up in the general prison population" that averaged seven years. Cunningham & Goldstein, *supra,* at 427.

The odd fact is that overwhelming majority of death row inmates in Texas are non-violent. The reason for this is not because the inmates were shocked into good behavior by placement on death row for execution. It is simply that they now live in a structured environment. "The frequency of prison violence among capital offenders who were sentenced at trial to a life prison term is quite similar to that of former death row inmates." Cunningham & Goldstein, *supra,* at 427. Marquart, 1989, 1994. "Similarly, rates of prison violence among convicted murderers sentenced to death, life-without-parole, and life-with-parole have been found to be remarkably consistent." Cunningham & Goldstein, *supra,* at 427; Sorensen & Wrinkle, 1996.

Current research verifies previous findings. Two leading researchers "substantially augmented the statistical support for these base rate estimates in their report of the rate of serious prison violence among 6,390 murderers in the Texas prison system" over the ten-year period, January 1990 to March 1999. *See* Table 21.6, Cunningham & Goldstein, *supra,* at 427. From this data, the researchers "extrapolated the probability of serious institutional violence across a 40-year prison term," the minimum period of incarceration in Texas for a non-death capital murder conviction. The purpose for this extrapolation was to determine the *actual* likelihood that a Texas capital defendant who is sentenced to a life sentence instead of death will display some serious

violence in prison over the course of 40 years.  *See* Sorensen, J.R. & R.L. Pilgrim, *An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants*, 90 J. Crim. L. & Criminality 1262 (2000).

If the host of State appointed forensic psychologists who regularly testify for prosecutors in Texas death penalty cases are to be believed, this group of non-death capital inmates should be a violent group.  One would expect that they would lead all categories for prison violence.  In truth, their level of violence in prison is low.  The researchers found a prevalence rate of only 16.4%.  Cunningham & Goldstein*, supra,* at 427.  Sorensen & Pilgrim,*supra*.  This means that of 100 non-death capital inmates, over 40 years only 16.4% of them would be involved in a serious violent offense.  Conversely, 83.6% of them would *not* be involved in serious violent offenses over their entire 40-year minimum period of incarceration.

Similarly, on a yearly basis, the non-death capital inmates were involved in serious violence at a rate of 8.4%.  Sorensen & Pilgrim,*supra*.  This means that annually 91.6% of non-death capital inmates were *not* involved in serious violence.

One of the advantages of the Sorensen & Pilgrim study of Texas non-death capital inmates was that the "extraordinary number of inmates followed in this study allowed for identification of a limited number of variables that served to raise or lower the risk of serious prison violence relative to the overall group risk."  Cunningham & Goldstein, *supra,* at 428.  In other words, one could break down the group of 6,390 inmates into risk pools.  Some pools would reflect higher violence, some lower.

As mentioned, in order to perform the appropriate scientific methodology a State appointed forensic psychologist is required to apply the relevant base rates to a capital defendant.  "Base rates

of the incidence of institutional violence among capital offenders and murderers in the general population of maximum-security prisons represent important anchoring points in performing a violence risk assessment of a capital defendant."  Cunningham & Goldstein, *supra*, at 428.  There are several other relevant base rates  which the forensic psychologist must consider:

- "the frequency of serious violence in specific correctional settings;"
- "inmate and staff homicide nationally and in the particular department of correction;"
- "disciplinary infraction rates of long-term inmates;"
- "prison disciplinary infractions as a function of age of the inmate."

Cunningham & Goldstein, *supra*, at 428.

The relevant base rates allow the forensic psychologist to tailor his assessment of a particular capital defendant.  Using the relevant base rates as a starting point, the forensic psychologist can adjust it for factors which are unique to the capital defendant on trial.   "Conservative individualization of base rates examines various factors that might serve to modestly raise or lower the risk as compared to the relevant group anchor" such as:

- "the age of the inmate,"
- "continuing availability of community supports and visitation,"
- "history of employment in the community,"
- "prior responses to structured environments" such as prison,
- "psychological disorder."

Cunningham & Goldstein, *supra*, at 428.

Current psychology emphasizes "the need for mental health experts conducting fair and balanced risk assessments to describe both risk and protective factors, as well as mediator or moderator effects in a particular context."  Cunningham & Goldstein, *supra*, at 428; Rogers 2000.  Moreover, it is vital "that before identifying a particularizing factor as being operative," the forensic

psychologist must consider "the incidence of that factor in the inmate group providing the anchoring base rate of violence risk." Cunningham & Goldstein, *supra,* at 428.

In other words, before latching on to one or more factors unique to the capital defendant on trial and claiming that these factors enhance his likelihood of committing future violent acts, the forensic psychologist must make certain that the factors are not ones which most inmates have. Otherwise, the forensic psychologist will be making generalizations of future violence which are not supported by the data which proves that the vast majority of capital inmates are not violent. "APD [Adaptive Personality Disorder] as well as a number of other factors that might be related to risk of violence in the community are so pervasively represented among prison inmates that they lose any predictive value in that setting." Cunningham & Goldstein, *supra,* at 428.

### 3. METHODOLOGY STEP THREE: ADJUSTING THE FINAL RISK ESTIMATE FOR RISK MANAGEMENT OR VIOLENCE PREVENTION/REDUCTION PROCEDURES THAT COULD BE APPLIED.

Once the State forensic psychologist has examined past prison behavior and computed the relevant base rates, his next step in the methodology of future risk assessment is to return to the context of prison and adjust the final risk estimate for tools available in prison for reducing the odds of future violence.

"[C]onsideration of what modifications in context or risk management procedures might be brought to bear to reduce the likelihood of violence is a critically important step in violence risk assessments at capital sentencing." Cunningham & Goldstein, *supra,* at 428. Prisons have a host of tools available which may reduce likelihood of prison violence by the capital defendant:

- psychotropic medications;
- counseling or other treatment of psychological disorders;
- programming and psychoeducational services, such as anger management;

- academic/work activities;
- classification and celling procedures;
- modifications in confinement, including both psychiatric and supermaximum units.

Cunningham & Goldstein, *supra,* at 428.

"The availability of supermaximum confinement in virtually all prison systems is a particularly critical variable to consider in violence risk assessment at capital sentencing." In a supermaximum unit, which impose higher staffing, more control, in-cell meals, and rigorous shackling, reduce opportunities for violence. "Consequently, inmates who are viewed as being a disproportionate risk of serious violence toward staff or other inmates can be confined in a context that minimizes that risk." Cunningham & Goldstein, *supra,* at 428.

*CLAIM NUMBER 4: WILLIAMS' TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HE MISTAKENLY BELIEVED ONE OF HIS EXPERTS WAS NOT QUALIFIED TO RENDER AN OPINION THAT WILLIAMS WAS MENTALLY RETARDED.*

In claim six of his state writ of habeas corpus, Williams claims his trial counsel rendered constitutionally deficient assistance of counsel when he was unaware one of his experts, Dr. Jim Patton, could testify that Williams was mentally retarded. Williams' trial counsel was under the mistaken impression that because Dr. Patton was not a licensed psychologist or psychiatrist and not certified by the State of Texas to diagnose mental retardation, he could not render an opinion that Williams was in fact mentally retarded. In fact, Dr. Patton had rendered an opinion in other courts that certain individuals were mentally retarded even though he did not have those particular qualifications.

In its Findings of Fact and Conclusions of Law, the trial court found that Dr. Patton's sole purpose as a defense team member was to testify about the adaptive deficits prong of the *Briseno* standard. His purpose, according to the court, was never to test the defendant for mental retardation.

Consequently, the court wrote that the issue of agreeing or disagreeing whether Dr. Patton could diagnose mental retardation was never an issue at trial. Dr. Patton was properly qualified to testify about the defendant's adaptive deficits and did so. Therefore, the trial court concluded that there was simply no credible evidence before the court that Williams' trial counsel provided ineffective assistance of counsel in any manner, much less in the manner alleged by the defendant's writ application. As mentioned, on March 18, 2009 the Texas Court of Criminal Appeals adopted the trial court's findings and conclusions. *Ex Parte Clifton Lamar Williams*, No. WR-71,296-01 (Tex. Crim. App. 2009).

The State court's adjudication of this claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding and resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law. 28 U.S.C. §2254(d). Whether or not Dr. Patton could diagnose mental retardation *was* an issue at trial. During the 705 hearing, the State during their voir dire examination of Dr. Patton:

Q: [Prosecutor] Okay. Under what Texas license or certification are you sanctioned to make a diagnosis of mental retardation?

A: [Dr. Patton] I believe that that – given my background in the field of mental retardation, that that's the argument for being able to serve in the capacity I do.

Q: Okay. And is that approved by or endorsed by anyone but yourself?

A: Well, I believe – I've served in this capacity in other cases, so I guess it – in that sense, if I understand your question... 56 RR 238-239
          ...

[The trial court] If he had said he was going to make a diagnosis of mental retardation, I would not have allowed him to say that. But based upon my reading of Daubert and Kelly and the prodigy, that I am not inclined to disallow the Defense

40

the opportunity to present this witness in the limited are for which you have indicated... 56 RR 244.

      ...

Q: [Prosecutor] Well, I mean, you cannot – you cannot come into court, by law, and make an M.R. diagnosis, can you?

A: [Dr. Patton] Not in – well, in this state right now, that's probably correct.

Q: Well, I mean, probably or is it? The law does not allow you to come in and make an M.R. diagnosis, does it?

A: As it has been defined in the – in the subsequent case law, that's right.

Q: Okay. Well, I mean, you have no license or certification to make any diagnosis of mental retardation. You can't do it, can you?

A: According to this Court, no, I cannot. 56 RR 292.

The previous colloquy Dr. Patton had with the trial court showed Williams' defense counsel's complete lack of witness preparation and understanding of pertinent case law and could not be the result of any reasonable trial strategy. In *In re Hearn*, 418 F.3d 444, 445 (5th Cir. 2005), the Fifth Circuit held that this same Dr. James Patton could was qualified to render an opinion that the Petitioner was mentally retarded despite the fact that he was not certified by the State of Texas to diagnose mental retardation because of his other numerous qualifications and significant experience. The *Hearn* court also noted that Dr. Patton had offered his opinion on a defendant's mental retardation in a similar case and that court noted Dr. Patton's affidavits opining that the Petitioner was mentally retarded constituted a "much stronger *Atkins* claim than he presented to the Texas courts." *Id*. at 447 fn.3, citing *Morris v. Dretke*, 413 F.3d 484, 490 (5th Cir. 2005). Had Dr. Patton rendered his opinion that Williams is in fact mentally retarded, the defense would have produced three experts with the opinion that he was mentally retarded. Only Dr. Proctor and, in

passing, Dr. Gripon testified on behalf of the State that Williams was not mentally retarded. Under *Briseno*, Williams only had to prove by a preponderance of the evidence that he was mentally retarded. Had Williams' counsel known that other courts had permitted Dr. Patton to render an opinion that a person is mentally retarded, and Dr. Patton would have been allowed to render such an opinion, it is clear that Williams would have proven by a preponderance of the evidence that he was mentally retarded.

### CLAIM NUMBER 5: WILLIAMS' TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HE FAILED TO PRODUCE EVIDENCE OF WILLIAMS' FAILED ATTEMPT TO OBTAIN HIS GED FROM THE LITERACY COUNCIL WHEN THAT EVIDENCE WAS AVAILABLE TO THE DEFENSE AND HIGHLY PROBATIVE TO THE ISSUE OF MENTAL RETARDATION AND CONSTITUTED MITIGATING EVIDENCE.

