IN THE UNITED STATE DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| CLIFTON LAMAR WILLIAMS, | § | |
| Petitioner | | |
| | § | |
| v. | | No. 1:09cv271 |
| | § | Judge Ron Clark |
| RICK THALER, Director, Texas | | |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | | |
| Respondent | § | |

## MEMORANDUM OPINION

Clifton Lamar Williams (Petitioner), an inmate confined to the Texas Department of
Criminal Justice, Correctional Institutions Division, filed a petition for writ of *habeas corpus*
pursuant to 28 U.S.C. § 2254. Petitioner challenges his capital murder conviction and death
sentence imposed on October 2 and 13, 2006, in the 114th Judicial District Court of Smith
County, Texas, in cause number 114-1505-06, styled *The State of Texas v. Clifton Lamar
Williams*. Petitioner raises nine claims for relief.

This case is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA")
because Petitioner's petition for federal *habeas corpus* relief was filed on February 24, 2010,
after the AEDPA effective date of April 24, 1996. The AEDPA provides in pertinent part:

> (d) An application for writ of *habeas corpus* on behalf of a person in custody pursuant to
> the judgment of a State court shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless the adjudication of the claim
> > (1) resulted in a decision that was contrary to, or involved an unreasonable
> > application of, clearly established Federal law, as determined by the Supreme
> > Court of the United States; or
> > (2) resulted in a decision that was based on an unreasonable determination of the
> > facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The AEDPA bars relitigation of any claim "adjudicated on the merits" in state court, subject only to the exceptions in § 2254(d)(1) and (d)(2).

**Procedural History**

The evidence presented at trial shows that Petitioner broke into the home of Cecilia Schneider, a 93 year-old woman, whom he beat, strangled, and stabbed before setting her body on fire and stealing her car. A jury convicted Petitioner for the capital murder of Schneider and sentenced him to death. The Texas Court of Criminal Appeals affirmed Petitioner's conviction and sentence. *Williams v. Texas*, 270 S.W.3d 112 (Tex.Crim.App. 2008). Petitioner did not file a petition for writ of *certiorari* to the United States Supreme Court. While his direct appeal was pending, Petitioner filed a state application for post-conviction relief. Judge Cynthia Kent, the trial court judge as well as the judge presiding over the state *habeas* case, held a two day evidentiary hearing on the claims in Petitioner's state application for relief. Judge Kent made findings of fact and conclusions of law denying relief which were adopted by the Texas Court of Criminal Appeals. *Ex parte Williams*, No. 71,296-01 (Tex.Crim.App. 2009). Petitioner then filed a petition seeking federal *habeas* relief from this Court on February 24, 2010. [Doc. #9]. Petitioner's original federal *habeas* petition raised ten claims for relief. Recognizing that one of his claims was unexhausted, Petitioner sought a stay from this Court so that he could return to state court and exhaust his claim. The Court denied Petitioner's request and, thereafter, Petitioner filed an amended petition for relief omitting the unexhausted claim. [Doc. # 15].

**Facts**

On July 9, 2005, Petitioner broke into the home of 93 year old Cecilia Schneider and beat and stabbed her to death. There was also evidence of strangulation and possible sexual assault of

the victim. The body of the victim was placed on a bed and then set on fire. The fire destroyed incriminating evidence of the offense. Petitioner left the home and stole the victim's car, as well as other items belonging to the victim. Petitioner threw away the clothes he was wearing during the crime, disposed of the murder weapon, and lied to his family and police about his involvement. Eventually, Petitioner told authorities that an acquaintance forced him to participate in the offense and that Petitioner's involvement was minimal. The police were unable to find any evidence to substantiate Petitioner's claim that someone else was involved in the capital murder.[1]

**First Claim for Relief**

In his first claim for relief, Petitioner alleges that his trial counsel provided ineffective assistance when he issued a Notice of Intent to Raise the Insanity Defense prior to trial when, in fact, counsel had no basis for raising this defense. Petitioner complains that counsel's notice prompted the trial court to order that Petitioner be examined by court-appointed experts, and that these experts formed opinions which were detrimental to Petitioner's case. This claim was raised in Petitioner's state writ and was denied on the merits by the Texas Court of Criminal Appeals. The state *habeas* court findings of fact and conclusions of law, which were adopted by the Texas Court of Criminal Appeals, found that Petitioner was represented by experienced, properly certified trial counsel who made a strategic decision on filing the notice that showed no evidence of ineffective assistance in any matter. *See Ex parte Williams,* No.71,296-01 (Tex.Crim.App. 2009).

---

[1] These facts are reported in the Texas Court of Criminal Appeals' opinion on direct appeal. *See Williams v. Texas*, 270 S.W.3d 112 (Tex.Crim.App. 2008).

In order to establish a claim of ineffective assistance of counsel, a petitioner must demonstrate both that counsel's performance was deficient and that, had counsel performed competently, there is a reasonable probability that the result in the case would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). "Deficient performance" is demonstrated by a showing that, in light of all the circumstances, counsel's performance fell below an objective standard of reasonableness. *Id*. at 687-88. In determining whether counsel's performance was deficient, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. To prove prejudice, the second prong under *Strickland*, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id*. A presumption of correctness applies to the state court's explicit findings of fact. 28 U.S.C. §2544(e)(1); *Valdez v. Cockrell*, 271 F.3d 941, 948 n.1 (5th Cir. 2001), *cert. denied*, 537 U.S. 883 (2002). The issue before this Court is whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court's holding in *Strickland*. *See* 28 U.S.C. § 2254(d)(1).

Petitioner argues that the trial court's decision that counsel acted competently is unreasonable because counsel gave inconsistent explanations for filing the late notice at both the pretrial hearing and the hearing on the state writ. This Court's review of the record of the June 2, 2006, pretrial hearing shows that trial counsel explained that he understood the deadline for filing his notice was prior to the pretrial hearing they were currently having, rather than an earlier

pretrial hearing.  The State argued that the deadline was actually prior to the first pre-trial hearing in the case.  The trial court then ordered both the Petitioner and State to file briefs on the timeliness issue.  Ultimately, however, the State withdrew its objection to the alleged late notice filing and the trial court permitted Petitioner to file the notice of insanity.  Therefore,  trial counsel was not required to explain his strategy for filing the notice when he did.