In claim seven of his state writ of habeas corpus, Williams claimed his trial counsel rendered constitutionally deficient assistance of counsel when he failed to produce evidence of Williams' failed attempt to obtain his GED from the Literacy Council when that evidence was available to the defense and highly probative to the issue of mental retardation and constituted mitigating evidence. In its Findings of Fact and Conclusions of Law, the trial court found that Williams' defense counsel was aware of the defendant's Literacy Council records admitted during the testimony of Nancy Crawford at the hearing on the state writ of habeas corpus. However, the court wrote, the trial counsel did not see the records as being significant in light of all of the defendant's school records that were available for the same purpose and consequently reasonably decided that their admission was not particularly important. Therefore, the trial court concluded that there was simply no credible evidence before the court that Williams' trial counsel provided ineffective assistance of counsel in any manner, much less in the manner alleged by the defendant's writ application. As with the other

claims, on March 18, 2009, the Texas Court of Criminal Appeals adopted the trial court's findings and conclusions. *Ex Parte Clifton Lamar Williams*, No. WR-71,296-01 (Tex. Crim. App. 2009).

The state court's findings of fact and conclusions of law resulted in a decision contrary to, or involved an unreasonable application of clearly established Federal law and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). The records from the Literacy Council *were* admitted during the trial and Williams' state habeas defense attorney, trial court and state prosecutor completely overlooked their admission. 54 RR 116; St. Ex. 332. In fact, Williams' defense counsel even "acknowledged" that the Literacy Council records were not admitted although he was aware of their existence. SW hearing, November 24, 2008, p.79.

As to the first prong of the *Strickland* test, Williams' defense counsel admitted that there was no strategic reason for not "admitting" the Literacy Council records. Since they were actually admitted into evidence, what his defense counsel really meant was that there was no strategic reason for not publishing those records to the jury or providing to his experts for testimony. The second prong of the *Strickland* ineffective assistance of counsel test is also easily met because the Literacy Council records were highly significant. As described by Nancy Crawford, the executive director of the Literacy Council during the hearing on the state writ of habeas corpus, Williams was given the Test of Adult Basic Education before he could begin his GED classes. SW hearing, p. 16. That test reflected that when he was twenty years old, he was reading on a second grade level and scoring at a fifth grade level for the math portion. SW hearing, pp. 16-17. The school records admitted at trial actually showed Williams earned several decent grades and his defense council struggled to show his mentally retarded client actually earned those grades due to "social promotion" and not

because he had a higher aptitude than a mentally retarded individual. 55 RR 163-164. Likewise, Dr. Robert McClure had difficulty explaining how his diagnosis that Williams was mentally retarded was correct even in light of passing school grades. 55 RR 206-210. Williams had failed many portions of the Texas Assessment of Academic Skills (TAAS) Test which was a standardized test that measured the minimum requirements a student needed to have in certain educational areas to proceed to the next grade. 55 RR 162-163. He received failing grades on the test even when he was given special accommodations to complete the test. 56 RR 92. The Literacy Council records would have perfectly dovetailed into the defense's argument that his school records were deceiving and should be largely ignored when the jury answered the special issue as to whether Williams was mentally retarded. While they were actually admitted during the trial, it appears from the record that neither counsel for the defense or the State ever published those records to the jury, and the defense never provided them to Williams' experts. Then, during the state writ of habeas corpus litigation, the defense, state and the trial court all believed they were *not* admitted during the trial.

### CLAIM NUMBER 6: WILLIAMS' TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HE FAILED TO OBJECT TO THE ADMISSIBILITY OF STATE'S WITNESS, STEVE ROGERS.[7]

In claim eight of the state writ of habeas corpus, Williams argued his trial counsel rendered constitutionally deficient assistance of counsel when he failed to object properly to and challenge the admissibility of the testimony of Steve Rogers, an expert called by the State who testified that inmates continue to act violently after sentencing to show that, even if given a life sentence, Williams could still constitute a continuing threat to society. Even though Williams' counsel had

---

[7]Both the state writ of habeas corpus and trial court findings of fact and conclusions of law mistakenly replaced Rogers's name with Royce Smithy, a different expert that rendered similar testimony.

filed an extensive Motion in Limine challenging this testimony, he failed to raise any objection at trial, thereby waiving a compelling issue for direct appeal.

In its Findings of Fact and Conclusions of Law, the trial court reiterated the testimony of Williams' defense counsel, writing that he strategically did not object to Rogers' testimony because he felt that it was more beneficial to the defendant than prejudicial. Mr. Rogers' testimony, according to defense counsel, showed that the State of Texas actually executed more prisoners than were killed by fellow inmates in prison. Although logically unsound, trial counsel felt this fact was significant in showing the jury that the State of Texas could protect other inmates from Williams should they decline to answer the special issues in such a way that the death penalty was precluded. Again, the trial court concluded that there was simply no credible evidence before the court that Williams' trial counsel provided ineffective assistance of counsel in any manner, much less in the manner alleged by the defendant's writ application. And as mentioned, on March 18, 2009, the Texas Court of Criminal Appeals adopted the trial court's findings and conclusions. *Ex Parte Clifton Lamar Williams*, No. WR-71,296-01 (Tex. Crim. App. 2009).

Thompson's lack of a relevance objection to Rogers' testimony was an inexcusable omission and not the result of any "reasonable trial strategy" because he consistently argued in all the other aspects of the trial that such testimony was wholly irrelevant. During the pretrial hearing held on August 4, 2006, in a hearing on his Motion in Limine, Thompson vigorously argued that testimony of incidents of violence by other inmates was *not* relevant to *Williams'* propensity to commit future acts of dangerousness. 12 RR 20. Royce Smithey, an expert called by the State just prior to Rogers, rendered the same form of expert evidence as Rogers and Williams' counsel had objected to the relevance of that testimony. 51 RR 60-62. Obviously, this contradicts his statement that he

45

"strategically did not object" to the testimony of Steve Rogers. The trial court's finding that Thompson was a "credible witness" and provided effective assistance of counsel in not objecting to Rogers expert testimony is an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

### CLAIM NUMBER 7: WILLIAMS' TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HE FAILED TO PROPERLY INVESTIGATE WILLIAMS' WORK DUTIES IN CONNECTION WITH HIS PREVIOUS EMPLOYMENT.

In claim nine of the state writ of habeas corpus, Williams argued his trial counsel rendered constitutionally deficient assistance of counsel when he failed to investigate properly Williams' duties as being a cook at Kentucky Fried Chicken.

Williams' trial counsel presented evidence during the trial of his inability to hold a job in order to show that he had adaptive behavior deficits which is one of the requirements under existing Texas law to show a defendant is mentally retarded. What defense counsel failed to do, however, is properly controvert the State's assertion that his job as a cook at Kentucky Fried Chicken actually showed he was not mentally retarded because that job required the ability to measure spices in the proper proportion and cook chicken appropriately. The State impeached the testimony of defense expert James Patton that Williams did not lack adaptive functioning because he was able to perform a long and protracted method of preparing food at Kentucky Fried Chicken. 57 RR 14-16. During their cross-examination of Dr. Allen, the State mentioned that Williams told Dr. Gripon that he had mixed spices while working at Kentucky Fried Chicken. 56 RR 113.

Williams' habeas counsel, through the use of his investigator, actually revealed that all of the ingredients come pre-mixed and all the cook has to do is open boxes, sift various ingredients together and dredge the chicken. This was explained during the punishment phase of the trial by Dr. Allen.

46

56 RR 113-114. These job "skills" do not require a high I.Q. and can be performed by people who are mentally retarded. Trial counsel allowed the State to mischaracterize repeatedly the job duties of a cook at Kentucky Fried Chicken which had an injurious affect on their decision that Williams was not mentally retarded.

In its Findings of Fact and Conclusions of Law, the trial court reiterated his trial counsel's testimony that he was fully aware of his job duties at Kentucky Fried Chicken and other places but wrote that the jury would nevertheless hear other testimony that he was able to cook simple meals for himself. The trial court further concluded that there was simply no credible evidence before the court that Williams' trial counsel provided ineffective assistance of counsel in any manner, much less in the manner alleged by the defendant's writ application. As mentioned, on March 18, 2009, the Texas Court of Criminal Appeals adopted the trial court's findings and conclusions. *Ex Parte Clifton Lamar Williams*, No. WR-71,296-01 (Tex. Crim. App. 2009).

### CLAIM NUMBER 8: WILLIAMS' TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HE ALLOWED WILLIAMS TO BE QUESTIONED BY THE TRIAL COURT AS TO HIS POSSESSION OF A RAZOR WHILE IN JAIL.

In claim ten of the state writ of habeas corpus, Williams alleged his trial counsel rendered ineffective assistance of counsel when he allowed his client to admit judicially to possessing a razor while in custody awaiting trial. During the punishment phase of the trial, the State presented evidence that on January 21, 2006, one of jailers employed at the Smith County Jail, T.J. Miles, found Williams in possession of a razor and had threatened to kill himself. 50 RR 33. Up to that point in the trial, a different jailer, Carla Caldwell, had testified that no razor was ever found in his cell or anywhere else after that particular incident. 50 RR 17-19. In fact, defense counsel admitted

Miles' offense report from the incident that never mentioned a razor blade. 50 RR 56; 51 RR 29.[8]

During Miles' testimony, Williams became agitated and the trial court excused the jury. 50 RR 37.

Then, outside the presence of the jury, Williams told the court that "he had something to say." 50

RR 39. After a brief discussion with Williams, the trial court asked "now, what is that you want to

say to the court?" 50 RR 40. Without any attempt by his attorney to prevent this colloquy, Williams

then admitted to possessing the razor on that occasion. 50 RR 40. That testimony was read back

to the jury during the punishment phase of the trial and considered by the jury in their determination

of the "future dangerousness" special issue. 51 RR 46. Dr. McNeel testified that it was a "fifty fifty"

proposition whether he thought Williams constituted a future danger to society until he learned

about, among other incidents, Williams' alleged possession of a razor in his cell. 51 RR 196-200.

In its Findings of Fact and Conclusions of Law, the trial court again merely reiterated the

testimony of Williams' trial counsel during the hearing on the state writ of habeas corpus. His trial

counsel "did not think he had any right to confront" the trial court for attempting to maintain

decorum in the courtroom after he "lost control" over the defendant. The Findings did mention that

his trial counsel "strenuously objected" -- too late -- to the admission of the defendant's statement

regarding possession of the razor, which was overruled. The trial court further concluded that there

was simply no credible evidence before the court that Williams' trial counsel provided ineffective

assistance of counsel in any manner, much less in the manner alleged by the Williams' writ

application. On March 18, 2009, the Texas Court of Criminal Appeals adopted the trial court's

---

[8]Carolyn Brown, the sergeant on duty that day, testified the day after Miles and Caldwell
that she did not find a razor either after searching his cell. 51 RR 9-10, 19.

findings and conclusions. *Ex Parte Clifton Lamar Williams*, No. WR-71,296-01 (Tex. Crim. App. 2009).

The trial court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. §2254(d). Williams' defense counsel never "lost control" over Williams. After his initial outburst, the record indicates Williams calmly and politely heeded the warnings of the trial judge and constantly addressed her as "ma'am" and later apologized to the court. 50 RR 37-41. Further, the trial court's request to hear from Williams was not done in connection with its attempt to "maintain decorum in the courtroom." That had already been addressed in the moments prior. Certainly, his defense counsel knew he had a right to "confront the trial court" before it heard from Williams because the court repeatedly admonished Williams that he could consult his attorneys before he made any statements. 50 RR 39-40.

Had his trial counsel performed competently, Williams would have never admitted in open court to possession of the razor blade while he was in jail and that testimony would not have been considered by the jury. By his own admission, Dr. McNeel was "on the fence" as to whether Williams constituted a continuing threat to society until he learned about the possession of the razor blade. Likewise, there is no question that evidence pushed the jury in that direction as well and without such testimony, and the record is barren as to any credible evidence that Williams committed acts of violence while in custody.

**CLAIM NUMBER 9: WILLIAMS IS MENTALLY RETARDED. AS HELD BY THE U.S. SUPREME COURT IN *ATKINS V. VIRGINIA*, EXECUTION OF AN INDIVIDUAL WHO IS MENTALLY RETARDED VIOLATES THE EIGHTH AMENDMENT GUARANTEE AGAINST CRUEL AND UNUSUAL PUNISHMENT OF THE U.S. CONSTITUTION.**

Williams is mentally retarded. As such, he is ineligible for the death penalty according to *Atkins v. Virginia*, 536 U.S. 304 (2002), in which the Supreme Court held that execution of the mentally retarded violates the Eighth Amendment.