At the hearing on the state writ of *habeas corpus,* trial counsel was able to explain his strategy and the state court made the following findings of fact and conclusions of law:

> [Trial counsel] further testified that he filed a notice to raise the insanity defense because it was necessary to do so prior to the start of pretrial hearings before he had concluded all of his investigation and because he had a good faith basis to believe that the defendant may have been insane during the commission of the offense, including that the defendant had been previously diagnosed as paranoid schizophrenic and, after interviewing family members, he learned that the defendant's mother had a history of mental illness and bizarre behaviors.  He was motivated to file his pretrial notice of intent to raise the insanity defense so as not to lose the opportunity for timely filing should further investigation reveal, after the time for filing notice to do so had expired, that the insanity defense needed to be asserted.  This strategic decision was made with the full knowledge of experienced counsel that such would open up the possibility that the State would be allowed to personally examine the defendant.

The reasons that trial counsel gave for the late filing of notice, and the state *habeas* court's findings and conclusions, are not inconsistent with the explanations given at the pretrial hearing. Petitioner has not rebutted the presumptive correctness of the trial court's findings by clear and convincing evidence.  *See* 28. U.S.C. § 2254 (e)(1); *Day v. Quarterman*, 566 F.3d 527, 540 (5th Cir. 2009).  The state court's decision that trial counsel's conduct was not ineffective was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court's holding in *Strickland*.  Petitioner's first claim for relief will denied.

**Second Claim for Relief**

In his second claim for relief, Petitioner contends that trial counsel was ineffective when he "opened the door" during cross-examination of State's expert witness Dr. Tynus McNeel which then allowed another State expert, Dr. Edward Gripon, the opportunity to personally interview Petitioner. As a result of the interview, Petitioner claims, Gripon "strengthened" his opinion that Petitioner presented a future danger to society. Petitioner also claims that trial counsel failed to limit the scope of the State's expert opinion, so that Gripon, who was called upon to testify about Petitioner's likelihood of being a future danger, also testified that Petitioner was not mentally retarded. In the findings of fact and conclusions of law issued by the state *habeas* court, the state court found that trial counsel was not ineffective and that the experts were entitled to a personal examination of Petitioner on the issues presented during trial. The question for this Court is whether the state court's decision that counsel provided effective assistance was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

During the State's punishment case-in-chief, McNeel testified that Petitioner would continue to commit criminal acts of violence that would constitute a continuing threat to society. While he reviewed many documents pertinent to the issue of Petitioner's likelihood of future dangerousness prior to forming his opinion, McNeel did not interview Petitioner. On cross-examination, Petitioner's trial counsel questioned McNeel about the lack of a personal interview with Petitioner. The State objected, arguing that trial counsel was hiding behind the Fifth Amendment right against self-incrimination in denying McNeel permission to interview Petitioner, and then inferring that it was improper for the expert to render an opinion on

6

Petitioner's future dangerousness without conducing an interview. Petitioner's counsel explained that he was merely denying access to Petitioner until he put the issue of future danger before the jury. Trial counsel told the court that he "understood the significance of asking the question" to McNeel and that he had no problem with Petitioner being interviewed at that point. Gripon interviewed Petitioner that evening and testified the following day during the State's rebuttal.

Relying on the United States Supreme Court decision in *Estelle v. Smith*, 451 U.S. 454 (1981), Petitioner argues that a criminal defendant who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence may be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. Petitioner further states that a defendant waives his Fifth Amendment privilege not to be compelled to a state-sponsored interview to determine future dangerousness only if the defendant submits his own expert testimony on the issue. *See Lagrone v. Texas*, 942 S.W.2d 602, 611 (Tex.Crim.App. 1997). Petitioner contends that he never proffered any expert testimony on future dangerousness and that his trial strategy focused on persuading the jury to answer "yes" to the mitigation special issue by demonstrating that Petitioner was mentally ill. As such, he reasons, the state court's finding that the experts were entitled to interview Petitioner on all issues presented is contrary to the holding in *Estelle*.

Petitioner's reliance on *Estelle* is misplaced. Unlike the defendant is *Estelle*, Petitioner put his mental status at issue before and during trial. Further, the state *habeas* court found that Petitioner and the State

had discussed exchange of information and exams relative to mental retardation with intent that if the [s]tate's experts agreed the defendant was mentally retarded that the [s]tate would withdraw its notice of intent to seek the death penalty. Based upon the agreement relative to waiver of the death penalty upon the [s]tate's confirmation of the mental retardation of the defendant, [trial counsel], agreed to allow the defendant to be examined by [s]tate's experts on the issue of mental retardation. [Trial counsel] knew that he intended to offer evidence of mental retardation during the trial based upon testing and personal interviews by his experts with the defendant and that therefore the [s]tate would eventually be allowed to conduct their own independent examination for trial purposes.

At the very least, Petitioner knew and agreed that the State's experts would have access to Petitioner on the subject of mental retardation. Additionally, Gripon testified about Petitioner's mental status only after Petitioner had presented testimony on the issue from two of his expert witnesses who had personally interviewed Petitioner. Even if there was no agreement between the parties, the State's expert would have been entitled to interview Petitioner on the subject of mental retardation.

As for the issue of future danger, it is significant that Gripon had testified extensively on this subject during the State's punishment case-in-chief. When Gripon testified during the State's rebuttal case, he stated that his opinion that Petitioner would be a future danger remained the same even after he interviewed Petitioner. In fact, Petitioner confirmed the truth of an incident involving a razor that occurred while he was in jail and that was pertinent to Gripon's opinion on future danger.

Assuming, *arguendo*, that trial counsel's conduct was deficient, Petitioner has not show that but for Gripon's testimony after he interviewed Petitioner, the jury would not have answered the special issues in such a way that Petitioner was sentenced to death. Prior to his rebuttal testimony, the jury had already heard Gripon testify that he believed there was a probability that Petitioner would continue to commit criminal acts of violence that constitute a continuing threat

to society. Gripon stated that he reviewed extensive documentation and materials related to Petitioner and the case in forming his opinion including offense reports, photos of the crime scene, as well as interviews and statements from people who knew Petitioner since his childhood. Gripon testified that in terms of the offense, the age of the victim, the multiple stabbings, beating, possible strangulation, and burning of the body all in the course of a property crime was "very significant" to forming his opinion on future danger. He further testified that Petitioner's apparent lack of remorse along with his conduct while incarcerated were probative to the issue of future danger. Gripon's rebuttal testimony on the subject was very limited in comparison to this testimony that he had already given.