**A.    DECISIONS BELOW**

Williams' *Atkins* claim was litigated in state court, but rejected by the jury, trial court and Texas Court of Criminal Appeals (CCA).

**TRIAL**

Williams' attorney litigated his *Atkins* claim at trial. A number of experts testified. Williams' mental retardation was submitted to jurors for decision, who determined that Williams was not mentally retarded. The trial court instructed jurors:

> You are instructed that the defendant must prove by a preponderance of the evidence that the answer to Special Issue No. 3 is "Yes." You are instructed that by "preponderance of the evidence" is meant the greater weight and degree of the credible evidence in the case."
>
> . . .
>
> Members of the jury need not agree on what particular evidence supports an affirmative answer to Special Issue No. 3.
>
> In deliberating on Special Issue No. 3 submitted in this charge, the jury shall consider all evidence admitted at the guilt of innocence stage and the punishment stage of this trial.
>
> With respect to Special Issue No. 3, you are instructed that mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

"Disability" is the expression of limitations in individual functioning within a social context and represents a substantial disadvantage to the individual.

"Intelligence" is a general mental ability. It includes reasoning, planning, solving problems, thinking abstractly, comprehending complex ideas, learning quickly, and learning from experience.

You are instructed that in reference to the "assessment of intelligence," the criterion for diagnosis is approximately two standard deviations below the mean, considering the standard error of measurement for the specific assessment instruments used and the instrument's strengths and limitations. In regard to standardized psychometic instruments you are instructed that the recognized standard error of measurement is a range of five points higher or lower.

"Adaptive behavior" is the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives.

You are instructed that in reference to the "assessment of adaptive behavior," for the diagnosis of mental retardation, significant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population, including people with disabilities and people without disabilities. On these standard measures, "significant limitations in adaptive behavior" are operationally defined as performance that is at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills.

You are instructed that in reference to "context," the assessment of context, although not typically accomplished with standardized measures, is a necessary component of clinical judgment and integral to understanding the individual's functioning.

. . .

If at least ten (10) jurors or more determine that the defendant has proved Special Issue No. 3 by a preponderance of the evidence, that is the defendant has proved by a preponderance of the evidence that the defendant, Clifton Williams, is a person with mental retardation, then the Jury Foreman will so record the Jury's answer of "Yes" to Special Issue No. 3 by signing his or her name to the finding reflecting such answer on the form provided for that purpose.

. . .

*See* Jury Instructions in Williams trial 7-9 (filed Oct. 13, 2006).

The court asked jurors to decide whether Williams was mentally retarded; the jury said no:

**Special Issue No. 3**

Is the defendant, Clifton Williams, a person with mental retardation?

Answer to Special Issue Number 3:

We, the jury unanimously find and determine that the answer to this Special Issue No. 3 is "No."

*/s/ Jamie Leach*
_____
Foreman

*See* Jury Instructions in Williams trial 19-22 (filed Oct. 13, 2006).

**TCCA**

On direct appeal, the CCA criticized the poor briefing by Williams' appellate lawyer but addressed the merits of Williams' *Atkins* claim, thereby preserving and exhausting the claim for review by this Court. *Williams v. State*, 270 S.W.3d 112, 115 (Tex. Crim. App. 2008). The CCA determined the mental retardation analysis to be structured by *Ex parte Briseno* 135 S.W.3d 1 (Tex. Crim. App. 2004), the AAMR definition of mental retardation, and the Texas definition of mental retardation contained in the Texas Health and Safety Code, section 591.003(13). *Williams,* 270 S.W.3d at 113-14.

In *Briseno*, the CCA squarely placed the burden of proving his mental retardation (and therefore his ineligibility for execution) on the capital murder defendant. 135 S.W.3d at 3. Then the court placed the additional heavy appellate burden on the defendant to prove on appeal that the jury's finding – entitled "great deference" -- is "so against the great weight and preponderance of the evidence so as to be manifestly unjust." *Id.* at 3.

In Williams' appeal the CCA slanted its analysis to find every justification for avoiding a retardation finding and sidestepping Williams' compelling evidence retardation evidence:

- He was 21 at the time of the murder.

- He was raised by his mother until she died when he was in the sixth or seventh grade. There were signs that she was mentally ill. She was not abusive, however, and Williams was close to her.

- After the death of his mother, Williams was raised by his father and step-mother.

- He scores in school were passing or above average until he dropped out in the twelfth grade.

- Williams repeated first grade. His first grade scores in reading, spelling and language were below the passing level. His first grade teacher thought Williams' relative youth for first grade may account for his low achievement. She did not see signs of mental retardation or a need for testing. He improved next year.

- None of the family or teachers who testified thought Williams was mentally retarded during his formative years.

- Williams' seventh grade teacher said that he was fully capable of reading at the seventh grade level.

- Williams was assigned to the "504 program" for special needs students, but this was not the same as a special education program for mentally retarded students.

- Williams was never assigned to special education.

- At 15, Williams began associate with the wrong crowd and using drugs.

- He drove but never obtained a driver's license.

- He worked in fast food restaurants, and was capable of taking orders inside and in the drive through window, handling money, making changes and preparing meals.

- He was capable of making purchases at stores.

- The CCA explained and quoted at length State experts while minimizing opinions of Williams' experts.

The CCA placed considerable weight on Williams' conduct associated with the crime and its aftermath:

- He was capable of understanding his *Miranda* rights;

- He could make voluntary statements to police;

- He could lie in his interests, albeit badly;

- He lived by himself in an apartment, although it was provided by his mother who also provided his groceries and paid his bills;

- He could purchase toiletries from the jail commissary.

Williams' IQ was never tested before age 18. When a psychologist evaluated Williams at age 19 for Social Security disability benefits, she diagnosed him as mildly mentally retarded and suffering some degree of schizophrenia. *Williams*, 270 S.W.3d at 118. His full scale WAIS IQ was 63. Applying the Wide Range Achievement Test, the psychologist found Williams' reading, writing and math skills at the fourth grade level. Another independent psychiatrist diagnosed Williams as suffering paranoid schizophrenia. Williams was assigned SSA disability benefits.

The CCA noted that one defense expert believed Williams' mental illness contributed to his commission of the murder, although another did not. *Id.* A defense expert testified that Williams had adaptive deficits in three areas: functional academics, home living and community use. And another defense expert, Dr. Allen, testified that Williams full scale IQ was 65 and that he was mildly mentally retarded. Williams never passed all portions of the TAAS standardized test for students.

State experts found that Williams, while below average, was not mentally retarded, accusing him of faking or exaggerating his schizophrenia symptoms. *Williams,* 270 S.W.3d at 126 n.1. Dr. Proctor's IQ tests measured 71, 78, 83 and 73-74. He assessed Williams' adaptive behavior as well

above the range for mental retardation. Another State expert, Dr. Gripon, agreed, finding Williams below average in intelligence and ability, but above the threshold for mental retardation. *Williams*, 270 S.W.3d at 131.

Sifting all of this information and the arguments by the attorneys, the CCA concluded that there was adequate information for the jurors to find Williams was not mentally retarded. *Williams*, 270 S.W.3d at 133. Consequently, the court denied Williams' *Atkins* claim.

### State district court on habeas

Williams filed a state application for writ of habeas corpus raising IAC claims against his trial and appellate counsel. After conducting an evidentiary hearing, the trial judge signed and filed findings of fact and conclusions of law on December 29, 2008. The court began by reciting the experts who testified for both sides in the trial, and the procedural history of the case.

The court summarized the evidence offered of additional proof of Williams' mental retardation missed by his trial attorneys. These included the director of the a local literacy agency which aids adults unable to read. Williams tested at a low reading level and received literacy training. Dr. Allen, the defense MR expert, described his role in the case and criticized the trial attorneys as inadequate.

The trial attorneys testified and explained their actions. The court summarized and approved their litigation strategy as reasonable. The appellate counsel testified that he raised only a few meritorious issues and jettisoned ones unlikely to reverse the appeal.

The court found the attorneys experienced and effective for Williams. The court found Dr. Allen not to be a credible source. The court therefore recommended that the CCA deny Williams' habeas petition, which the CCA followed.

# ARGUMENTS

**THE STATE COURTS ' DETERMINATION THAT WILLIAMS IS NOT MENTALLY RETARDED IS UNREASONABLE IN LIGHT OF THE EVIDENCE PRESENTED IN THE STATE COURT AND THE RESULT IS CONTRARY TO AND AN UNREASONABLE APPLICATION OF *ATKINS*.**

## B.    STANDARDS OF REVIEW

As mentioned, under the AEDPA, a federal district court may grant a habeas application when a state court decision upholding a conviction or sentence rests on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding" or "resulted in a decision that [is] contrary to, or involve[s] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. §2254(d). State court factual findings are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. §2254(e)(1).

A state court decision constitutes an "unreasonable application" of federal law if the court correctly identifies the governing legal principle but applies that principle to the case in an objectively unreasonable manner. *Rivera v. Quarterman*, 505 F.3d 349, 356 (5th Cir. 2007), *cert. denied* (2008). A decision is "contrary to" clearly established federal law if it contradicts a controlling Supreme Court case. *Id.* "If the state court's decision runs afoul of these limits, then federal court review 'is unencumbered by the deference AEDPA normally requires.'" *Id.* (quoting *Panetti v. Quarterman*, 127 S.Ct. 2842, 2855 (2007)). "When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in §2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires." *Panetti*, 127 S.Ct. at 2858.

A state court decision may involve an unreasonable application of controlling federal law, even when the Supreme Court has not previously dealt with a "nearly identical factual pattern." *Id.* (internal quotes omitted). "[E]ven a general standard may be applied in an unreasonable manner." *Id.*

## C.   BASIC INFORMATION ABOUT MENTAL RETARDATION

This Court recently signed a well-written opinion discussing current mental retardation standards which may be used in this case. *See* Memorandum Opinion and Order, *Danielle Simpson v. Quarterman*, No. 1:04-cv-485 (Jan. 8, 2009) (docket no. 97).

Legal definitions of mental retardation in virtually all jurisdictions are derived from either or both the diagnostic manual of the American Association on Mental Retardation (AAMR; recently changed to American Association on Intellectual and Developmental Disabilities, AAIDD)[9] or the Diagnostic and Statistical Manual on Mental Disorders (DSM) of the American Psychiatric Association.[10]

Starting with the third DSM edition (DSM-3) in 1980, the DSM has deferred to the AAMR, and based its definition of mental retardation largely on the most current AAMR edition. The most recent DSM is DSM 4-TR (Text Revision) which was published in 2000, and is thus based on the definition contained in the 9th edition (AAMR-9), published in 1992. The most recent AAMR manual (AAMR-10) was published in 2002.[11]

---

[9]Am. Ass'n on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports*, 5 (9th ed. 1992).

[10]Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 41 (4th ed. 2000) (hereinafter, "DSM-IV-TR").

[11]AAMR *Mental Retardation: Definition, Classification, and Systems of Supports*, (10th Ed. 2002) (hereinafter AAMR Manual).

A significant difficulty in defining and diagnosing mental retardation is at the upper boundary, namely in the sub-category of "mild mental retardation", at the cusp of "mental retardation" and "normality." This is also the sub-category in which *Atkins* pleaders are often found. The reason why mild mental retardation is so difficult to diagnose is because the disorder is somewhat hidden, in the sense that people with mild mental retardation are more likely to look normal, to talk in complete and syntactically correct sentences, and to have a number of strengths mixed in with their weaknesses. It is because people with mild mental retardation can function normally in many areas that current definitions of mental retardation do not require global adaptive functioning impairments. Instead, it is necessary only to show impairments in some areas, and these can differ from individual to individual.