Petitioner has failed to rebut the presumption of correctness afforded the state court's findings and conclusions on this claim. This court finds that the state court's decision that counsel provided effective assistance was not contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court in *Strickland* and *Estelle*. Petitioner's second claim will be denied.

**Third Claim for Relief**

In his third claim for relief, Petitioner contends that trial counsel was ineffective for failing to object to the expert testimony on future danger offered by McNeel and Gripon because it is still "hotly contested whether such evidence" is admissible. Trial counsel's failure to object to such testimony, Petitioner claims, precluded any meaningful review of this claim in state court. The state *habeas* court took "judicial notice of the admissibility of psychiatric testimony on the future dangerousness issue and . . . [found ] it helpful to the fact finder, admissible and within the legal standards for reliability . . . ." In determining that counsel was

not ineffective, the state court noted that trial counsel did not object to the experts' testimony on future danger because counsel was "well aware that the [s]tate has the right to offer expert mental health testimony regarding future dangerousness." Further, trial counsel did not request a hearing on the experts' qualifications "because he was well aware of their credentials and that they have been found to qualify as experts . . . in past capital murder trials." The question for this Court is whether the state court's decision that counsel provided effective assistance was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

Petitioner argues that the state court's decision was unreasonable because the record indicates that trial counsel believed that the State should not have the right to offer psychiatric or psychological evidence that Petitioner constituted a future danger. Trial counsel filed a Motion in Limine on the issue, which the trial court overruled. The court indicated that it would conduct an evidentiary hearing when the evidence was offered at trial, but because trial counsel did not object to the admissibility of the evidence, a hearing was never held. During the proceedings on the state writ, trial counsel inferred that he believed that ethical psychiatrists should not give an opinion on an individual's future dangerousness. While acknowledging that testimony about future dangerousness is admissible, citing the United States Supreme Court decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), Petitioner nevertheless urges that counsel should have been aware "that there was nothing to lose and much to gain by challenging that testimony in the chance that the Supreme Court will revisit and reject future dangerousness prognosticating as junk science incompatible with . . . *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." However, Petitioner contends, because trial

counsel failed to object to the testimony, if the Supreme Court finds expert opinion on future dangerousness unreliable or otherwise inadmissible one day in the future, the issue will not have been preserved in this case.

Petitioner's claim fails for several reasons. Initially, trial counsel's opinion regarding the validity of expert testimony on future dangerousness is irrelevant to the actual law on the admissibility of such testimony. Counsel's argument about what the law should be does not overcome the presumption of correctness afforded the trial court's findings that counsel knew the State had the right to offer the testimony and that the experts in this case were qualified. Second, the United States Supreme Court has never recognized a "nothing to lose" approach to ineffective assistance of counsel claims. *See Knowles v. Mirzayance*, 556 U.S. 111, 121-22 (2009). Rather, relief can only be granted if the state court decision unreasonably applied the standard established by the Supreme Court in *Strickland*. In the instant case, where the law allows the admissibility of expert testimony on future dangerousness and the experts were believed to be qualified, trial counsel was not ineffective in failing to object to their testimony. *See Kock v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (holding that counsel is not required to make futile motions or objections in the context of an ineffective assistance of counsel claim). Finally, Petitioner cannot establish prejudice. His suggestion that the Supreme Court may overrule *Barefoot* in light of *Daubert* is completely speculative. Arguing that trial counsel should have made an objection on the chance that the law might change sometime in the future to benefit his client cannot form the basis for *habeas* relief.

In light of the foregoing, this court finds that the state court's decision that counsel provided effective assistance was not contrary to, or an unreasonable application of, clearly

established federal law as determined by the United States Supreme Court in *Strickland*. Petitioner's third claim will be denied.

**Fourth Claim for Relief**

In his fourth claim for relief, Petitioner argues that his counsel was ineffective because counsel mistakenly believed that defense expert, Dr. Jim Patton, was not qualified to render an opinion that Petitioner was mentally retarded. Petitioner contends had counsel known Patton was in fact able to render an opinion, the witness would have provided further support for Petitioner's mental retardation claim. In its findings of fact and conclusions of law, the state court found that Patton's role for the defense was to testify about adaptive deficits, a prong of the state standard used to determine mental retardation. The state court determined that Patton was qualified to testify on adaptive deficits, and because that was the purpose of his testimony, the concern over whether Dr. Patton could diagnose mental retardation was never an issue at trial. The state court found no evidence of ineffective assistance of counsel. The question for this Court is whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

During trial, the State took Dr. Patton on *voir dire* and questioned him about his ability to diagnose mental retardation. The state court interrupted the prosecution and clarified with Petitioner's trial counsel that Dr. Patton's role was to discuss significant deficits in adaptive behavior and not to render an opinion on whether Petitioner was mentally retarded. Trial counsel confirmed that he was not going to ask Dr. Patton whether he diagnosed Petitioner with mental retardation. As such, Dr. Patton's qualification to give an opinion on mental

retardation is irrelevant. Petitioner has failed to overcome the presumptive correctness of the state court's findings that the sole purpose of Patton's testimony was to discuss Petitioner's adaptive deficits. It follows that trial counsel's decision not to question Dr. Patton about mental retardation was sound trial strategy and in no way amounted to deficient performance.

Petitioner attempts to show that he was prejudiced by counsel's conduct by arguing that had Dr. Patton testified that Petitioner was mentally retarded, Petitioner would have produced three experts in support of his mental retardation claim which would have proven, by a preponderance of the evidence, that Petitioner was in fact mentally retarded. This assertion is wholly conclusory. There is no method by which to gauge the weight the jury might have given a mental retardation diagnosis offered by Dr. Patton. Likewise, there is no magical equation which guarantees that testimony by three experts on any issue at trial satisfies proof by a preponderance of the evidence.[2]

The Court finds that the state court's decision that counsel was not ineffective in failing to recognize that Dr. Patton could have testified about mental retardation was not contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court in *Strickland*. Petitioner's fourth claim will be denied.