### D.  THE ELEMENTS OF A CLAIM UNDER *ATKINS*

1.      Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

2.      A diagnosis of mental retardation requires significantly subaverage intellectual functioning defined as two standard deviations below the mean (an IQ score of 70 plus or minus 5 points); significant limitations in conceptual, social, and practical adaptive behavior skills; and onset before the age of 18. AAMR <u>Mental Retardation: Definition, Classification, and Systems of Supports</u> 39 (10th Ed. 2002) (hereinafter AAMR Manual).

3.      Because the definition of mental retardation requires an assessment of both adaptive functioning and intellectual functioning during the development phase, a reviewing court must

consider evidence of the inmate's current and historical intellectual functioning, as well as evidence of adaptive behavior deficits dating back to the developmental period of his life.

The convention within the field of mental retardation, stated in both the AAMR Manual and the DSM-IV-TR, is that IQ scores within the standard error of measurement range of two deviations below the mean (or under 75), satisfies Prong 1. AAMR Manual, 58-59; American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th Ed., Text Revised 2002).

A full-scale IQ score is the most accurate assessment of intellectual functioning. It provides a holistic assessment of the individual's functioning, to include auditory, verbal, tactile, kinesthetic, visual and motor skills; and provides the most comprehensive information possible on a person's intellectual functioning level. IQ tests are divided into verbal and performance scales, the purpose of which is to provide information about an examinee's areas of strengths and weaknesses.

In order to assess accurately an individual's level of functioning, full scale IQ tests must be adjusted to compensate for the obsolescence of a test's standardization scale. As IQ tests age, so the norms on which they are based become outdated, and people's scores on the test become artificially inflated. This phenomenon is known as the Flynn Effect, and, in the case of Wechsler intelligence tests administered in North America, requires a downward adjustment of an IQ score of three tenths of a point per year between the date the test was originally normed, and the date the test was actually administered. AAMR User's Guide, guideline 4.

In addition, every testing instrument has a standard error of measurement, otherwise known as a confidence band within which there is a 95% certainty that a person's true level of intellectual functioning falls. That confidence band is typically plus or minus five points, and explains why the AAMR and the DSM-IV place the cut point for mental retardation five points above 70, at 75.

## E.	Texas Adopted the AAMR Definition Of Mental Retardation.

In *Briseño*, 135 S.W.3d 1 (Tex. Crim. App. 2004), the TCCA recognized that *Atkins* requires states to develop definitions and procedures to forbid the execution of the mentally retarded. *Briseño* questioned whether all mentally retarded individuals must be exempted from execution, 135 S.W.3d at 6, but, in adopting the AAMR standard, the TCCA aligned itself behind *Atkins*, which unequivocally draws a bright line and "categorically exclude[s] from execution" all mentally retarded offenders. 536 U.S. at 318.

The TCCA previously had used the AAMR-9 definition of mental retardation in criminal cases. *E.g., Ex parte Tennard*, 960 S.W.2d 57, 60-61 (Tex. Crim. App. 1997), *rev'd on other grounds*, *Tennard v. Dretke*, 542 U.S. 274 (2004), *on remand*, 442 F.3d 240 (5th Cir. 2006). *Briseño* held that, until the legislature decreed a different approach, the Texas courts should apply the AAMR's clinical definition of mental retardation in evaluating *Atkins* claims. 135 S.W.3d at 8. Neither legislative enactment nor subsequent opinion has modified *Briseño*'s adoption of the AAMR definition.

The AAMR definition of mental retardation that *Briseño* adopted states:

> *Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations[12] in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.

> AAMR-9 at 5, *cited*, 135 S.W.3d at 7 n.26.

---

[12]	"Related limitations" are limitations in adaptive skills that "are more closely related to the intellectual limitation than to some other circumstances such as cultural or linguistic diversity or sensory limitations." AAMR-9 at 6.

*Briseño* also noted with approval an AAMR treatise recognizing standardized tests as a usual way to assess adaptive behavior. *Id.* at 7 n.25.

Because the TCCA saw the adaptive behavior criteria used by mental health professionals as "exceedingly subjective," the TCCA enunciated the seven "other evidentiary factors" now referred to as "the *Briseño* factors" that fact-finders may consider. *Id.* at 8. Initially, the TCCA conceived these factors as a way to determine whether a defendant's behaviors manifested mental retardation or an anti-social personality. *Id.*[13] Later cases use the *Briseño* factors more broadly as a way to reinforce findings supported by the AAMR criteria.[14] The TCCA has often treated the *Briseño* factors as supplemental factors that courts could weigh in an ambiguous case or when the petitioner did not offer documentary evidence such as school records or standardized test results. In *Ex parte Van Alstyne*, 239 S.W.3d 815, 820 (Tex. Crim. App. 2007), the TCCA clarified that the *Briseño* factors are "non-diagnostic criteria."

---

[13] The notion that someone is either mentally retarded <u>or</u> has an anti-social personality disorder reflects a false dichotomy. Mental health professionals uniformly recognize that someone can have <u>both</u> mental retardation and a personality disorder. DSM-IV-TR at 45; AAMR-10 at 172; AAMR-9 at 54; RR2:41-42; *Holladay v. Campbell*, 463 F. Supp.2d 1324, 1346 (N.D. Ala. 2006) (noting expert testimony that "anti-social behaviors and mental retardation are not mutually exclusive and that such disorders could be a function of mental retardation"). Once significant intellectual deficits and related adaptive deficits are established, the person qualifies as mentally retarded; a court may not then rule out that diagnosis through further inquiry about whether the limitations also reflect mental illness. Mental retardation is <u>not</u> an exclusion diagnosis; if the criteria are met, the diagnosis should be made, even when other diagnoses also apply. AAMR-10 at 115.

[14] *E.g., Hunter v. State*, 243 S.W.3d 664, 666-72 (Tex. Crim. App. 2007); *Van Alstyne*, 239 S.W.3d at 819-21.

**F.   THE COURT OF CRIMINAL APPEALS' IMPROVISATION OF SEVEN FACTORS TO GUIDE THE MENTAL RETARDATION DETERMINATION HAS NO BASIS IN THE SCIENCE OF MENTAL RETARDATION, AND THE FACTORS ARE IN MOST RESPECTS CONTRARY TO THE SCIENCE OF MENTAL RETARDATION**

The State of Texas has failed to take appropriate legislative actions to prevent the execution of mentally retarded defendants in violation of the Sixth, Eighth and Fourteenth Amendments. In the years since the Supreme Court identified mental retardation as a bar on the execution of the mentally retarded, the Texas Legislature has repeatedly failed to enact legislation to create a statutory framework for the determination of mental retardation in the death penalty context. Instead, the guidelines initially created by the Court of Criminal Appeals for the express purpose of providing guidance in disposing of state habeas corpus proceedings during the "legislative interregnum" have been increasingly applied to a broader class of cases. The present case is typical in that respect; here, as in other cases, the Court of Criminal Appeals has indicated those judicially-created, *ad hoc*, guidelines are now the lodestar for determining mental retardation in all death penalty proceedings. Because the judicially created guidelines lack the safeguards and heightened procedural protections required in the death penalty context, the Texas death penalty scheme is unconstitutional.

In the complete absence of statutory law from the lawmakers, it is not up to the courts to divine what feels right and call it procedure. The trial court had no statutory authority for determining at what point of the proceedings the issue would be presented to the jury; no statutory authority for deciding that the question of William's retardation would be considered by the jury; no statutory authority for how to craft the jury charge on the issue of mental retardation; no statutory authority to answer whether the determination of the retardation could be carried along with the punishment phase of trial; and no statutory authority for making the burden of proof preponderance

of the evidence and placing that burden on the defendant. The *Briseño* factors provide merely a suggestion of how mental retardation should be determined at trial in the death penalty context, but they do not require that the trial court conduct the proceedings in any certain manner.

Until the Texas Legislature adopts a constitutionally viable procedure for adjudicating claims of mental retardation, the trial court does not have the authority to contrive a procedure on its own, nor does the CCA have the authority to create guidelines for the express purpose of keeping executions on track. The CCA's intervening action has allowed the Legislature not to act, and the CCA's position that the *Briseno* factors constitute the framework until and unless the Legislature acts provides a disincentive for the Legislature to do so. Texas's death penalty scheme is unconstitutional because the lack of a statutory framework renders the system lacking in regard to procedural safeguards required in death penalty cases. In the face of the lack of statutory requirements for determining mental retardation, and the number of questions left unresolved even under the *Briseño* factors, the CCA should have stayed Williams' appeal pending the development of a statutorily authorized procedure for determining mental retardation. If the Legislature never acted to bring Texas' death penalty scheme in line with *Atkins*, then the State would not be authorized to carry out executions where mental retardation might be an issue, because the Legislative inaction must be taken as a reflection that such executions are not important enough to voters to force the Legislature to act. The correct remedy is not for the CCA to step into the shoes of the Legislator to craft a framework in order to keep the death machinery running. The only appropriate remedy in this case is to award Williams a new trial, and for the trial court to hold this matter in abeyance until after the Legislature acts to set statutory procedures that provide for a

constitutional death penalty scheme that ensures mentally retarded individuals are not subjected to the death penalty.

As mentioned, Briseno's case was the first post-*Atkins* case decided on the merits by the Court of Criminal Appeals. As such, the court used Briseno's case to provide guidance to the lower Texas courts handling *Atkins* claims. *See Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004). In *Briseno*, the CCA deemed the clinical definitions of adaptive behavior "exceedingly subjective," *id*. at 8, and thus articulated "some other evidentiary factors which factfinders in the criminal trial context might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder." *Id*. These factors are:

- Did those who knew the person best during the developmental stage – his family, friends, teachers, employers, authorities – think he was mentally retarded at that time, and, if so, act in accordance with that determination?

- Has the person formulated plans and carried them through or is his conduct impulsive?

- Does his conduct show leadership or does it show that he is led around by others?

- Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

- Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

- Can the person hide facts or lie effectively in his own or others' interests?

- Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

135 S.W.3d at 8-9. These factors, favorable to the government, wholly improvised by the CCA without any reference to treatises or other scientific sources, have no basis in the science of

mental retardation and are in most respects diametrically opposed to the science of mental retardation.

The *Briseno* factors begin with a false dichotomy. The CCA described the seven *Briseno* factors initially as a way to determine if someone has "mental retardation or ... a personality disorder." 135 S.W.3d at 8. No scientific understanding of mental retardation supports drawing this distinction. Mental health professionals recognize that someone can have *both* mental retardation *and* a mental health disorder such as antisocial personality disorder.[15] Moreover, as noted, there is some overlap between the manifestations of antisocial personality disorder and the ways in which the core adaptive behavior limitations of mental retardation often manifest in the life of a person with mild mental retardation. Notwithstanding this overlap, DSM IV-TR makes clear that whenever impairments in adaptive behavior would also meet the criteria for antisocial personality disorder, *and* there is evidence of significantly subaverage intellectual functioning, these impairments should be associated with mental retardation, even if they may also be associated with another disorder such as antisocial personality disorder. DSM IV-TR at 47; *see also Holladay v. Campbell*, 463 F.Supp.2d 1324, 1346 (N.D. Ala. 2006) ("anti-social behaviors and mental retardation are not mutually exclusive and ... such disorders could be a function of mental retardation").[16]

---

[15]*See* AAMR 2002 manual at 172 ("In general, mental health disorders are much more prevalent in this population [of individuals with mental retardation] compared to the general population.... The types of mental health disorders are the same in people with and people without mental retardation."); DSM-IV-TR at 45 ("Individuals with Mental Retardation have a prevalence of comorbid mental disorders that is estimated to be three to four times greater than the general population.... All types of mental disorders may be seen.").