**Fifth Claim for Relief**

In his fifth claim for relief, Petitioner argues that his trial counsel was ineffective in failing to produce evidence of Petitioner's unsuccessful attempt to obtain his GED from the Literacy Council of Tyler. Petitioner claims that this evidence is highly probative to the issue

---

[2] Further, the record demonstrates that the trial court stated that it would not have allowed Dr. Patton to make a diagnosis of mental retardation.

of mental retardation. The state *habeas* court found that the Literacy Council records were available to the defense and that some of the records were admitted during trial. The state court further found that trial counsel made "a proper and strategic decision to not present" the evidence. The inquiry for this Court is whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

The state *habeas* court found that Nancy Crawford, head of the Literacy Council of Tyler, was subpoenaed by the prosecution during trial. She supplied the state with records reflecting that when Petitioner was twenty years old he read at a second grade level and his math ability ranked at a fifth grade level. While Crawford did not discuss the records with the defense team or testify at trial, the records were contained in the discovery and some records were admitted into evidence during trial. At the state hearing on *habeas corpus*, trial counsel explained that he was "aware of the defendant's Literacy Council records admitted during the testimony of Nancy Crawford at this hearing," but did not find the records significant in light of Petitioner's school records that were available for the same purpose. Trial counsel stated that there would not have been any harm in admitting the Literacy Council records, but that the defense team believed they had the "most significant information" at their disposal.

Petitioner takes issue with the state court's findings and conclusions, claiming that Petitioner's trial counsel was not aware that the Literacy Council records were actually admitted during trial. If trial counsel had no knowledge that the records were admitted, Petitioner argues, the record does not support the state court's finding that he was aware of the admission of the records but did not believe that they were significant. The admission status of

the Literacy Council records is irrelevant. Trial counsel knew about the records and made the strategic decision not to introduce them. "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983). Petitioner has not shown that trial counsel's conduct met that standard.

Petitioner has also failed to prove that he was prejudiced by any action trial counsel took or did not take with regard to the records. Petitioner contends that the Literacy Council records reflecting his poor test scores in math and reading lend validity to Petitioner's theory that his school records showing passing grades were deceiving and the result of "social promotion" rather than intellectual ability. However, trial counsel understood the limited value of the Literacy Council testing. He testified at the state *habeas* hearing that the Literacy Council's work with Petitioner was not directed at making a determination of his ability to learn. Crawford's testimony at the state *habeas* hearing confirms trial counsel's characterization of the Literacy Council testing noting that Petitioner was given an Adult Basic Education test which is "designed 'just to give a grade level so we can know where to start instruction'" toward a GED. The test environment is "'whatever space [was] available' and [Petitioner] could have even taken the test while sitting in a chair in the corner of a noisy room full of people." Petitioner has failed to demonstrate that had these records been introduced, the jury would have found Petitioner to be mentally retarded and ineligible for the death penalty.

The court finds that the state court's decision that counsel was not ineffective in failing to produce evidence of Petitioner's unsuccessful attempt to obtain a GED was not contrary to,

or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court in *Strickland*. Petitioner's fifth claim will be denied.

**Sisth Claim for Relief**

In his sixth claim for relief, Petitioner argues that trial counsel was ineffective in failing to object to the trial testimony of State punishment witness Steve Rogers. Rogers testified that inmates continue to act violently after sentencing to demonstrate that, even if given a life sentence, Petitioner would still constitute a continuing threat to society. In failing to object, Petitioner claims, trial counsel waived a compelling issue for appeal.

Respondent argues that Petitioner's claim is procedurally barred from federal *habeas* review because it was not fairly presented to the state court. Petitioner's state writ does not contain an ineffective assistance of counsel claim challenging Rogers's testimony, however, Petitioner did challenge trial counsel's failure to properly object to similar testimony from State witness Royce Smithey. In a footnote in his federal application for writ, Petitioner boldly asserts that "[b]oth the state writ of habeas corpus [sic] and trial court findings of fact and conclusions of law mistakenly replaced Rogers's name with Royce Smithy [sic], a different expert that rendered similar testimony." Petitioner is essentially claiming that, up to this point in all proceedings involving this claim, the parties inadvertently used the witness name Smithey but understood that Petitioner was actually challenging witness Rogers' testimony.

A federal court may not grant *habeas* relief unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Exhaustion requires that the prisoner "have fairly presented the substance of his claim to the state courts." *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997), *cert. denied*, 523 U.S. 1139 (1998). "It is not

enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless* 459 U.S. 4, 6 (1982). Where a "petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement." *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001). "Exhaustion 'requires a state prisoner to present the state courts with the same claim he urges upon the federal courts.'" *Id.* at 263 (*citing Picard v. Connor*, 404 U.S. 270, 276 (1971)). It is necessary, then, for this Court to examine Petitioner's state claim.

In his state writ, Petitioner's eighth claim challenges trial counsel's conduct as ineffective for "FAILURE TO PROPERLY OBJECT TO ROYCE SMITHEY'S TESTIMONY." The witness at issue is identified as "Royce Smithey, an investigator with the Special Prosecution Unit." Petitioner complained that Smithey "testified to specific instances whereby certain offenders by name, committed specifically described acts of violence in prison." While trial counsel objected to Smithey's testimony on the basis of relevance, Petitioner argued that counsel should have made an objection on the grounds that the Eighth Amendment requires individualized sentencing.

At the state writ hearing, Petitioner's state writ counsel questioned trial counsel about "prison expert" Smithey's testimony and characterized it as referring to "specific acts of violence committed by certain people, named people . . . ." Trial counsel claimed that Smithey's testimony was actually beneficial to the defense in that the witness' own documents showed that the State of Texas had put more people to death than were murdered in the Texas Department of Corrections. Trial counsel was attempting to demonstrate that the State of

Texas "turned out to be much more violent than the inmates it was housing." The document at issue was offered during Rogers's testimony. In its findings of fact and conclusions of law, the state *habeas* court addressed Petitioner's claim, noting that trial counsel "did not object to the testimony of . . . Royce Smithey regarding violence in prison, because he felt that it was more beneficial to the defendant than prejudicial." The state court noted that trial counsel "clearly showed that the State of Texas actually executed more prisoners than were killed by fellow inmates in prison." The state *habeas* court indicated incorrectly that trial counsel did not object to Smithey's testimony.