[16]At least two other cases have been decided on the basis of the scientifically invalid reasoning that personality and other mental health disorders rule out mental retardation. *See Neal v. State*, 256 S.W.3d 264, 274-75 (Tex.Crim.App. 2008) (finding no adaptive behavior deficits where experts diagnosed defendant with conduct disorder and antisocial personality rather than mental retardation; "[w]hile there is much evidence that he had struggled in coping with society

Given this fundamental flaw in the CCA's reasoning in *Briseno*, it is not surprising that the court did not draw its list of factors from any scientific source. *No such source exists.* Indeed, the source of the factors is nothing more than the prosecution evidence in Briseno's case. The CCA concocted the factors to match that evidence, without heeding Briseno's argument that the prosecution's evidence was contrary to the science of mental retardation. Analysis of these factors reveals that each is either altogether contrary to the science of mental retardation or irrelevant to assessing mental retardation. As the following analysis of each factor shows, the factors not only add nothing to the analysis of the evidence of mental retardation that the clinical factors provide, they in fact distract the factfinder from a reliable analysis of whether a particular petitioner has mental retardation.

1.      **"Did those who knew the person best during the developmental stage – his family, friends, teachers, employers, authorities – think he was mentally retarded at that time, and, if so, act in accordance with that determination?"**

Whether people close to the defendant thought he had mental retardation is immaterial, because most lay people do not know the criteria for such a diagnosis, do not know enough about the person to make such a determination, and are often fooled by the attempts that most people with mild mental retardation make to conceal their disability.[17] Whether people close to the defendant

_____

throughout his life, his underlying problems seem primarily behavior- and personality-related *rather than* related to low intellectual capacity") (emphasis supplied); *Williams v. Quarterman*, 2008 WL 4280315, *13 (5th Cir. Sept. 19, 2008) (finding no clear error in district court's ruling that "Williams's strange behavior was due to anti-social personality *rather than* mental retardation") (emphasis added).

[17]*See* n. 11, *supra*, citing Ellis and Luckasson. *See also* AAIDD *User's Guide*, *supra*, at 21 ("people with MR/ID are more likely to attempt to look more competent and 'normal' than they actually are")(citing R.B. Edgerton, *The Cloak of Competency* (Berkeley: Univ. Of California Press 1993)).

saw *indications* of mental retardation – such as being slow intellectually, being a passive follower in social settings, and being unable to live independently without help – *is* relevant. Indeed, these observations by people who knew the defendant are one of the primary sources of evidence concerning limitations in adaptive behavior. In formulating this factor, however, the CCA missed this point entirely. The CCA's observation that led to the articulation of this factor – "[i]t is highly significant that in none of these voluminous records is there any indication from any source that any person thought applicant might be mentally retarded," 135 S.W.3d at 16-17 – was thus immaterial. The CCA overlooked the significance of numerous observations, by witnesses and in documents, of Briseno's *behaviors* that were consistent with mental retardation, and in so doing, formulated a factor which *misleads* factfinders toward finding no mental retardation because no one has previously recognized explicitly that the person has mental retardation.

The CCA relied heavily on this factor to find against Williams:

- "Several of appellant's family members and several of his school teachers testified at trial, none of whom testified that, at the time of this developmental stage of appellant's life, they thought that appellant was mentally retarded." *Williams*, 270 S.W.3d at 116.

- "Appellant's I.Q. was never tested prior to the age of 18. The State suggested, through its cross-examination of one of the defense experts (McClure), that this was 'because no one thought [that appellant] needed' to have his I.Q. tested." *Id.*

- "Dobroski [first-grade teacher] testified that she did not have any indication that appellant 'was a mentally retarded child or needed to be tested for that.'" 270 S.W.3d at 116 n.6.

- "Riley testified that he believed that appellant was able to perform properly but that appellant 'was disinterested, unwilling to do the work.'" 270 S.W.3d at 116 n.6.

- "The defense attempted to diminish appellant's passing grades in school with evidence that appellant may have been 'socially promoted' [fn. 8] and that he was unable to pass all portions of various standardized tests that he took during his school

years. The defense also presented testimony that appellant was at times a '504 student' with 'special needs' before he entered high school."

> fn. 8 "Several of appellant's school teachers denied this. For example, appellant's first-grade teacher (Dobroski) testified that appellant earned his good grades that ranged from 85 to 96. Appellant's seventh-grade teacher testified that appellant earned his passing grades and that appellant 'was fully capable on a seventh grade reading level.' *Williams*, 270 S.W.3d at 116-17 & n.8

- "Appellant's step-mother (Nell) testified, however, that appellant 'read fairly well.'" *Id.* at 119 n.12.

- "'The people who knew him didn't think of him as mentally retarded. He wasn't labeled as mentally retarded during the developmental period.'" *Id.* at 127 (testimony of Dr. Proctor, state expert).

- "'There are a lot of examples, and a lot of them are the things that I started to go into in the beginning when I talked about his educational background, and the fact that, you know, his teachers didn't see him as mentally retarded or special education, . . . .'" *Id.* at 127-28 (same).

- "'You've heard the teachers say they didn't view him as mentally retarded, someone who needs special education. That's certainly true.'" *Id.* at 126 (same).

- "The jury did not have to accept the defense claim that appellant's average and above-average grades over the course of eleven years in school, during which it occurred to no one that appellant might be mentally retarded, were inflated." *Id.* at 132.

By contrast, the CCA ignored contrary testimony that Williams was crazy:

- Williams' trial counsel stated in opening that a witness indicated that the suspect's name was Crazy C. The information that police had gathered as a part of their investigation tracing the telephone number that Mr. Winters had in his cell phone, they were able to determine that Crazy C was actually Clifton Williams. They gathered information wherein they determined or discovered that Williams was a mental patient at the Andrews Center and took medication. 37 RR 69;

- Witness Jamarist Paxton referred to Williams as "Crazy C." 45 RR 49;

- Stella Barnes, Jamarist Paxton's "baby's momma" also referred to Williams as "Crazy C." 45 RR 154;

- Williams' grandmother, Helena Hawkins, thought he had the same "symptoms" as his mom.  53 RR 243;

- According to her, he heard voices.  53 RR 240;

- According to Ms. Hawkins, he was "severely" depressed after the death of his mother.  53 RR 244;

- According to her, Job Corps brought him back because "they say he was mentally ill."  53 RR 247;

- She thought he had some serious mental problems that concerned her and she would never let him babysit for her.  53 RR 252-253.

### 2. "<u>Has</u> the <u>person</u> <u>formulated</u> <u>plans</u> <u>and</u> <u>carried</u> <u>them</u> <u>through</u> <u>or</u> is <u>his</u> <u>conduct</u> <u>impulsive</u>?"

Impulsive behavior is, as the Court noted, a hallmark of mental retardation.  *See Atkins v. Virginia*, 536 U.S. 304, 318 (2002) (people with mental retardation "have diminished capacit[y] ... to control impulses ... [and] there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan...").  However, people with mental retardation do not *always* act impulsively.  Sometimes they formulate plans and carry them through.[18]  Moreover, a sizeable body of research shows that people with mild mental retardation can learn to set goals and make and carry out plans.[19]  Thus, the CCA's factor rests on a false assumption – that a person with mental retardation cannot and does not formulate and carry out plans – and sets forth a false dichotomy.  In

---

[18]The DSM-IV-TR observes that people with mild mental retardation "usually achieve social and vocational skills adequate for minimum self-support" and "can usually live successfully in the community."  DSM-IV-TR at 43.  To be able to do this, people with mild mental retardation must be able to plan and carry through plans and not act impulsively all the time.

[19]*See, e.g.,* M.L. Wehmeyer, *et al.*, TEACHING STUDENTS WITH MENTAL RETARDATION: PROVIDING ACCESS TO THE GENERAL EDUCATION CURRICULUM (2002); M.L Wehmeyer & S.B. Palmer, *Adult Outcomes for Students with Cognitive Disabilities Three Years After High School: The Impact of Self-Determination*, EDUCATION AND TRAINING IN DEVELOPMENTAL DISABILITIES (2003).

fact, while people with mental retardation "often act on impulse," *Atkins*, they also sometime act and can act pursuant to a plan.

Tellingly, the uninformed prosecution expert in *Briseno* misled the CCA into formulating this factor as it did. The defense expert identified numerous occasions in which, as a juvenile, Briseno repeatedly ran away from home, engaged in aggravated batteries and burglaries, failed to go to school, and got into fights, 135 S.W.3d at 15-16 – all of which he saw as examples of "'impulsivity,' a trait associated with mental retardation." *Id.* at 16 (footnote, citing juvenile authorities' notation of Briseno's impulsivity, omitted). The CCA continued, "On the other hand, the State's expert saw this impulsive behavior as consistent with conduct disorder," *id.* at 16, and "antisocial behavior," *id.* at 17, because Briseno was able to engage in crimes that involved planning. *Id.* at 17 n.70. This expert, Dr. Mears, thus led the CCA to ignore the applicable scientific principles, noted *supra*, (a) that people with mental retardation *both* plan *and* act impulsively, and (b) that impulsive behavior is a sign of *both* mental retardation *and* antisocial personality disorder, not just a sign of antisocial personality disorder.

The CCA relied on this factor as well against Williams:

- "Nell testified on cross-examination that appellant had the ability to go into a grocery store and 'to pick out what he wanted, go to the check-out and pay for it.' She also testified that she saw appellant work the cash register and the kitchen when he worked at Kentucky Fried Chicken." *Williams*, 270 S.W.3d at 121.

- "Patton also testified on cross-examination that a letter appellant wrote in jail to Nell and his sister asking for money was 'meaningful in the sense that individuals sometimes need money, and they ask for it.' He also testified that his notes indicated that appellant was not spending all of his money at the jail commissary on candy." *Id.* at 122-23.

- "'The type of work he did, yes, it was fast-food work, but he was hired like by KFC, worked for a while, was doing work as a cook, cashier, drive-through, leaves and then gets rehired.'" *Id.* at 127 (Dr. Proctor)

- "'There are a lot of examples, and a lot of them are the things that I started to go into in the beginning when I talked about his educational background, and the fact that, you know, his teachers didn't see him as mentally retarded or special education, . . . his work history, how he lived on his own, the things that he did when he lived on his own, and things like having your own apartment, riding a bike, cooking meals for yourself, working as a cook, working as a cashier, going to the gym, being able to walk around town, using the bus system, you know, driving a car." *Id.* at 127-28 (same).

The CCA ignored other portions of the record favoring Williams:

- Dr. Allen testifies that Williams' disciplinary problems at school can "possibly" be explained by having schizophrenia. 56 RR 79;

- Dr. Allen also testified that the fact that Williams could only hold menial jobs for a brief period of time could be explained by Williams having paranoid schizophrenia. 56 RR 104.

### 3. "<u>Does his conduct show leadership or does it show that he is led around by others</u>?"

Being a follower is, like impulsive behavior, a hallmark of mental retardation. *See Atkins v. Virginia*, 536 U.S. 304, 318 (2002) ("there is abundant evidence that ... in group settings they are followers rather than leaders."). However, people with mental retardation do not *always* follow. Indeed, one of the skills that people with mental retardation are actively encouraged to develop is leadership. *See* the website of the AAMR/AAIDD, at http://www.aamr.org/Policies/

faq_leadership.shtml[20]  Thus, as with impulsive behavior and planning, people with mental retardation can occasionally lead even though "there is abundant evidence that ... in group settings they are followers rather than leaders." *Atkins*.

Since Briseno allegedly performed in a leadership role on occasions, and the trial court found that Briseno did not have mental retardation, the CCA set up the dichotomy between being a leader and being a follower, not knowing that people who have mental retardation can lead even if they, more typically, follow.

Another problem with this factor, as with the second factor, is that in setting up either-or dichotomies as the CCA has – the petitioner either plans and carries out plans or acts impulsively, and the petitioner either leads or follows – these factors overlook another foundational scientific principle of mental retardation, which is that

> [a]daptive behavior encompasses the application of conceptual, social, and practical skills to daily life.  Its assessment should relate to an individual's typical performance during daily routines and changing circumstances, not to maximum performance.