A careful review of the record supports Petitioner's theory that the state *habeas* proceedings misidentified State witness Rogers as Smithey. At the state *habeas* hearing it was clear that trial counsel was discussing his strategy with regard to witness Rogers, specifically noting that the witness' own documents, documents that were only introduced during Rogers's testimony, showed the number of executions by the State of Texas was higher than the number of murders in the Texas prison system. Furthermore, trial counsel did object to Smithey's testimony, but did not object to Rogers's testimony. The state *habeas* court's statement that counsel did not object to Smithey's testimony can lend support to Petitioner's argument that the witness names were interchanged.[3] Trial counsel did make the point, through his cross examination of Rogers, that "the State has executed five times more people than have been killed by other inmates in T.D.C."

---

[3] Trial counsel did object to Rogers's testimony on the grounds of hearsay when Rogers testified about another witness who the State intended to call.

Upon review of the trial testimony, state writ application, state *habeas* hearing, and the findings of fact and conclusions of law, the Court is satisfied that the claim was fairly presented to the state court. While it is clear that the state writ application did not properly raise the claim now before this Court, the testimony at the state *habeas* hearing and the state court's treatment of the claim in it's findings and conclusions satisfy the Court that the issue of trial counsel's failure to object to Rogers's testimony at trial was litigated at the state level.

Assuming, however, that the issue had not been fairly presented to the state court, the AEDPA allows a federal court to deny a *habeas* petition on its merits even if the claims it contains are unexhausted. *See* 28 U.S.C. § 2254(b)(2); *Rocha v. Thaler*, 626 F.3d 815 (5th Cir. 2010), *cert. denied,* 132 U.S. 397 (2011). In addressing the ineffective assistance claim on the merits, the inquiry, then, is whether counsel's performance was deficient and if so, had counsel performed competently, there is a reasonable probability that the result in the case would have been different. *See Strickland*, 466 U.S. at 687, 694.

As discussed above, trial counsel explained at the state *habeas* hearing that he did not object to the witness' testimony because he wanted to demonstrate through Rogers that the State of Texas executed more individuals than are killed by inmates housed in the prison system. Trial counsel believed that Rogers' testimony helped the defense show the jury that Petitioner would not be a future danger to other inmates if given a life sentence based on the statistics represented in the documents Rogers quoted. Petitioner challenges the state *habeas* court's decision that trial counsel practiced reasonable trial strategy by arguing that counsel's testimony at the *habeas* hearing that he believed the testimony beneficial was inconsistent with

his pre-trial motion *in limine* objecting to Rogers' testimony, as well as his objection to witness Smithey's testimony on the same subject matter.

Petitioner's argument is unpersuasive. The record shows that trial counsel took witness Smithey on *voir dire* at the beginning of the State's direct examination and then objected, albeit unsuccessfully, to his proposed testimony. The crux of trial counsel's objection was the generic nature of Smithey's testimony in that Smithey did not know anything about Petitioner specifically but could only testify about inmate violence in general. On cross examination, trial counsel questioned Smithey about rehabilitation in prison and the witness agreed with counsel that there is an opportunity for change. Trial counsel also demonstrated that Smithey could not specifically testify to how many incidents of prison violence were committed by capital offenders serving a life sentence, but the witness did indicate that the number was around ten in over a decade.

On cross-examination of Rogers, trial counsel pointed out to the jury that in 2006, the State of Texas carried out 20 executions, while the number of inmate homicides was 5-6 in that same year when there was an inmate population of over 150,000. He also demonstrated that less than 10 percent of the inmate population had a disciplinary conviction for assault, that there was less than one-tenth of one percent of cases of possession of a weapon by an inmate, and only 9 incidents where a guard had to draw a weapon. Trial counsel's strategy was to turn the statistics on prison violence in favor of the defense.

Based on the foregoing, the Court finds that trial counsel was not ineffective in failing to object to Rogers's testimony and that there is not a reasonable probability that had counsel objected, the outcome of the trial would have been different. Petitioner has failed to show that

the state court was unreasonable in concluding that counsel provided effective assistance on this claim.  Petitioner's sixth claim will be denied.

**Seventh Claim for Relief**

In his seventh claim for relief, Petitioner argues that trial counsel was ineffective for failing to investigate Petitioner's work duties as a cook at Kentucky Fried Chicken.  A proper investigation, Petitioner contends, would have refuted evidence put on by the prosecution that a cook was required to measure spices and cook chicken appropriately, duties which a mentally retarded individual could not fulfill.  The state *habeas* court rejected Petitioner's claim on the merits.  The inquiry for this Court is whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.

Petitioner asserts that the spice ingredients come pre-mixed and that all the cook must do is open the boxes, sift the ingredients together, and dredge the chicken.  Trial counsel's failure to controvert the prosecution's evidence regarding the cook's duties, Petitioner claims, mischaracterized the nature of Petitioner's job and left the jury with the impression that Petitioner did not lack adaptive functioning, one of the three prongs used to prove mental retardation.  The state *habeas* court found that trial counsel was fully aware of Petitioner's job duties at Kentucky Fried Chicken, but chose not to address the issue because he believed the jury would hear evidence that Petitioner was able to cook simple meals for himself.  Rather than focusing on the level of Petitioner's cooking skills, trial counsel's strategy was to use Petitioner's employment records to show that Petitioner was unable "to maintain steady employment even in 'low functioning jobs,' which his experts said was consistent with a

mentally retarded person."  In any event, defense witnesses Dr. Allen put the information at issue before the jury when he testified at the punishment phase that chain restaurants such as Kentucky Fried Chicken do not rely on the employees to add spices together, but that the spices are essentially pre-packaged.

Petitioner has failed in his burden to show that trial counsel's conduct in pursuing the strategy he chose with regard to this evidence was deficient, nor has he shown that he was prejudiced by trial counsel's conduct.  The state court's decision was not contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court's holding in *Strickland*.  Petitioner's seventh claim will be denied.