AAMR 2002 manual at 17.  Thus, even if on occasion someone plans and carries out a plan, but his typical performance is to behave impulsively, and if on occasion the person acts in a leadership role, but his typical performance is to be a follower, under this scientific principle, the assessment would find that the person typically engaged in impulsive behavior and typically was a

---

[20]"Leadership is when a person learns the skills they need to run a group or be a part of a board or committee.  It is also speaking up for yourself and helping each other learn how you can work together as a TEAM (Together Everyone Achieves More).  It is learning new things and sharing what you have learned with others.  Leaders also know how to listen to people when they are talking and know when a person might need support.  Leadership sometimes is letting other people take over a discussion and have a chance to practice being a leader while they are learning new skills.  Being a leader is being a part of the community and knowing what is going on and getting involved.  Leadership means a lot of different things to a lot of people so it is important for people to figure out what is best for them."  (Definition of Leadership).

follower. Under the CCA's either-or taxonomy, however, the assessment could well find that the person acted pursuant to a plan and was a leader, thereby ruling out mental retardation.

Here, the CCA did not analyze the evidence straightforwardly whether Williams was a leader or follower, but instead assumed that he was effectively a leader because he was self-motivated to act alone:

- "The evidence in this case shows that on July 9, 2005, the then 21-year-old appellant broke into the home of a 93-year-old woman and beat and stabbed her to death." *Williams*, 270 S.W.3d at 114.

- "Appellant initially denied any involvement in the offense, but eventually told the police that Jamarist 'Monterral' Paxton, an acquaintance, forced him to participate in the offense and that appellant's involvement in it was minimal. The police were unable to find any other evidence to substantiate this claim, and Monterral testified at appellant's trial that he was not involved in the offense. The overwhelming weight of the evidence supports the State's factual theory that appellant acted alone in murdering the victim." fn. 4. *Id.* at 115.

  > fn. 4  "The State also presented evidence at the punishment phase that appellant sexually assaulted the victim (in the form of appellant's statement to the police that Monterral sexually assaulted her). The State's theory was that references in appellant's statement to Monterral actually referred to appellant's actions." *Id.* at 115 n.4.

  **4.**    **"Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?"**

This factor has no basis in the trial court findings in *Briseno* or in any testimony by the experts who testified in *Briseno*. Indeed, in reviewing or characterizing the trial court evidence, the CCA mentions nothing that would suggest why this factor helps differentiate people who have mental retardation from people who do not – and this factor does not do that.

Whether a petitioner responds to "external stimuli rational[ly] and appropriate[ly]" has nothing to do with mental retardation. It is a question that is instead relevant to mental illnesses,

such as psychosis, in which people misperceive external stimuli and often act inappropriately with respect to external stimuli.  *See* DSM-IV-TR, at 297 (psychosis includes "delusions, any prominent hallucinations, disorganized speech, or disorganized or catatonic behavior" ).  People with mental retardation are not mentally ill.  *Holladay v. Campbell*, 463 F. Supp.2d at 1340 (citing Ellis and Luckasson, *supra*).[21]  Some may have mental illness in addition to mental retardation, but mental retardation is quite different from mental illness.  Ellis and Luckasson, *supra*, at 424-425 & nn.53, 59.

For this reason, people with mental retardation can and usually do respond to external stimuli rationally and appropriately – that is, they do not misperceive reality and respond irrationally and inappropriately on the basis of that misperception.  Their ability to respond to external stimuli and the appropriateness of their response are very likely to be shaped by their cognitive limitations, but that is different from the kind of irrational and inappropriate response seen in people who have some type of mental illness.  By erroneously identifying this as a factor for ruling out mental retardation, the CCA has thus mis-directed factfinders toward not finding mental retardation if a person *can* do what most people with mental retardation can do.

The CCA relied on this factor, explaining that Williams responded appropriately to needs and events around him:

- "Appellant also threw away the clothes that he was wearing, disposed of the murder weapon, and lied to his family and to the police about his involvement in the offense. Appellant initially denied any involvement in the offense, but eventually told the police that Jamarist 'Monterral' Paxton, an acquaintance, forced him to participate in the offense and that appellant's involvement in it was minimal."  *Id.* at 115.

---

[21]Ellis and Luckasson explain, "[T]he cardinal difference [between mental illness and mental retardation] is that mental retardation is not an illness.  Mentally ill people encounter disturbances in their thought processes and emotions; mentally retarded people have limited abilities to learn." 53 Geo. Wash. L. Rev. at 424.

- "Appellant also had jobs in fast food restaurants such as a Kentucky Fried Chicken for short periods around this time." *Id.* at 115.

- "He was capable of taking customer orders inside and at the drive-through windows, handling money, and getting the meals ready to be served to the customers." *Id.* at 115.

- "Appellant also learned how to drive a car (even though we understand the record to reflect that he never obtained a driver's license)." *Id.* at 115.

- "Nell testified on cross-examination that appellant had the ability to go into a grocery store and 'to pick out what he wanted, go to the check-out and pay for it.'" *Id.* at 121.

- "She also testified that she saw appellant work the cash register and the kitchen when he worked at Kentucky Fried Chicken." *Id.* at 121.

- "Patton also testified on cross-examination that a letter appellant wrote in jail to Nell and his sister asking for money was 'meaningful in the sense that individuals sometimes need money, and they ask for it.' He also testified that his notes indicated that appellant was not spending all of his money at the jail commissary on candy." *Id.* at 122-23.

- "'The type of work he did, yes, it was fast-food work, but he was hired like by KFC, worked for a while, was doing work as a cook, cashier, drive-through, leaves and then gets rehired.'" *Id.* at 127 (Dr. Proctor)

    **5.      "Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?"**

Like the preceding factor, this factor has nothing to do with mental retardation. Neither expert in *Briseno* testified that it did. No recognized text on mental retardation includes inability to carry on a conversation appropriately as a diagnostic matter. To the contrary, the DSM-IV-TR explains, people with mild mental retardation

> typically develop social and communication skills during the preschool years ... and often are not distinguishable from children without Mental Retardation until a later age.... During their adult years, they usually achieve social and vocational skills adequate for minimum self-support.

75

DSM-IV-TR at 43. While people with mental retardation can have limitations in communication, those impairments usually have to do with limitations in expressing oneself or understanding others, not with responding rationally and on point and staying on subject. People with mental illness, such as psychotic disorders, often have trouble "respond[ing] coherently, rationally, and on point to oral or written questions," and may "wander from subject to subject," 135 S.W.3d at 8, *see* DSM-IV-TR 312 (the disorganized speech characteristic of psychosis includes "frequent derailment or incoherence"), but people with mental retardation do not.

The CCA's basis for this factor appears to be the testimony of four prison guards, who testified that "[Briseno] could understand them and they could understand him," 135 S.W.3d at 18, and a sheriff's deputy (who had no expertise in mental retardation), who testified, "[S]omeone that's mentally retarded ... it's hard to carry a conversation with them sometimes because they wander a lot. [Briseno] does not wander. He can keep a conversation going and he can stay in sequence." *Id*. Finally, the CCA relied on its own sense that when Briseno testified at the *Atkins* hearing, "his testimony was clear, coherent, and responsive." *Id*. Again, because the state trial court found that Briseno did not have mental retardation, the CCA found that certain of Briseno's abilities differentiated people who have mental retardation from people who do not – without any grounding in expert testimony or science. By erroneously identifying this as a factor for ruling out mental retardation, the CCA thus mis-directed factfinders toward not finding mental retardation if a person *can* do what most people with mental retardation can do.

The CCA relied on this factor, citing proof that Williams responded rationally to requests:

- "'It [school records] doesn't indicate that he was in special education, that he had problems communicating with teachers, that he couldn't handle kinds of basic instructions and communicate with others, handle practical--socializing and

interacting with others, that type of thing.'" *Williams*, 270 S.W.3d at 130 (Dr. Proctor, state expert, testimony).

• "'The type of work he did, yes, it was fast-food work, but he was hired like by KFC, worked for a while, was doing work as a cook, cashier, drive-through, leaves and then gets rehired. Most people, if you have a mentally retarded individual and you hire them, you would think it doesn't go well, and you're not going to hire them again. They hire him again. He gets a merit raise for pay, and all these types of things.'" *Id.* at 127 (Dr. Proctor).

• [State] "'Okay. Did the tests tell you anything about [appellant] or reveal to you anything about [appellant's] cognitive ability? [Dr. Proctor]: Well, sure. Q. What? A. I mean, it's not a direct measure of a cognitive test, so it's not what I would strongly rely on in that way, but what it showed me was that he was performing below average on those tests. Q. And what does that tell you about [appellant's] cognitive ability? A. Well, that would be consistent with someone who has below average or borderline intellectual functioning. Q. Or if you were looking at it prior to administering the test, it could be an indication of mental retardation? A. No. Q. Never could be that? A. It's not in the 2nd or 3rd percentile, and there are scores well above that consistently. I mean, that's just not consistent.'" *Id.* at 130.

• "Appellant made many passing and above-average grades in school until he dropped out in the twelfth grade." *Id.* at 116.

• "Appellant's seventh-grade teacher testified that appellant earned his passing grades and that appellant 'was fully capable on a seventh grade reading level.'" *Id.* at 117 n.8.

• "Dobroski [first grade teacher] testified that appellant successfully repeated the first grade 'with a 25-point difference in his scores.' Appellant's 'lowest grade [was] 85, 85 with a range to 96, with an 88 in reading and language arts.'" *Id.* at 116 n.6.

• "Riley [high school teacher] testified that he believed that appellant was able to perform properly but that appellant 'was disinterested, unwilling to do the work.'" *Id.* at 116 n.7.

• "Appellant initially denied any involvement in the offense, but eventually told the police that Jamarist 'Monterral' Paxton, an acquaintance, forced him to participate in the offense and that appellant's involvement in it was minimal." *Id.* at 115.

• fn. 4 "The State also presented evidence at the punishment phase that appellant sexually assaulted the victim (in the form of appellant's statement to the police that Monterral sexually assaulted her). The State's theory was that references in

appellant's statement to Monterral actually referred to appellant's actions." *Id.* at 115 n.4.

• "He was capable of taking customer orders inside and at the drive-through windows, handling money, and getting the meals ready to be served to the customers." *Id.* at 115.

• "Appellant also learned how to drive a car (even though we understand the record to reflect that he never obtained a driver's license)." *Id.* at 115.

• "Nell testified on cross-examination that appellant had the ability to go into a grocery store and 'to pick out what he wanted, go to the check-out and pay for it.'" *Id.* at 121.

• "She also testified that she saw appellant work the cash register and the kitchen when he worked at Kentucky Fried Chicken." *Id.* at 121.

• "Patton also testified on cross-examination that a letter appellant wrote in jail to Nell and his sister asking for money was 'meaningful in the sense that individuals sometimes need money, and they ask for it.' He also testified that his notes indicated that appellant was not spending all of his money at the jail commissary on candy." *Id.* at 122-23.

The CCA ignored witnesses who testified otherwise:

• Williams was seen sucking his thumb on the videotaped confession. 39 RR 165-166;

• Det. Perrett testified, "Some of the information [Williams] gave me made no sense. Some of it did." 42 RR 125;

• During Williams' trial, a jailer observed, "He's not coherent with what you're asking him. He would curse at you. He just wouldn't do what you would ask him to do." 50 RR 12. She had no idea what provoked him to call her names without reason. 50 RR 13. He threatened to kill himself. RR50:17, 19, 33. His cell was completely disorganized. 50 RR 21.

## 6. "Can the person hide facts or lie effectively in his own or others' interests?"

The evidence in *Briseno* showed that Briseno lied to protect himself. 135 S.W.3d at 15.

Nevertheless, no expert testified that lying was beyond the reach of people with mental retardation.

Moreover, the CCA cited nothing in the mental retardation literature to support this factor, and none

exists. The prosecution expert testified that Briseno's lying was one of the factors that led him to find that Briseno had antisocial personality disorder. 135 S.W.3d at 17. However, lying because one has antisocial personality disorder – assuming that Briseno had such a disorder – cannot be used to rule out mental retardation. A person clearly can have both conditions. The CCA's articulation of this factor, as with so many other of its improvised factors, has the effect of mis-directing factfinders toward not finding mental retardation if a person *can* do what most people with mental retardation can do.