**Eighth Claim for Relief**

In his eighth claim for relief, Petitioner contends that trial counsel provided ineffective assistance in the punishment phase of trial by allowing Petitioner to admit to the trial court that he had possessed a razor while incarcerated in the Smith County Jail.  This admission was later read to the jury.  Petitioner asserts that the State's future dangerousness expert, Tynus McNeel, upon learning of the admission, testified that he believed Petitioner would be a future danger. Petitioner argues that but for his admission to possessing a razor while in jail and McNeel's testimony, the jury would not have found Petitioner to be a future danger.  This claim was raised in Petitioner's state writ.  The Texas Court of Criminal Appeals, adopting the state *habeas* court's findings of fact and conclusions of law, found that trial counsel was not ineffective and denied this claim on the merits.  The inquiry for this Court is whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.  *See* 28 U.S.C. § 2254(d)(1).

The state *habeas* court made several findings of fact regarding the incident at issue, and took judicial notice of testimony given at the evidentiary hearing on Petitioner's state writ. The state court found the following in reaching its conclusion that counsel was not ineffective in his representation of Petitioner. During the punishment phase of the trial, Petitioner became agitated during the testimony of a jailer who was involved in the razor incident. Trial counsel warned Petitioner to keep quiet, but Petitioner ignored his counsel's advice. Petitioner then made a profane outburst in front of the jury. The trial court recessed the jury and outside of the jurors' presence, admonished Petitioner to cease his disruptive behavior. Petitioner interrupted the trial court stating that he had something he wanted to tell the court. The trial court further admonished Petitioner, directing him to speak to his attorneys before he volunteered a statement. Trial counsel said he was given a moment to speak with Petitioner, which was not well reflected by the record. Counsel knew Petitioner was being disruptive, and after having lost control of Petitioner during the proceedings, counsel did not believe he had the right to confront the trial court in its efforts to regain control. After being admonished by the trial court, and advised by trial counsel not to speak, Petitioner volunteered to the trial court that he did possess a razor while in jail. Over counsel's objection, the trial court allowed Petitioner's statement to be read to the jury.

Petitioner argues that the state court's decision that trial counsel provided effective representation is based on an unreasonable determination of the facts outlined above in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2). The trial court's findings are presumed correct unless Petitioner can rebut them with clear and convincing evidence. In support of his position, Petitioner claims that trial counsel never lost control over Petitioner. Once the trial

23

court warned Petitioner to be quiet, he complied and apologized for his outburst. Further, Petitioner's request to speak to the trial court, which preceded his admission to having a razor, was separate from the issue of Petitioner's courtroom demeanor. After careful review of the record, the Court finds that Petitioner has failed to meet his burden of rebutting the trial court's findings with clear and convincing evidence.

At the state *habeas* hearing, trial counsel testified that during the testimony of the jailers who were involved in the incident with the razor, Petitioner became agitated and started mumbling "they're lying, they're lying." Trial counsel tried to get him to be quiet and settle down, but Petitioner would not listen to his attorneys. As the testimony continued, Petitioner became more vocal until he finally made a profane outburst. Once the jury was recessed and the trial court had admonished Petitioner to maintain decorum in the courtroom, Petitioner was determined to speak to the court. Again, trial counsel advised Petitioner to be quiet, but Petitioner "wasn't going to listen to what [counsel was] saying about not saying anything. He was bound and determined to say it, so he said it." This testimony supports the state *habeas* court's findings and Petitioner has failed to overcome the presumptive correctness of the state court's decision.

Petitioner has also failed to show either deficient performance or prejudice under *Strickland*. As for his professional conduct, the foregoing demonstrates that trial counsel did all he could to keep Petitioner quiet during the proceedings and to prevent him from making a statement to the trial court. Petitioner has not shown that trial counsel was deficient or unprofessional in how he advised Petitioner. Once an attorney counsels his client, it is

ultimately the client's choice whether to follow that advice. *See Canaan v. McBride*, 395 F.3d 376, 385 (7th Cir. 2005).

Furthermore, Petitioner has failed to demonstrate that trial counsel's conduct prejudiced his trial and resulted in a finding that Petitioner is a future danger. In addition to the razor incident, punishment phase testimony from various witnesses showed that Petitioner had been involved in several other disruptive events while in jail including being disrespectful and using profanity toward a female guard, a plan to fight with another inmate, an altercation with an inmate over a cup of coffee, a threat to slap a jailer, the discovery of a trustee jacket in Petitioner's cell, as well as a physical altercation with another inmate that required the other inmate to be taken to the jail clinic. McNeel testified that he was "riding the fence" as to whether he believed Petitioner was a future risk for violence, but when he considered the above testimony, the razor incident in addition to all of the other evidence, he formed the opinion that Petitioner does present a significant future risk of violence. McNeel specifically noted that the evidence brought out at the punishment phase showed Petitioner's anger, impulsive behavior, retaliation attempts, and lack of control and served to influence his ultimate determination that Petitioner is a future danger.

Petitioner has also failed to show prejudice resulting from Petitioner's admission or McNeel's testimony in regard to the jury's decision on future danger; there was other evidence which could have lead the jury to determine that Petitioner was a future danger. State expert Gripon opined that Petitioner was a future danger based on many factors including the violent nature of the crime in relation to Petitioner's goal of stealing from the victim. Gripon also considered Petitioner's conduct after the crime, how he tried to blame the murder on another,

then claimed someone forced him to commit the crime, and his apparent lack of remorse. Finally, Gripon considered Petitioner's past criminal history and conduct in prison in reaching his determination that Petitioner was a future danger.

Petitioner's inability to rebut the state court's fact findings, or to demonstrate either deficient performance or prejudice under *Strickland*, leads the Court to conclude that the state court's decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. §2254(d). Petitioner's eighth claim is denied.