Again, the CCA relied on this factor against Williams:

- "He was capable of understanding his *Miranda* rights and of coherently and voluntarily making statements to the police (and lying in his own interests)." *Williams*, 270 S.W.3d at 117 (footnote 9 omitted).

- "Appellant also threw away the clothes that he was wearing, disposed of the murder weapon, and lied to his family and to the police about his involvement in the offense. Appellant initially denied any involvement in the offense, but eventually told the police that Jamarist 'Monterral' Paxton, an acquaintance, forced him to participate in the offense and that appellant's involvement in it was minimal." *Id.* at 115.

- [fn. 10] "We note that a defense expert (Kate Allen) testified that appellant was not a very good liar." *Id.* at 117 fn. 10.

- [fn 14] "The State argues on appeal, as it did at trial, that appellant 'was completely motivated to try to score as poorly as possible during his IQ testing with Dr. McClure' and that he deliberately misled McClure 'regarding crucial background information' in order to obtain disability benefits." *Id.* at 121 n.14.

- "Proctor 'disagree[d] with several of the areas that [defense expert Patton] said he saw adaptive deficits in.' In addition to questioning some of the methodology used by defense expert Tom Allen, Proctor also suggested that the information relied upon by Allen (particularly information provided by appellant and his family members) could have potentially been 'very biased' because of the 'legal situation' that appellant was in." *Williams*, 270 S.W.3d at 128.

- "Proctor suggested that McClure's diagnosis was based on incomplete and possibly biased information." *Id.* at 128.

- "McClure also testified on cross-examination that misrepresentations that appellant and his father made to him were significant and could have compromised his 'determinations in the adaptive functioning.'" *Id.* at 120.

- "'Q. [STATE]: Right. And in this case, they have misrepresented the special education, misrepresented he did poorly in school, misrepresented problems with drugs and alcohol. Are those three significant areas? A. [MCCLURE]: Yes.'" *Id.* at 120-21.

- [fn 21] "Proctor also suggested (without making a diagnosis) that appellant may have been exaggerating or faking his mental-illness (i.e., schizophrenia) symptoms." *Id.* at 125 n.21.

- "The jury could have reasonably found that appellant's 70 and below I.Q. scores (out of other 70 and above I.Q. scores) do not truly reflect his academic functioning." *Id.* at 132.

   7.   **"<u>Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?</u>"**

The CCA derived this factor from testimony by the prosecution expert. As the court explained,

> According to the State's expert, 'we have to look at historical records of the nature of the criminal offense, the person's ability to locate victims, to work in society, to use society to better his or her short-range impulsive needs.' He acknowledged that there are mentally retarded persons who are criminals, but they tend to commit fairly primitive crimes, impulsive shoplifting, impulsive robbery, sudden acts of violence. Those who are mentally retarded will have a hard time finding victims, 'pulling off a scam,' finding and hiding weapons, breaking out of jail, etc. 'The more complex the crime, the less likely the person is mentally retarded.' Thus, an examination of the type of criminal conduct and the circumstances involved in that conduct are relevant in determining whether a person is mentally retarded.

> *Briseno*, 135 S.W.3d at 17 n.70.

The reasoning of the prosecution expert may have superficial appeal – if a particular crime requires extremely complex planning to commit and to avoid detection, how can it be done by a

person with mental retardation?  The problem is that there is no reliable way to correlate levels of

intelligence with degrees of complexity of crimes and efforts to avoid detection, except for the

obvious correlation respecting crimes on either extreme of the spectrum.  Most crimes, however –

including nearly all capital crimes – fall somewhere in between.  For these reasons, the

AAMR/AAIDD has set forth the following guideline in its *User's Guide*, *supra* at 22:

> Do not use past criminal behavior or verbal behavior to infer level of adaptive
> behavior or about having MR/ID.  Greenspan and Switzky (in press) discuss two
> reasons for this guideline.  First, there is not enough available information; second,
> there is a lack of normative information.

Thus the prosecution expert's made-up attempt to set out a gauge – those who have mental

retardation "tend to commit fairly primitive crimes, impulsive shoplifting, impulsive robbery, sudden

acts of violence," but not crimes that require "finding victims, 'pulling off a scam,' finding and

hiding weapons, breaking out of jail" – has no basis in science.  It was simply concocted to fit the

facts of Briseno's case.

In addition to the unreliability of any attempt to correlate the complexity of a crime with the

level intelligence necessary to commit it, focusing on one episode of behavior rather than patterns

of behavior through a person's life is misleading.  As the court explained in *United States v. Nelson*,

419 F. Supp.2d 891, 902 (E.D. La. 2006), in finding that the defendant had mental retardation,

> Nelson's behavior in these isolated incidents [the underlying capital crime and
> another crime] has limited relevance to the mental retardation diagnosis because it
> is isolated, in contrast to the recurring patterns which emerge from all of the records
> in this case and which indicate a low level of adaptive functioning.

*See also* AAMR 2002 manual at 17 ("Adaptive behavior encompasses the application of

conceptual, social, and practical skills to daily life.  Its assessment should relate to an individual's

typical performance during daily routines and changing circumstances, not to maximum performance.")

Notwithstanding the lack of scientific support for any of these factors – worse, that most of the factors are *flatly contradicted* by the science of mental retardation – the CCA used them to justify its decision in Briseno's case, and has used them to the same end in many other cases. *See, e.g., Ex parte Modden*, 147 S.W.3d 293, 296-98 (Tex.Crim.App. 2004); *Ex parte Elizalde*, 2006 WL 235036 at *3 (Tex.Crim.App. Jan. 30, 2006) (unpublished); *Ex parte Taylor*, 2006 WL 234854 *3-4 (Tex.Crim.App. Feb. 1, 2006) (Johnson, J, concurring) (unpublished); *Ex parte Chester*, 2007 WL 602607 at *3-5 (Tex.Crim.App. Feb. 28, 2007) (unpublished); *Ex parte Blue*, 230 S.W.3d 151, 157 (Tex.Crim.App. 2007); *Ex parte Van Alstyne*, 239 S.W.3d 815, 819-21 (Tex.Crim.App. 2007); *Hunter v. State*, 243 S.W.3d 664, 666-72 (Tex. Crim. App. 2007). The mosaic of unreliability and arbitrariness thus runs throughout the *post-Atkins* jurisprudence of the CCA.

The CCA relied on this factor against Williams:

- "Appellant placed the victim's body on a bed and set the victim's body and the bed on fire. One of the police detectives involved in the case testified that this destroyed incriminating evidence." *Williams*, 270 S.W.3d at 115.

- "Appellant also threw away the clothes that he was wearing, disposed of the murder weapon, and lied to his family and to the police about his involvement in the offense." *Id.* at 115.

- "Appellant initially denied any involvement in the offense, but eventually told the police that Jamarist 'Monterral' Paxton, an acquaintance, forced him to participate in the offense and that appellant's involvement in it was minimal." *Id.* at 115.

- fn 4 "The State also presented evidence at the punishment phase that appellant sexually assaulted the victim (in the form of appellant's statement to the police that Monterral sexually assaulted her). The State's theory was that references in appellant's statement to Monterral actually referred to appellant's actions." *Id.* at 115 n.4.

Therefore, the CCA's decision reveals that it relied heavily on the *Briseno* factors to find that Williams had not met his burden of proof of mental retardation.

### G. WILLIAMS MEETS THE AAMR AND APA DEFINITIONS OF MENTAL RETARDATION.

As mentioned, under current Texas and Fifth Circuit law, Williams must prove:

- that his IQ is below 70;
- that he possess adaptive deficits in two categories;
- that his disability began before age 18.

#### 1. *There is proof that Williams' IQ is below 70.*

As discussed, Dr. Robert McClure, a licensed psychologist and professor of psychology at the University of Texas at Tyler, reported that Williams tested at a composite 63 I.Q. level before he was eighteen years old and read at a fourth grade level. 55 RR 196, 201. Dr. McClure also diagnosed Williams as mentally retarded and schizophrenic. 55 RR 200. The State attempted to minimize Dr. McClure's findings by claiming: (1) that Williams and his father lied to obtain financial disability benefits, (2) that McClure was not testing for retardation but merely applied less rigorous testing to determine disability, and (3) McClure's results and opinions rely establish mental illness more than retardation. McClure, however, comes across in testimony as completely competent and credible, having obtained accurate findings. Moreover, there is nothing more than speculation and wishful thinking that Williams and his father lied, malingered or faked disability to obtain benefits. All signs point to Williams lacking the intelligence and sophistication to fool an experienced psychologist who had examined thousands of applicants.

Further, as discussed, Dr. Thomas Allen, a forensic psychologist retained by the defense, administered the Wechsler Adult Intelligence Scale (WAIS) test to Williams and found full scale I.Q. to be 65 which falls within the mild range of mental retardation. 56 RR 49, 51.

Dr. Timothy Proctor, an expert retained by the State, examined Williams and found his I.Q. on one intelligence test to be 71. 59 RR 44. Technically, that score did not qualify Williams as mentally retarded because the AAMR definition of mental retardation is an I.Q. of 70 or below, but that test does include measurement error of plus or minus five points, meaning his true I.Q. could fall as low as 66. 59 RR 44. Dr. Proctor administered yet another I.Q. test and found his score to be a 70, therefore predicting an actual IQ as low as 65. 59 RR 51, 53.

### 2. *There is proof that he possesses adaptive deficits in two categories.*

Dr. McClure testified that throughout Williams' adult life, he had difficulty maintaining employment at fast food establishments and was intermittently homeless. 55 RR 197. Dr. Allen also found significant adaptive functioning deficits in academics, communication, daily living skills and socialization with an onset prior to him reaching the age of 18. 56 RR 96-97, 108. Dr. James Patton, another expert retained by the defense, testified Williams had adaptive deficits in functional academics, community use and home living. 56 RR 242, 273. Consequently, there are three credible experts supporting Williams' proof of adaptive deficits. Although the State argued that Williams had adequate living skills because he was employable as a cook Kentucky Fried Chicken where he mixed spices and fried chicken, 57 RR 14-16; 56 RR 113, the reality is that little thinking is required of a Kentucky Fried Chicken cook because all ingredients come pre-mixed and all the cook has to do is open boxes, sift various ingredients together and dredge the chicken, 56 RR 113-114. All

experts agreed that Williams was frequently or periodically homeless.  RR51:192, 194, 195-96, 202-03; RR51:263; 55 RR 197.

### 3. *There is proof that his disability began before age 18.*

There was no testimony that Williams was injured or impaired after he became an adult by some accident or affliction.  Witnesses testified that he made progress in school, albeit on the slow side, until his mother died, when he gave up on learning and effort.  Dr. McClure conclusively established onset before age 18.

### H. THE JURY INSTRUCTIONS WERE INCOMPREHENSIBLE AND INADEQUATE TO PROVIDE A FRAMEWORK FOR DECIDING WHETHER WILLIAMS WAS MENTALLY RETARDED.

Although at trial Williams' attorney incompetently waived obvious challenges to the sentencing jury instructions, *Williams*, 270 S.W.3d at 133, the CCA nevertheless addressed the merits of William's third point of error on appeal challenging the adequacy of the mental retardation component of the sentencing jury instructions.  *Id.*

The jury instructions suffer foremost from incomprehensibly.  A rare juror who had taken statistics as a college undergraduate might have made sense, with effort, the trial judge's explanation of standard deviations, means and percentiles in the context of a mental retardation analysis, but it is unreasonable to expect ordinary jurors to do so.  Given the evidence favoring retardation and the distracting arguments of the State it seems likely they did not.

The jury instructions also suffer from the omission of the critical components of mental retardation analysis:

- There was no plain, common sense explanation of what is meant by an adaptive deficit.

- There is not even a list of the categories of functioning in which adaptive behavior may be deficient.

- There was no discussion at all of intelligent quotient testing, the 70 I.Q. threshold, the difference between partial and full scale testing, or the range necessary for the first element of a mental retardation, or the ten-point range which a given full scale test predicts.