**Ninth Claim for Relief**

In his ninth and final claim for relief, Petitioner states that he is mentally retarded and that the state court's determination otherwise is "contrary to and an unreasonable application of" the Supreme Court decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), and that the state court's decision was unreasonable in light of the evidence presented. In *Atkins*, the Supreme Court held that "death is not a suitable punishment for a mentally retarded person." *Id*. at 321. While the Supreme Court found that there was a national consensus opposing the execution of the mentally retarded, it recognized that there existed disagreement "in determining which offenders are in fact retarded." *Id*. at 317. Furthermore, the Court noted that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id*. The Court left to the states the task of formulating ways to comply with the constitutional restriction upon death sentences. *Id.*

Petitioner claims that the Texas Legislature has failed to enact legislation to define mental retardation in the death penalty context, as well as challenges the use of the Texas Court of Criminal Appeals' decision in *Ex parte Briseno*, 135 S.W.3d 1 (Tex.Crim.App. 2004), for determining mental retardation. Petitioner did not raise these issues on direct appeal to the state court or in his state application for post conviction relief, and therefore, his claim is unexhausted. *See* 28 U.S.C. § 2254(d)(2); *Rocha*. 626 F.3d at 820 ("[I]f the prisoner has never fairly presented that claim to the highest available state court, the claim is unexhausted.") A claim raising these issues was available to Petitioner at the time he filed his state writ of *habeas corpus*, and as such, an attempt to raise them now would be dismissed by the Texas Court of Criminal Appeals as an abuse of the writ. *See* Tex.Code Crim. Proc. art. 11.071 §5(a) and (c)(prohibiting consideration of subsequent state *habeas* application unless application contained specific facts establishing that claims presented could not have been presented in previous application because legal or factual basis was not available at time of previous application).

In any event, it is significant to note that the Fifth Circuit, in addressing challenges to the Texas Court of Criminal Appeals' analysis of mental retardation claims, has found that "the Court in *Atkins* explicitly stated that it left 'to the States the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences' . . . it would be wholly inappropriate for this court, by judicial fiat, to tell the States how to conduct an inquiry into a defendant's mental retardation." *See In re Johnson*, 334 F.3d 403, 405 (5th Cir. 2003). Absent additional direction from the United States Supreme Court, the Fifth Circuit continues to "decline to tell the state of Texas how to conduct its inquiry into a defendant's mental

retardation." *See Hearn v. Thaler*, 669 F.3d 265, 272 (5th Cir.), *cert. denied*, WL 2358716 (July 18, 2012). Petitioner has failed to demonstrate any constitutional violation in the Texas procedure for analyzing his mental retardation claim.

In addition to attacking Texas' procedure for analyzing mental retardation claims in general, Petitioner challenges the framework for determining whether a defendant is mentally retarded as set forth by the Texas Court of Criminal Appeals in *Briseno*. Specifically, Petitioner takes issue with the seven factors the *Briseno* court established to provide guidance to lower courts in handling *Atkins* claims arguing that they have "no basis in the science of mental retardation."

Texas follows the American Association on Mental Retardation (AAMR) definition of mental retardation as characterized by "(1) 'significantly subaverage' general intellectual functioning; (2) accompanied by 'related' limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." The *Briseno* court created the seven factors to assist the trier of fact in determining, within the framework of the AAMR definition of mental retardation, whether a particular defendant was in fact mentally retarded. In *Chester v. Thaler*, 666 F.3d 340 (5th Cir. 2011), the Fifth Circuit addressed a similar challenge to *Briseno*. Arguing that *Atkins* required state courts to apply the clinical definitions of mental retardation promulgated by the AAMR, the petitioner in *Chester* alleged that the Texas Court of Criminal Appeals' reliance on the *Briseno* factors for determining his mental retardation status, rather than the AAMR definition, was an unreasonable application of, and contrary to, the Supreme Court's decision in *Atkins*. The Fifth Circuit disagreed, reasoning that the *Briseno* court recognized that determining deficits in adaptive behavior (the second element of the AAMR

definition) was highly subjective. *See Chester*, 666 F3d at 346. "To account for these weaknesses in definition, the *Briseno* court listed seven factors to flesh out the AAMR definition to determine whether the convict falls within *Atkins* so as to be protected against the death penalty." *Id.* The Fifth Circuit explained that the *Briseno* factors were crafted as a means "of developing appropriate ways to enforce the constitutional restriction" set forth in *Atkins*, and concluded that "on their face, nothing about them contradicts *Atkins*. " *Id.* The court in *Chester* concluded that "the application of the *Briseno* factors, . . . cannot be an 'unreasonable application' of *Atkins'* broad holding." *Id.* at 347. By the same token, the *Chester* court held that the *Briseno* factors do not contradict *Atkins*. *Id.* The Court finds that Petitioner's challenge to the Texas Court of Criminal Appeals' use of the *Briseno* factors must fail.

Having found that the state court's determination that Petitioner was not mentally retarded is neither contrary to nor an unreasonable application of *Atkins*, the Court now considers whether the state court's holding that he was not mentally retarded is reasonable in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2). Petitioner's claim is considered through the AEDPA mandate that "relief may not be granted unless the decision was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." *Id.* Importantly, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." § 2254(e)(1); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). The issue of mental retardation is a factual determination. In the instant case, the state court's factual determination is presumed correct unless Petitioner rebuts it with clear and convincing evidence.

On direct appeal, Petitioner challenged the sufficiency of the evidence to support the jury's finding that he was not mentally retarded. The Texas Court of Criminal Appeals sifted through the voluminous record evidence presented at trial on the issue and summarized the testimony of experts and lay persons. After setting out the evidence submitted by both parties, the state court concluded that Petitioner had received a full and fair opportunity to establish his claim of mental retardation, and that "the jury made its determination that [he] is not mentally retarded based on the testimony of psychological experts from both sides in the field of mental retardation and others such as teachers, counselors and mental health providers." *Williams*, 270 S.W.3d at 132. Based on the record, the state court concluded that a finding that Petitioner "is not mentally retarded is not so against the great weight and preponderance of the evidence as to be manifestly unjust." *Id.*

Petitioner challenges the Texas Court of Criminal Appeals' finding by addressing the three criteria for mental retardation. First, he points out that two of his experts, Dr. McClure and Dr. Allen, both tested Petitioner and obtained IQ results under 70. He also notes that State witness Dr. Proctor tested Petitioner and found his IQ to be 71 on one test and 70 on another. Taking into account a measurement error of plus or minus five points, Petitioner states that his true IQ could be as low as 65. Petitioner next challenges the finding by stating that Dr. McClure, Dr. Allen, and an additional defense witness, Dr. Patton, all testified that Petitioner had adaptive deficits in multiple categories. Petitioner claims that the State's position that he had adequate living skills because he worked as a cook at Kentucky Fried Chicken was misguided because "little thinking is required" to work as a cook at that restaurant. Finally, Petitioner states that there is no evidence that he was injured or impaired as an adult, and that

30

Dr. McClure's testimony conclusively established onset of his disability before age 18.