- The instructions provide no framework for determining onset before age 18.

Oddly, although the CCA sifted Williams evidence with the sieve of *Briseno*, the jury instructions do not list the *Briseno* factors. Therefore, if *Briseno* is Texas law on the factors for the trier of fact to decide retardation, Williams' jurors were unaware. Not dissuaded by this stunning oversight, the CCA applied the prosecutor's arguments as gloss to cover the deficiency. The CCA found Williams' instructions perfectly lucid, and wrote, "Moreover, the extensive testimony presented on the issue of appellant's mental retardation and the parties' closing jury arguments make clear that this issue was litigated before the jury under the guidelines set out in *Briseno* and the AAMR mental retardation definition." *Williams*, 270 S.W.3d at 134. In this sentence, the CCA seems to recognize that the jury instructions were bereft of *Briseno* factors, and plugged the hole by grafting in the State's jury argument, without identifying how the State's argument met the constitutional requirements of providing a retardation analysis for jurors to follow.

Reading the densely worded instructions, stilted with obtuse, undefined terminology and legalese, one cannot realistically believe that Williams' jurors had any idea how to decide whether he was in fact mentally retarded. This is significant because the CCA praised the district court for providing Williams with a jury trial which the court said was more due process than is constitutionally required by the Fifth Circuit. *Williams*, 270 S.W.3d at 132. Realistically, however, in the absence of comprehensible jury instructions containing a logical and accurate framework for

identifying retardation where it exists, Williams effectively did not have a jury trial on the issue which mattered most.

## I.     FIFTH CIRCUIT STANDARDS FOR *ATKINS* CLAIMS

The legal standards for determining whether an inmate is mentally retarded for *Atkins* relief are unsettled and ultimately must be decided by the Supreme Court.  Williams summarizes decisions by the Fifth Circuit.

In *Taylor v. Quarterman*, No. 06-70045 (5th Cir. Aug. 21, 2007), the court denied COA on an *Atkins* claim, and placed the burden of persuasion by the high clear and convincing standard on the inmate to prove that he his mentally retarded.  The district court concluded that Taylor had not met that burden.

In *Rivera v. Quarterman*, 505 F.3d 349 (5th Cir. 2007), however, the Fifth Circuit found that Rivera had.  In *Rivera*, the Fifth Circuit upheld a district court finding of MR, sifting the evidence supporting the decision and finding it ample.  The district court's analysis of adaptive functioning focused on the AAMR skill areas but made no findings specific to the *Briseño* factors.  2006 WL 870927 at *26 (S.D. Tex. Mar. 31, 2006).  In finding the district court's analysis not clearly erroneous, the Fifth Circuit did not mention or take into account any analysis based on *Briseño* factors.  505 F.3d  at 362-63.  The Circuit simply required the district court to evaluate the three AAMR criteria: (1) sub-normal IQ, (2) severe adaptive deficits, and (3) onset before age 18.

The issue in *In re Hearn*, 418 F.3d 444, 446-47 (5th Cir. 2005), was whether Hearn, who sought relief as a successor habeas petitioner, had made a prima facie showing of mental retardation to proceed further.  Hearn prevailed over the state's contention that Hearn's expert on deficits in adaptive functioning was not licensed or qualified to render his opinion.  The state's argument was

based on a Texas statute which ostensibly requires a diagnosis of mental retardation to be made by a professional with a Texas license to do so. The *Hearn* court, in deciding to permit further claim development at successor habeas, declined to address the state's further contention that Hearn's expert had used a standardized psychological testing instrument rather than the controversial *Briseño* factors to measure the petitioner's deficits in adaptive functioning.

*In re Salazar,* 443 F.3d 430 (5th Cir. 2006), rejected Salazar's *Atkins* claim for his failure to meet the cognitive deficits prong of the *Atkins* test. Meanwhile, *Woods v. Quarterman*, 493 F.3d 580 (5th Cir. 2007), as in *Rivera*, evaluated an MR claim by assessing the evidence supporting AAMR criteria. In *Woods*, the only discussion of any challenge to the *Briseño* factors is in a footnote. The footnote states that Woods argued that "*Briseño* . . . is contrary to *Atkins* in the way it allows courts to evaluate limitations in adaptive behavior." 493 F.3d at 587 n.6. The Fifth Circuit rejected that claim in a sentence, stating, "We find nothing in *Briseño* that is inconsistent with *Atkins* in this regard." *Id.* From the footnote, it is impossible to know what Woods urged, but it is plain that he lacked the factual basis for advancing the argument that Williams makes. Woods submitted very little evidence that he suffered from significant limitations in adaptive functioning. *Id.* at 587. The state habeas court made specific findings why it determined that Woods did not have significant deficits in two of the AAMR skill areas. *Id.* In other words, the state court had a factual basis and articulated reasons for finding that Woods failed the AAMR-9 test for significantly subaverage adaptive functioning. Any *Briseño* analysis by the state court reinforced -- and did not replace -- the AAMR analysis. Its opinion did not approve reliance on the *Briseño* factors to overrule a strong showing of subaverage functioning under the AAMR criteria. *Woods* is not precedent that supports rejecting Williams' claim.

*Hall v. Quarterman*, 534 F.3d 365 (5th Cir. 2008), remanded an MR case for an evidentiary hearing, weakening *Briseño* by explaining that the qualifications of a defense expert were not subject to challenge under a certain Texas statute. *Atkins* placed no such limitation on a MR expert's qualifications. *Id.* at 371.

*Morris v. Dretke*, 413 F.3d 484, 497-98 (5th Cir. 2005), remanded for an MR evidentiary hearing.

*Moreno v. Dretke*, 362 F. Supp.2d 773 (W.D. Tex. 2005), *aff'd*, 450 F.3d 158 (5th Cir. 2006), *cert. denied*, 127 S.Ct. 935 (2007), upheld reliance on just the seventh *Briseño* factor as a basis for rejecting a mental retardation claim. The district court -- and later the Fifth Circuit -- considered the facts of the defendant's crime along with much other evidence as weighing against a finding of mental retardation. Moreno's crime was particularly sophisticated, entailing months of advance planning. 362 F. Supp.2d at 791-92; 450 F.3d at 161-62, 164-65. Previously, the state habeas case (*Ex parte Moreno*, No. 25,897-02 (Tex. Crim. App. Sept. 10, 2003) (dismissal without written order)) concluded before *Briseño* was decided, so it could not rely exclusively on *Briseño* factors. On appeal Moreno did not argue that he satisfied the AAMR definition of significantly subaverage adaptive functioning. *Id.* at 164-65. And he did not dispute that the *Briseño* factors, used in conjunction with the AAMR criteria, "are correct definitions of mental retardation." 450 F.3d at 164. Thus, as in *Woods*, the Fifth Circuit did not analyze the reliability of the *Briseño* factors as the sole means of evaluating mental retardation, because the facts did not require this.

Other Fifth Circuit cases citing *Briseño* likewise do not address whether the *Briseño* factors alone reliably determine mental retardation.

In *In re Mathis*, 483 F.3d 395 (5th Cir. 2007), for example, the Fifth Circuit allowed a successive habeas claim to proceed, based on a prima facie showing by lay and expert witnesses that Mathis is retarded under the AAMR definitions and skill areas. Far from approving exclusive reliance on *Briseño*, the court noted that no evidence was presented specific to the *Briseño* factors. *Id.* at 397-98.

*Clark v. Quarterman*, 457 F.3d 441 (5th Cir. 2006), *cert. denied*, 127 S.Ct. 1373 (2007), rejected an *Atkins* claim, first, on the ground that petitioner did not establish his sub-70 IQ or that his deficits manifested before age 18. *Id.* at 446-48. These finding alone negated his mental retardation claim. Nonetheless, the Fifth Circuit discussed the adaptive functioning evidence; that discussion reveals that the state courts considered a wide range of evidence and did not rely exclusively on the *Briseño* factors, much less rely exclusively on the facts of Clark's crime. *Id.* at 446-47.

An unpublished decision, *Rosales v. Quarterman*, 2008 WL 3858466 (5th Cir. Aug. 19, 2008), rejected an *Atkins* claim, noting that the district court "carefully and thoughtfully" applied both the AAMR factors and the *Briseño* factors. *Id.* at *4. In context, the court's statement that "[t]his court has repeatedly approved the use of the framework laid out in *Briseño*" reflects the court's past endorsement of <u>all</u> of the *Briseño* framework; the court was not referring to ever having approved reliance on the *Briseño* factors to the exclusion of the AAMR factors. *Id.*

Thus it appears that the burden of a Texas federal habeas petitioner complaining in the Fifth Circuit that he was improperly denied *Atkins* relief is this: He must prove by clear and convincing evidence that 1) the evidence preponderated in his favor at the hearing in state court, or 2) that with

the proper addition of new evidence, probative of mental retardation not before the state court, the

evidence preponderates in his favor.[22]

In summary, in no case has the Fifth Circuit determined that the *Briseño* factors by

themselves reliably identify those who are mentally retarded, or the proper relationship of the

*Briseño* factors with proper AAMR criteria.

## CONCLUSION

As this petition demonstrates, Williams' rights under the federal constitution were violated,

unremedied by Texas courts.

## RELIEF REQUESTED

WHEREFORE, PREMISES CONSIDERED, the Applicant CLIFTON WILLIAMS asks this

Court to hold hearings, make its findings of fact and conclusions of law, and find that he was denied

rights. He requests the Court to vacate his conviction and issue a writ to the Respondent, or the

warden of the Polunsky Unit, ordering release of Williams from custody, or alternatively, to reverse

Williams' conviction and order a new trial, or alternatively, to vacate his sentence of death and order

a new trial on sentencing.

Williams also asks the Court to allow a reasonable time to amend this petition rather than to

dismiss for failure to exhaust remedies. He also requests reasonable time to respond to the State's

answer to this petition. Finally, he asks for such other relief as the Court finds the Applicant justly

entitled.

---

[22]The Court may consider a balanced article in the University of Richmond Law Review
which Simpson supplied in his record excerpts. *See* Bonnie, Richard J. & Katherine Gustafson,
*The Challenge of Implementing Atkins v. Virginia: How Legislatures and Courts Can Promote
Accurate Assessments and Adjudications of Mental Retardation in Death Penalty Cases,* 41 U.
Rich. L. Rev. 811 (May 2007). The authors discuss the process by which courts assess mental
retardation evidence.

Respectfully submitted this 24 day of February 2010,

*/s/ James W. Volberding*

_____
**JAMES W. VOLBERDING**
**SBN: 00786313**

**Plaza Tower**
**110 North College Avenue**
**Suite 1850**
**Tyler, Texas 75702**

**(903) 597-6622 (Office)**
**(903) 597-5522 (fax)**
*e-mail: volberding@attglobal.net*

*/s/ Zack Hawthorn*

_____
**ZACK HAWTHORN**
**SBN: 24014603**

**Hawthorn & Hawthorn**
**485 Milam Street**
**Beaumont, Texas 77701-3518**

**(409) 838-3969**
**(409) 832-5611 (fax)**
*email: zackhawthorn@yahoo.com*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this pleading has been delivered this 24 day of February 2010 to:

Ms. Carole Susanne Callaghan
Mr. Edward Larry Marshall
Office of the Attorney General                    *Counsel for the State*
Capital Litigation Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 936-1600 (voice)
(512) 320-8132 (fax)

by the following means:

| | |
|---|---|
| \_\_\_\_\_ | By U.S. Postal Service Certified Mail, R.R.R. |
| \_\_\_\_\_ | By First Class U.S. Mail |
| \_\_\_\_\_ | By Special Courier _____ |
| \_\_\_\_\_ | By Hand Delivery |
| \_\_\_\_\_ | By Fax <u>before</u> 5 p.m., |
| \_\_\_\_\_ | By Fax <u>after</u> 5 p.m. |
| \_X\_\_\_ | By Email at: |

carole.callaghan@oag.state.tx.us
edward.marshall@oag.state.tx.us

*James W. Volberding*

_____
JAMES W. VOLBERDING