While Dr. Allen testified that the results of his IQ tests showed Petitioner scored below 70, the state *habeas* court found that Dr. Allen was not a credible witness and that his opinions were biased. The jury heard evidence that could have caused it to question the reliability of the lower IQ test scores including less than ideal testing conditions and Petitioner's incentive to test low to obtain eligibility for social security benefits. Dr. Proctor gave Petitioner a total of five IQ tests with scores of 70, 71, 73-74, 78, and 83. Even with the five point measurement error, Petitioner scored above 70 on two of the tests. With regard to adaptive deficits, the Texas Court of Criminal Appeals' found that the "jury could . . . have reasonably found that any deficits [Petitioner] had in adaptive behavior where not within the range of mental retardation." Dr. Proctor testified that Petitioner did have deficits in adaptive behavior, but not significant to qualify in the mentally retarded range. Petitioner has offered nothing to contradict this finding. Petitioner has also failed to rebut no onset prior to age 18. This Court would be hard pressed to agree that Dr. McClure conclusively established anything with his testimony in light of the fact that Petitioner misrepresented and misled McClure concerning his background during Petitioner's interview for benefits.

Petitioner falls far short of his burden of showing by clear and convincing evidence that the state court's determination was unreasonable. While a different factfinder might have reached a different conclusion on mental retardation, the AEDPA requires this Court to review the proceedings to determine only whether Petitioner presented clear and convincing evidence that rebuts the presumption that the state court's determination was correct. *See* 28 U.S.C. §2254(e)(1). It was not unreasonable for the Texas Court of Criminal Appeals to determine

that the jury could have found that Petitioner was not mentally retarded in light of the evidence presented at trial.

In addition to these challenges to the Texas death penalty scheme, Petitioner argues that the jury instructions in his case were incomprehensible and inadequate to provide a framework for determining whether he was mentally retarded. Petitioner claims that the jury could not be expected to understand "the trial judge's explanation of standard deviations, means and percentiles in the context of a mental retardation analysis." He further claims that the instructions omitted critical components of the analysis such as a common sense definition of an adaptive deficit, a list of categories of functioning in which adaptive behavior may be deficient, an explanation of the intelligent quotient component, or a framework for determining onset before age 18.

On direct appeal, Petitioner argued that the trial court improperly rejected his proposed jury instructions. The Texas Court of Criminal Appeals found that the defense did not request any mental retardation jury instructions, and in fact, stated that it had no objection to the proposed punishment charge, which included the mental retardation instruction at issue. The state court, however, chose to address Petitioner's challenge to the instructions given as "arcane and almost incomprehensible," concluding that it disagreed with Petitioner's characterization of the instructions. Specifically, the state court found that the instructions were not inconsistent with either *Briseno* or the AAMR definition of mental retardation. The state court reasoned that the testimony presented at trial on the issue of Petitioner's mental retardation, as well as the parties' closing arguments, demonstrated that the issue was submitted to the jury under the appropriate standards set forth in *Briseno* and the AAMR. The

inquiry for this Court is whether the state court decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.  *See* 28 U.S.C. § 2254(d).

In *Boyde v. California,* 494 U.S. 370 (1990), the petitioner complained about the ambiguous nature of a factor listed in the jury charge that the jurors were to consider in imposing a death sentence.  The factor at issue instructed jurors to take into account "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."  The petitioner argued that the factor prevented the jury from giving effect to mitigating evidence that was not related to the crime.  *Boyde*, 494 U.S. at 378.  The Supreme Court held that the legal standard for reviewing claims alleging that a jury instruction is ambiguous, and therefore subject to erroneous interpretation, is whether there is a reasonable likelihood that the jury has applied the challenged instruction in such a way that prevents the consideration of constitutionally relevant evidence.  *Id*. at 380.  The *Boyde* Court stated that even if the instruction was not as clear to the jury as the Court believed it to be, the context of the proceedings would have led reasonable jurors to believe that evidence of the petitioner's background and character could be considered.  *Id*. at 383.  The Court reasoned that the amount of evidence relating to the petitioner's background and character, coupled with the instruction that the jury "shall consider all of the evidence which has been received during any part of the trial," would have overcome any restraint jurors might have implied from the factor as presented in the charge.  *Id.* at 383-84.

In the instant case, as in *Boyde*, there was extensive evidence offered at trial which was the subject of the challenged jury instruction. The Texas Court of Criminal Appeals correctly noted the large amount of evidence presented to jurors regarding mental retardation, as well as the arguments of both parties on the subject, and the matter was clearly before the jury. There were over six volumes of testimony on the issue of Petitioner's mental retardation, comprising nearly 1,900 pages, excluding exhibits. Further, as in *Boyde*, the jury here was instructed to consider *all* of the evidence admitted during the trial in determining Petitioner's mental retardation status. Contrary to Petitioner's claim, it is unlikely that the jurors were unaware of the *Briseno* factors merely because they were not included in the instructions. The state court's decision that the mental retardation issue was submitted to the jury under the appropriate standards set forth in *Briseno* and the AAMR was a reasonable application of clearly established federal law as determined by the United States Supreme Court in *Atkins* and *Boyde*. *See* 28 U.S.C. § 2254(d). Petitioner's ninth claim for relief will be denied.

The Court has carefully reviewed all of Petitioner's claims and has found that the state court did not reach a decision that was contrary to or an unreasonable application of clearly established Federal law or that was based on an unreasonable determination of the facts in light of the evidence presented to the state court. Petitioner's application for a writ of *habeas corpus* will be denied. An order and judgment will be entered.

So **ORDERED** and **SIGNED** this **26** day of **March, 2013.**

Ron Clark, United States District Judge

34